## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WAVERLEY VIEW INVESTORS, LLC,     )
          )
        Plaintiff,     )
          )
     v.     )     No. 15-371L
          )     Judge Susan G. Braden
UNITED STATES OF AMERICA,     )
          )
        Defendant.     )
_____)

## PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT ON DEFENDANT'S LIABILITY AND MEMORANDUM IN SUPPORT

Clifford J. Zatz (Attorney of Record)
R. Timothy McCrum (Of Counsel)
Dawn K. Miller (Of Counsel)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:   (202) 624-2500
Facsimile:   (202) 628-5116

April 17, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. II

PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT ON
      DEFENDANT'S LIABILITY AND MEMORANDUM IN SUPPORT ......................... 1

STATEMENT OF THE QUESTION PRESENTED ................................................... 3

STATEMENT OF THE CASE / UNDISPUTED MATERIAL FACTS .................... 4

I.      WVI'S OWNERSHIP OF THE WAVERLEY VIEW PROPERTY AND
      APPROVED PLANS FOR RESIDENTIAL DEVELOPMENT .................................... 4

II.     DEFENDANT'S DEMANDS FOR ACCESS TO AND USE OF THE
      WAVERLEY VIEW PROPERTY ....................................................................... 5

      A.     Purpose of Government's Access Demands ......................................... 5

      B.     The Government's Unrelenting Demands for Access to the
            Waverley View Property ....................................................................... 6

      C.     Compelled Right-of-Entry for Government Access to and Use of
            the Waverley View Property ................................................................. 8

III.    DEFENDANT'S PERMANENT PHYSICAL OCCUPATION OF THE
      WAVERLEY VIEW PROPERTY ..................................................................... 10

IV.    DEFENDANT'S OPEN-ENDED PLANS FOR CONTINUED
      OCCUPATION OF THE WAVERLEY VIEW PROPERTY ...................................... 12

V.     WVI'S NEED FOR EXPEDITIOUS CONSIDERATION AND RELIEF ................... 13

STANDARD OF REVIEW ................................................................................. 14

ARGUMENT .................................................................................................... 14

I.      DEFENDANT'S INSTALLATION AND SERVICING OF
      GROUNDWATER MONITORING WELLS AND OTHER RELATED
      ACTIVITIES ON WVI'S PRIVATE PROPERTY CONSTITUTE A *PER
      SE* TAKING ................................................................................................. 15

II.     DEFENDANT'S LIABILITY IS NOT NEGATED BY THE RIGHT-OF-
      ENTRY. ......................................................................................................... 18

CONCLUSION .................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applegate v. United States,*
35 Fed. Cl. 406 (1996) .........................................................................14

*Boise Cascade Corp. v. United States,*
296 F.3d 1339 (Fed. Cir. 2002).................................................15, 17, 20

*FCC v. Florida Power Corp.,*
480 U.S. 245 (1987) .............................................................................19

*Gutierrez v. Guam Power Auth.,*
2013 Guam 1, 2013 WL 212277 ...........................................................17

*Hendler v. United States,*
952 F.2d 1364 (Fed. Cir. 1991)...................................................... *passim*

*John R. Sand & Gravel Co. v. United States,*
457 F.3d 1345 (Fed. Cir. 2006), *aff'd on other grounds,* 552 U.S. 130 (2008).......................15

*Juliano v. Montgomery-Otsego-Schoharie Solid Waste Mgmt. Auth.,*
983 F. Supp. 319 (N.D.N.Y. 1997) ..................................................19, 20

*Kimball Laundry Co. v. United States,*
338 U.S. 1 (1949) .................................................................................20

*Lingle v. Chevron U.S.A. Inc.,*
544 U.S. 528 (2005)..............................................................................15

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982)....................................................................14, 15, 18

*Lucas v South Carolina Coastal Council,*
505 U.S. 1003 (1992).............................................................................18

*McKay v. United States,*
199 F.3d 1376 (Fed. Cir. 1999).........................................................1, 17

*Otay Mesa Property, LP v. United States,*
670 F.3d 1358 (Fed. Cir. 2012).............................................................18

*Scogin v. United States,*
33 Fed. Cl. 568 (1995) .....................................................................17, 20

*United States v. General Motors Corp.*,
   323 U.S. 373 (1945)...................................................................20

*United States v. Grizzard*,
   219 U.S. 180 (1911)...................................................................18

*United States v. Petty Motor Co.*,
   327 U.S. 372 (1946)...................................................................20

*Yee v. City of Escondido*,
   503 U.S. 519 (1992)...................................................................19

## Constitutional Provisions

U.S. Constitution, Fifth Amendment .................................................. *passim*

## Statutes

42 U.S.C. § 9620(e) ........................................................................6

## Rules

Court of Federal Claims Rule 56(a)...................................................3, 14

## Other Authorities

74 Fed. Reg. 16,126, 16,130 (Apr. 9, 2009) ......................................6

Robert Meltz, *United States Court of Federal Claims 27th Annual Judicial
   Conference — Substantive Takings Law: A Primer* 36 (2014), *available at*
   http://www.uscfc.uscourts.gov/conferences/2014/files/downloads/Property%2
   0Panel/Article/Meltz%20Takings%20Law%20Summary.pdf. ...............................14

## PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT ON DEFENDANT'S LIABILITY AND MEMORANDUM IN SUPPORT

Plaintiff Waverley View Investors, LLC ("WVI") hereby moves the Court for summary judgment on the defendant federal government's liability for a taking of WVI's real property without just compensation. Plaintiff further requests that the Court allow briefing and resolution of the motion to go forward without delay while Defendant answers the complaint and seeks discovery relevant to the issue of damages.

The facts of this case present a classic *per se* taking. The government entered upon WVI's private real property and drilled a series of groundwater monitoring wells as part of the government's investigation of the U.S. Army's contamination of the adjacent Ft. Detrick Army base. The government's monitoring wells remain on WVI's property, with no end to this occupation in sight. WVI never freely and voluntarily consented to such access and use of its property, and the government never compensated WVI for such access and use.

The Federal Circuit has held uniformly that the government's installation and servicing of groundwater monitoring wells on private property without just compensation constitutes a taking. *See Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991); *McKay v. United States*, 199 F.3d 1376, 1381-82 (Fed. Cir. 1999). Because there is no question that the government, through its agents, has physically occupied WVI's private property with its monitoring well installations and activities, and in light of the urgent and devastating financial pressure on WVI to obtain timely relief, WVI respectfully requests that the Court allow briefing of this motion to proceed in order to expedite its review of this motion and grant WVI summary judgment on liability. The Court should hold Defendant liable for taking WVI's property in violation of the Fifth Amendment, with just compensation due in an amount to be determined through subsequent proceedings.

1

It is plainly within this Court's power to control the timing and disposition of its docket in a way the best serves both the interests and resources of the Court and the interests of justice. Under the circumstances of this case, and with due regard for the Court's considerable docket and competing obligations,[1] Plaintiff respectfully requests that the Court facilitate further briefing and a decision on the instant motion for summary judgment as expeditiously as possible.

The government will undoubtedly argue that the Court should not consider the motion for summary judgment before it has answered the complaint and taken discovery. No further factual development is required, however, for the Court to rule on the issue of liability. Specifically, there is no genuine dispute:

- that WVI owns the property;

- that the government entered the property and installed and serviced groundwater monitoring wells;

- that those monitoring wells remain on the Waverley View property, notwithstanding expiration of the Right-of-Entry ("ROE"); and

- that the government has never offered WVI just compensation for its occupation of the property.

*See* Statement of the Case, *infra*. Moreover, evidence related to the government's demands for access to the Waverley View property, the terms of the ROE, and the government's activities on the Waverley View property – including correspondence with the government, presentations, and other public materials produced by or sent to the government or its agents – is inherently within

---

[1] Based upon the recent status conference, Plaintiff recognizes that this Court may be unable to address this motion for two to three months. However, full briefing of this motion can occur within that time frame to enable the Court to then rule upon the fully briefed motion.

the possession of Defendant.  *See generally* Exhibits to attached Declaration of John W. Anderson (March 3, 2015) ("Anderson Decl.").

Thus, irrespective of whatever discovery may be needed to litigate other issues in this case, there is no basis for the Court to suspend briefing or defer consideration of Plaintiff's motion for summary judgment on liability under the standard set by this Court's rules.  *See* RCFC 56(a), (d) ("The court *shall* grant summary judgment if the movant shows that there is *no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of law"; the court "may" defer summary judgment or allow time for discovery *only* "[i]f a nonmovant shows by affidavit or declaration, for specified reasons, it *cannot present facts essential to justify its opposition*") (emphasis added).  Simply put, there are no legal or practical barriers to briefing and resolution of the narrow liability issue presented here.  With sixty days to answer the complaint – a complaint nearly identical to the one it was served with nearly nine months ago − the government can surely respond to this motion at the same time.

Equitable considerations reinforce the need for expeditious resolution of this motion. Plaintiff WVI is a small business.  Statement of the Case, ¶ 35, *infra*.  The devastating damages due to the Defendant's ongoing occupation of the Waverley View property, including over half a million dollars in annual carrying costs, continue to mount with each day that WVI remains in legal limbo, prevented from developing substantial portions of its property or otherwise realizing any return on its investments.  *See id*. ¶¶ 35-36.  This financial position, of course, cannot be sustained indefinitely.  Anderson Decl. ¶ 41.  It is thus critical that resolution of the narrow issues presented in this motion proceed without delay or interruption.

## STATEMENT OF THE QUESTION PRESENTED

The question presented here is whether Defendant's long-term, open-ended physical occupation of WVI's property – including the government's drilling, installation, and servicing

of groundwater monitoring wells, construction of access roads and gates, and other access to and use of the property – makes Defendant liable to WVI for taking its private property without just compensation.

## STATEMENT OF THE CASE / UNDISPUTED MATERIAL FACTS

The Fifth Amendment to the U.S. Constitution states, in relevant part, "nor shall private property be taken for public use, without just compensation." Upon the undisputed facts presented below, WVI alleges a *per se* taking of private property without just compensation, in violation of the Fifth Amendment. Compl. ¶¶ 52-59 (July 30, 2014) [Doc. 1].[2]

### I. WVI'S OWNERSHIP OF THE WAVERLEY VIEW PROPERTY AND APPROVED PLANS FOR RESIDENTIAL DEVELOPMENT

1. Plaintiff WVI is the fee simple title owner of 92.8 acres of undeveloped land located at 1831 Shookstown Road, Frederick, Maryland, 21702. *See* Anderson Decl. ¶¶ 5, 7 & Exhibit 2.

2. WVI acquired this real property on November 15, 2012, and like its predecessors before it, planned to establish a residential development on the property to be known as Waverley View. *Id.* ¶¶ 7, 10.

3. The property is approved by The City of Frederick, Maryland, to be subdivided into approximately 732 residential lots, to be developed in two phases, known as Phase I and Phase II. *Id.* ¶ 13 & Exhibit 7.

4. Much work has been undertaken, and millions of dollars spent, to obtain the necessary permits and approvals for the highly valuable intended use of the Waverly View

---

[2] WVI's complaint also includes a claim of temporary taking in the alternative. Compl., Count II, ¶¶ 60-70. Because the facts and relevant precedent support summary judgment for WVI under a *per se* taking theory, WVI does not address its alternative claim in this motion.

property.  *Id*. ¶¶ 11-12.  A consultant to WVI's predecessor also conducted an environmental site characterization, resulting in June 2005 in a "No Further Requirements Determination" from the Maryland Department of the Environment, providing that there were "no further requirements related to the investigation of controlled hazardous substances" on the Waverley View property, so long as it was used for limited residential, commercial or industrial purposes.  *Id*. ¶¶ 14 & Exhibit 8.

5.      Preliminary plan approvals were obtained from The City of Frederick in 2002 and 2005, followed by numerous other approvals for development of the residential community.  *Id*. ¶ 12.

6.      At the behest of WVI's lender Eagle Bank, a real estate valuation and investment counseling firm, CL Group, LLC, conducted an inspection and appraisal of the Waverley View property.  It valued the property at $12.8 million as of December 4, 2012.  *Id*. ¶ 9 & Exhibit 6a. A second inspection and appraisal of the Waverley View property, also upon request by WVI's lender, and dated February 11, 2015, valued the property at $14.735 million, under the express "hypothetical condition" that the property "is free of environmental contamination and can be developed as described …."  *Id*. ¶ 9 & Exhibit 6b.

## II.    DEFENDANT'S DEMANDS FOR ACCESS TO AND USE OF THE WAVERLEY VIEW PROPERTY

### A.    Purpose of Government's Access Demands

7.      Defendant's demands for access to the Waverley View property arose from its ongoing investigation of environmental contamination at the U.S. Army's installation at Fort Detrick, which borders the Waverley View property to the north and east.  *Id*. ¶¶ 6, 15-16 & Exhibit 1.

8.     Fort Detrick was the historical "proving ground in the Army's biological warfare program." *Id.*, Exhibit 9 (Fort Detrick Federal Facility Agreement) at §§ 6.3-6.4.  Unlined, unmarked trenches and burial pits at a location known as "Area B," immediately adjacent to the Waverley View property, served as the "primary location for Fort Detrick's waste management activities" and, as such, were used to dispose of a variety of biological, radiological, and chemical materials over the course of the 1950s to 1970s.  *Id.*, Exhibit 9 at § 6.4.

9.     In April 2009, as a consequence of these past disposals, the U.S. Environmental Protection Agency ("U.S. EPA") added "Fort Detrick Area B Ground Water" to the National Priorities List ("NPL"), thereby designating the site as a Superfund site in need of remedial investigation, study, and potential remedial action, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9620(e). *See* 74 Fed. Reg. 16,126, 16,130 (Apr. 9, 2009).

10.     In December 2010, EPA entered into a Federal Facility Agreement with the U.S. Department of the Army, establishing provisions and timetables for remedial investigation and cleanup of contamination at Fort Detrick, including Area B groundwater.  Anderson Decl. ¶ 15 & Exhibit 9.

**B.     The Government's Unrelenting Demands for Access to the Waverley View Property**

11.     Beginning in the spring of 2011, WVI and its predecessor began to receive government demands for access to and use of the Waverley View property.  On May 5, 2011, agents of the U.S. Army Corps of Engineers contacted WVI's predecessor seeking access to the Waverley View property for purposes of investigating potential groundwater contamination originating at the adjacent Fort Detrick property.  *Id.* ¶ 16 & Exhibit 10.

12.     WVI's predecessor responded by letter on May 9, 2011, questioning the need for access to the property and supplying records of the already extensive environmental investigation that had previously taken place on the Waverley View property.  *Id*. ¶ 17 & Exhibit 11.

13.     Not backing down, the government renewed its access request by letter dated October 17, 2011 and sought a meeting with WVI's predecessor.  *Id*. ¶ 18 & Exhibit 12.  WVI's predecessor met with representatives of the U.S. Army Corps of Engineers, Fort Detrick, and their consultants on November 16, 2011.  *Id*. ¶ 19.  At this meeting, the government informed WVI's predecessor that it had discovered trichloroethylene ("TCE") contamination nearby on Fort Detrick and that, as a result, it needed blanket access to the WVI property for at least two years.  *Id*.

14.     Again in 2012, WVI's predecessor continued to receive requests for access to, and use of, the Waverley View property, including requests to install and operate groundwater monitoring wells on the Waverley View property.  *See id*. ¶¶ 20-22 & Exhibits 13 (Feb. 7, 2012 letter), 14 (Oct. 23, 2012 letter), and 15 (Nov. 8, 2012 letter).

15.     At no point did the government offer compensation for access to and use of the property, and at no point did WVI or any of its predecessors ever consent to such access and use.  *See id*. ¶¶ 17-22, 26 & Exhibits 11-15.

16.     Finally, on February 8, 2013, after having obtained the necessary approvals for the property's development and at the time of scheduled hearings before the City regarding the planned development, WVI received a letter from EPA, "strongly urg[ing]," under threat of CERCLA enforcement and liability, that WVI consent to the Army's access to the property "to install groundwater monitoring wells and perform sampling as part of that remedial investigation."  *Id*. ¶ 23 & Exhibit 16.  The letter detailed at length the U.S. government's

authority under CERCLA section 104(e) to conduct activities on the Waverley View property and the government's various avenues of enforcement to obtain access to the property. *Id*. It also asserted that any continued denial of access would strip WVI of the "contiguous properties" defense to CERCLA liability. *Id*.

**C.**    **Compelled Right-of-Entry for Government Access to and Use of the Waverley View Property**

17.    Under coercive threat of enforcement and liability, WVI entered into an 18-month "Right-of-Entry for Environmental Assessment and Response" ("ROE") with the federal government "pursuant to [the government's] response and enforcement authority and responsibilities under [CERCLA]." *Id*. ¶ 27 & Exhibit 17. The ROE became effective on May 14, 2013 and expired by its own terms on November 13, 2014. *Id*.

18.    The ROE extended to "approximately thirty-four and three quarters (34.75 ±) acres" on that part of the property known as "Phase II" (south of Fort Detrick and constituting nearly 40% of the entire Waverley View property) and permitted agents of the government to enter and use the property for purposes of:

- "[e]valuation, logging, surveying, measuring, and testing of [four] existing wells … on the land affected by the right-of-entry, including regular access during the groundwater tracer study (e.g., weekly, biweekly, or monthly for the duration of the study and/or right-of-entry period)";

- "[d]rilling, logging, and borehole testing …, including rig access to each drill area, monitoring well construction (multiple), surveying, measuring, and testing of completed wells for the duration of the right-of-entry period"; and

- "[a]ccess to any streams, seeps, springs, or other surface water features that may exist on the land affected by the right-of-entry for surveying, monitoring, and sampling, including

regular access during the groundwater tracer study; and access for placement of samplers, gauges or other devices…."

*Id*., Exhibit 17, ¶ 6 & Appendix A.

19.     In addition, the government asserted the right, with three days' notice, "to store, move, and remove equipment and supplies; investigate and collect samples …; construct, operate, maintain, alter, repair, and remove groundwater monitoring wells, appurtenances thereto, and other devices for the monitoring of contamination in soil, air, and water; and, perform any other such work which may be necessary and incident to the Government's use for the investigation and determination of need for response on said lands …." *Id*., Exhibit 17, ¶¶ 1-2.

20.     The ROE did not provide any compensation to WVI in exchange for the government's access to and use of the Waverley View property.  The ROE did, however, expressly reserve WVI's rights to assert legal claims under the U.S. Constitution's Takings Clause.  *Id*., Exhibit 17, ¶ 5.

21.     WVI did not freely consent to the ROE.  Although the government originally asked WVI to accept a draft ROE reciting that WVI "freely and voluntarily" granted access to the property, WVI declined to do so and contemporaneously reaffirmed by letter dated May 24, 2013 that it "could not accept [that] proposed text … because all of the negotiations concerning such demanded access were conducted within the coercive context of [the government's] significant enforcement authorities under the CERCLA statute."  *Id*., ¶ 28 & Exhibit 18.  In light of EPA's threats of substantial penalties and CERCLA liability, WVI confirmed that it would not interfere with Defendant's assertion of its CERCLA access authority—but was "not freely and voluntarily granting this access."  *Id*.

## III.   DEFENDANT'S PERMANENT PHYSICAL OCCUPATION OF THE WAVERLEY VIEW PROPERTY

22.     Agents of the government have entered onto the Waverley View property and have physically occupied that property. *Id.* ¶ 29. They have installed a gate and gravel access roads, drilled into the land, and constructed and serviced both shallow and deep groundwater monitoring wells, spread across Phase II of the Waverley View property. *Id.* ¶¶ 30-33, 36 & Exhibit 21, Slide 9 (map of monitoring well installations).

23.     Public briefings on the status of the government's investigative and remedial activities, prepared by the government's contractor performing the work, document the substantial nature and extent of Defendant's drilling and sampling activities on the Waverley View property. *Id.* ¶ 32 & Exhibits 19-22. Beginning in December 2013 and extending into November 2014, Defendant (through its contractors) drilled, serviced, and sampled a series of four permanent monitoring wells ranging from 142 feet to 400 feet deep,[3] *id.* ¶¶ 31, 33, 36, identified as follows:

| Monitoring Well | Depth |
|---|---|
| Waverley 1 | • Drilled to 177 ft. below grade ("BG")<br><br>• Well screened (constructed) to 145-155 ft. BG |
| Waverley 2 | • Drilled to 142 ft. BG<br><br>• Well screened (constructed) to 86-91 ft. BG |
| Waverley 3 | • Drilled to 161 ft. BG<br><br>• Well screened (constructed) to 100-115 ft. BG |

---

[3] An additional boring drilled to 218 ft. below grade ("BG") (designated as Waverley 4) was abandoned upon experiencing borehole collapse and encountering major voids and sinkhole concerns. Anderson Decl. ¶ 33 & Exhibit 19, Slide 13.

| Waverley 5s and 5d | • Drilled to 400 ft. BG |
|---|---|
| | • Well screened (constructed) to two monitoring points at 225-235 ft. (WVLY5s) and 347-377 ft. (WVLY5d) |

*See id.*, Exhibit 21, Slide 7; *see also id.*, Exhibit 22, Slides 9, 12-14, 16 (further description of deep monitoring well installations as of July 2014).

24.     Installation of the wells called for the use of stainless steel risers and screen materials, grouted cement casings, as well as other construction features occupying both surface and below-ground property.  *See id.*, Exhibits 20-22.

25.     Geological conditions underlying the property complicated the drilling process, such that significant volumes of sediment and other investigation derived waste ("IDW") were generated.  *See id.*, Exhibit 22, Slides 3, 9, 13.

26.     Defendant's contractors eventually established permanent monitoring points at each of four wells (Waverley 1-3 and 5), a process that requires installation of grout (cement) followed by pumping and surging at the location to remove silt and fine-grained material from the screen area.  *Id.*, Exhibit 20, Slide 17; *see also id.*, Exhibit 21.  Initial sampling from these permanent monitoring points yielded findings of contamination far above federal Safe Drinking Water Act Maximum Contaminant Levels ("MCLs") at the well nearest the property line (Waverley 1).  *Id.* ¶ 34 & Exhibit 21, Slides 10-11; *see also id.*, Exhibit 23 (test results from permanent sampling points).

27.     In addition to drilling these deep monitoring wells, Defendant, through its agents, drilled and sampled from 11 shallow wells on the property, with borings to approximately 50 feet.  *Id.* ¶ 33 & Exhibit 20, Slide 11.  Four of these 11 locations, located near the property line, showed contaminant levels exceeding the MCLs.  *Id.* ¶ 35 & Exhibit 20, Slides 12-13.

According to a public presentation by Defendant's contractors' from November 2014, a recommendation has been made to convert these four wells into permanent sampling points. *Id*., Exhibit 20, Slides 13, 33; *see also id*. Exhibit 21, Slide 27.

28.     In addition to the physical occupation of the groundwater monitoring wells on the property, Defendant's drilling and sampling activities have required that its agents have regular access to the property. *Id*. ¶ 30.  To this end, Defendant's contractors installed gravel roads and a gate on the property, by which Defendant's agents, their vehicles, and other government equipment have accessed the various drilling and monitoring locations.  *Id*.

29.     The ROE expired on November 13, 2014. *Id*. ¶ 27.  Defendant's monitoring wells, gravel roads, and gate have not been removed and continue to occupy the property.  *Id*. ¶ 36.

## IV.     DEFENDANT'S OPEN-ENDED PLANS FOR CONTINUED OCCUPATION OF THE WAVERLEY VIEW PROPERTY

30.     The government's most recent correspondence with WVI confirms that Defendant intends to conduct further investigative and remedial activities on the Waverley View property, and that the monitoring wells installed on the Waverley View property, including the well bores, casings, and other appurtenances to the wells, will remain on the property for the foreseeable future.

31.     On February 5, 2015, EPA's Acting Associate Director for the Office of Federal Facility Remediation and Site Assessment wrote to counsel for WVI seeking renewal of the ROE and "urg[ing] WVI to continue to provide access [to the Waverley View property] to the Army...." *Id*. ¶ 37 & Exhibit 24.  In doing so, the letter reiterates the government's substantial access and response authorities under CERCLA and renews the government's earlier threats of enforcement and liability should WVI deny continued access to the property.  *Id*.

32. The government has provided no definitive timetable for the completion of its intended activities on and use of the Waverley View property. In the letter, EPA confirms that, in addition to the drilling and sampling already conducted on the Waverley View property, "*much remains to be done with regard to the continuing [Remedial Investigation] of the groundwater plume*" from Fort Detrick. *Id.*, Exhibit 24 at 1 (emphasis added). As to when this additional work would be completed, EPA states:

> At this time, since the full extent of the contaminated groundwater plume is not yet known, *the Army and EPA cannot estimate the total length of time needed to address the contamination on WVI's property*. Once the [Remedial Investigation] is completed, and a Feasibility Study (FS) to analyze remedial alternatives has been performed, the Army and EPA will be in a better position to estimate the length of time required to implement a remedy.

*Id.* ¶ 38 & Exhibit 24 at 2 (emphasis added).

33. Based on Defendant's most recent projections, a Feasibility Study is not likely to be performed until at least the latter part of 2016. *See id.*, Exhibit 21, Slides 21, 27. Defendant's physical occupation of the Waverley View property, therefore, can be expected to extend well beyond 2016.

34. While it remains to be seen what further activities or investigations on the Waverley View property will be required to implement a remedy, EPA previously has represented to WVI that the need for access to the Waverley View property was an open-ended one, and that the government's activities on the property *could persist for decades*. *Id.* ¶ 25.

## V. WVI'S NEED FOR EXPEDITIOUS CONSIDERATION AND RELIEF

35. Plaintiff is a small business that exists for the sole purpose of developing the property at issue in this litigation. *See id.* ¶¶ 10, 41.

36. As a result of the government's occupation of the Waverley View property and its ongoing, open-ended need for access to the property, WVI has been unable to proceed with its

plans to develop the Phase II property, sell the property, or otherwise realize a return on its

investments.  *Id.* ¶¶ 39-41.  Meanwhile, WVI continues to incur carrying costs in excess of half a

million dollars each year.  *Id.* ¶ 40.

## STANDARD OF REVIEW

Plaintiff WVI moves for summary judgment under Rule 56(a) of the Rules of the United

States Court of Federal Claims.  Summary judgment is warranted if "there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).

## ARGUMENT

It is well established that "when the 'character of [a] governmental action' is a permanent

physical occupation of property, …  a taking [exists] to the extent of the occupation, without

regard to whether the action achieves an important public benefit or has only minimal economic

impact on the owner."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35

(1982) (citation omitted).  The inquiry is simply "whether the claimant can establish a physical

occupation, not necessarily of infinite duration, of his property by the Government."  *Applegate*

*v. United States*, 35 Fed. Cl. 406, 414 (1996) (citing *Loretto*, 458 U.S. at 441).

The government's activities on WVI's property are a quintessential example of

permanent physical occupation of private land.  As noted by one leading expert in Fifth

Amendment takings law, "[p]ermanent physical occupations classically stem from . . .

government installation of structures on private property (e.g., groundwater monitoring wells),"

among other types of physical invasions.[4]  Because in this case the government has permanently

---

[4] Robert Meltz, *United States Court of Federal Claims 27th Annual Judicial Conference —
Substantive Takings Law: A Primer* 36 (2014), *available at*
http://www.uscfc.uscourts.gov/conferences/2014/files/downloads/Property%20Panel/Article/Mel
tz%20Takings%20Law%20Summary.pdf.

occupied WVI's property through its installation and servicing of groundwater monitoring wells, without WVI's consent, Defendant is liable for taking WVI's property and owes WVI just compensation.

## I. DEFENDANT'S INSTALLATION AND SERVICING OF GROUNDWATER MONITORING WELLS AND OTHER RELATED ACTIVITIES ON WVI'S PRIVATE PROPERTY CONSTITUTE A *PER SE* TAKING.

A property owner's right to exclude others from his or her property is "one of the most treasured strands in an owner's bundle of property rights"—"perhaps the most fundamental of all property interests." *Loretto*, 458 U.S. at 435; *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). "Thus, a permanent physical occupation by the government is a per se physical taking requiring compensation under the Fifth Amendment because it destroys, among other rights, a property owner's right to exclude." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1356 (Fed. Cir. 2006), *aff'd on other grounds*, 552 U.S. 130 (2008).

The Federal Circuit Court of Appeals unequivocally has determined that a *per se* physical taking occurs when, as here, the government permanently occupies the property of another through the installation, use, and servicing of groundwater monitoring wells. *Hendler v. United States*, 952 F.2d 1364 (1991), was the first case to directly address this issue. Like this case, *Hendler* involved a federal government investigation of a groundwater contaminant plume from a Superfund site, necessitating the installation of groundwater monitoring wells on the plaintiffs' nearby property. Under these circumstances, the court clarified that "'permanent' does not mean *forever, or anything like it*," and highlighted the sharp contrast between government's groundwater monitoring well installations and occupations that are "transient and relatively inconsequential." *Id*. at 1376-77 (emphasis added); *see also*, *e.g.*, *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1355-57 (Fed. Cir. 2002) (contrasting permanent physical occupation in *Hendler* from intermittent, transient entry of government agents to conduct owl surveys).

Whether or not the wells were "truly permanently affixed to plaintiffs' property" in the sense that they could not or would not ever be removed, *Hendler*, 952 F.2d at 1375, the court had no difficulty concluding that the monitoring well installation fell within the meaning a "permanent physical occupation" giving rise to a *per se* taking. *Id*. at 1376-77. As Circuit Judge Plager stated:

> There is nothing 'temporary' about the wells the Government installed on plaintiff's property, in the sense in which we used it in referring to the parked truck of the lunchtime visitor. Years have passed since the Government installed the first wells. The wells are some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement. Each well was capped with a cement casing lined with reinforcing steel bars, and enclosed by a railing of steel pipe set in cement. These surveillance wells are at least as 'permanent' in this sense as the CATV equipment in *Loretto*, which comprised only a few cables attached by screws and nails and a box attached by bolts. Nothing in the Government's activities suggests that the wells were a momentary excursion shortly to be withdrawn, and thus little more than a trespass. Nor does the [administrative access] Order or the Government's subsequent actions disclose any indication of a timetable for withdrawal.

*Id*. at 1376 (citation omitted).[5] The court thus found that a permanent physical occupation had occurred and granted summary judgment to plaintiffs on the issue of the government's physical takings liability. *Id*. at 1384. Like the groundwater monitoring wells in *Hendler*, the wells on WVI's property are permanent fixtures installed with stainless steel and grout (cement) and extend to even greater depths of up to 400 feet below the land surface. *See* Statement of the

---

[5] The government's activities related to installing, servicing, and sampling the monitoring wells were also encompassed within the permanent occupation found by the court in *Hendler*. Such activities are "a taking of the plaintiffs' right to exclude, for the duration of the period in which the wells are on the property and subject to the Government's need to service them." 952 F.2d at 1378.

Case, Section III, *supra*. Also, as in *Hendler*, the government has provided no timetable for withdrawal from the private property.

 *Hendler*'s holding has been reaffirmed and applied repeatedly. In *McKay v. United States*, 199 F.3d 1376, 1381-82 (Fed. Cir. 1999), the Federal Circuit expressly analogized to *Hendler*, declining summary judgment to the government where "multiple groundwater monitoring wells were drilled, and the groundwater from the wells was monitored over a period of several years." And in *Boise*, *supra*, the court distinguished the factual circumstances from *Hendler*, while reiterating that when the government installs groundwater wells on private property and enters that property to maintain and monitor those wells, "a per se taking under *Loretto* has occurred." 296 F.3d at 1357; *see also*, *e.g.*, *Scogin v. United States*, 33 Fed. Cl. 568, 579-80 (1995) (declining to find a taking over a period during which the plaintiff had expressly consented to government access to his property, but applying *Hendler* in concluding that a taking occurred during the government's subsequent physical occupation of his property); *Gutierrez v. Guam Power Auth.*, 2013 Guam 1, 2013 WL 212277, ¶¶ 41-42 (analogizing to *Hendler*, holding that cement power poles and transmission lines installed on private property for several years constituted a *per se* physical taking).

 Here, the government's physical occupation of the Waverley View property is undisputed. As in *Hendler* and *McKay*, the government has drilled a series of groundwater monitoring wells on property owned by Plaintiff WVI for purposes of the government's remedial investigation of contamination arising from the Fort Detrick Superfund site. *See* Statement of the Case, Section II-III, *supra*. The government has drilled both shallow and deep wells at a total of 15 locations throughout the Phase II property (16 when including the abandoned drill site), to

depths up to 400 feet. *See id.*, Section III, *supra*.[6] These groundwater monitoring wells remain

on the Waverley View property. *Id.* Four of the monitoring wells are deep wells with permanent

monitoring points. *Id.* These wells and the materials from which they were constructed are

certainly no less "permanent" than those *Hendler* held to effect a *per se* taking. And to be sure,

the government has expressed its intent to maintain the permanent monitoring wells and continue

monitoring and other activities on the property indefinitely. Statement of the Case, Section IV,

*supra*. "When the governmental intrusion is as substantial a physical occupancy of private

property as this is, *Loretto* establishes that there is a taking." *Hendler*, 952 F.2d at 1377.

## II.   DEFENDANT'S LIABILITY IS NOT NEGATED BY THE RIGHT-OF-ENTRY.

WVI's now-expired ROE with Defendant, entered into in recognition of the

government's statutory access and response authorities and under the coercive threat of

CERCLA enforcement and liability, does not change the fact that Defendant is liable under the

Fifth Amendment for its groundwater monitoring installations and activities on the Waverley

View property.

---

[6] The fact that some portions of the Waverley View property remain physically unoccupied does
not enable Defendant to escape liability. "[N]o matter how minute the intrusion, and no matter
how weighty the public purpose behind it," a permanent physical occupation requires
compensation. *Lucas v South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *see also
Loretto*, 458 U.S. at 438, n.16 (physical taking occurred on account of cable installation with
volume of one and one half cubic feet). Both the duration and geographic extent of the
government's occupation are relevant here only insofar as they may affect the amount of
compensation (to include both primary and severance damages, *see* Compl. ¶¶ 46-51, 59). *See*,
*e.g.*, *Otay Mesa Property, LP v. United States*, 670 F.3d 1358, 1363 (Fed. Cir. 2012) ("The
duration of a physical taking pertains, not to the issue of whether a taking has occurred, but to the
determination of just compensation."); *United States v. Grizzard*, 219 U.S. 180, 183 (1911) (just
compensation includes "not only the market value of that part of the tract appropriated, but the
damage to the remainder resulting from that taking, embracing, of course, injury due to the use to
which the part appropriated is to be devoted").

First, the ROE has expired. *See* Statement of the Case, ¶¶ 17, 29. Even if the government ever had WVI's free and voluntary consent to occupy the property, it does not have it now. Yet the government's monitoring well network remains on the Waverley View property. WVI has neither agreed to extend the ROE nor otherwise consented to the continuing presence of the monitoring well installations on its property. This ongoing physical occupation falls squarely within the meaning of a taking.

Second, WVI never freely and voluntarily consented to Defendant's occupation of the Waverley View property in the first place. To the contrary, WVI repeatedly and consistently denied the government's requests for access to the property. *Id*., Section II(B), *supra*. And when WVI granted the ROE in May 2013, it did so out of coercion, strong-armed by the government's assertion of extensive CERCLA access and response authorities and threats of CERCLA enforcement and liability. *Id*., Section II(C), ¶ 21, *supra*. Thus, WVI both expressly reserved its right to pursue a takings claim and documented that, through the ROE, WVI was "not freely and voluntarily granting . . . access" to the Waverley View property. *Id*.

Under such circumstances, *i.e.*, when a property owner is forced to acquiesce to physical occupation by the government, courts have found a taking. "'[The] element of *required acquiescence* is at the heart of the concept of occupation.'" *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (quoting *FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987)) (emphasis added). Thus, there is "a material distinction . . . between a consent form freely entered into" and, here, an ROE (i) granted after repeated refusals, (ii) documented as being without free and voluntary consent, (iii) entered into under documented threat of liability and enforcement pursuant to the government's statutory access and response authorities, and (iv) expressly preserving the right to bring a "takings" claim. *See Juliano v. Montgomery-Otsego-Schoharie*

19

*Solid Waste Mgmt. Auth.*, 983 F. Supp. 319, 329 (N.D.N.Y. 1997) (distinguishing between free

consent and testing agreement authorizing activities that, "but for [the local government's]

statutory authority to force entry, Plaintiffs would not have allowed").[7] These facts, moreover,

are a far cry from circumstances where courts have concluded that consent was freely given. For

example, in *Scogin*, this court declined to find takings liability where the plaintiff had executed

numerous access agreements, using terms such as "PERMISSION" and "CONSENT," and

stating that permission was given "voluntarily with knowledge of [the signatory's] right to refuse

and without threats or promises of any [kind]." 33 Fed. Cl. at 570-72, 578.[8] Here, the ROE

used no such comparable terms – in fact, they were expressly rejected by WVI during the

negotiations and documented as such. *See* Statement of the Case, ¶ 21, *supra*, and Anderson

---

[7] In *Juliano*, the U.S. District Court for the Northern District of New York denied summary judgment to the government in view of facts much like those here (*i.e.*, government installation of monitoring wells and other testing activities on private property). *See generally* 983 F. Supp. 319. The court readily concluded that the monitoring well installations, involving the injection of "grout [that] is 'intended to exist or function for a long, indefinite period without regard to unforeseeable conditions,'" qualified as a "permanent" physical occupation. *Id.* at 328. However, in doing so, the court departed from *Hendler* by taking a literal, purely temporal view of the concept of permanency. *Id.* at 327-28. The Federal Circuit has expressly rejected *Juliano*'s tinkering with *Hendler* and reaffirmed the principle, stated in *Hendler* and supported by the Supreme Court's own precedent, that permanency in this context considers "the *character* of the government intrusion . . . , rather than solely focusing on temporal duration." *Boise*, 296 F.3d at 1356-57 (citing *Hendler*, 952 F.2d at 1376; *United States v. General Motors Corp.*, 323 U.S. 373 (1945); *United States v. Petty Motor Co.*, 327 U.S. 372 (1946); *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)) (emphasis in original).

[8] The court in *Scogin*, however, found that a permanent taking *did* occur based on the government's subsequent occupation of private property pursuant to a lease agreement entered into under "[g]overnment compulsion." *Scogin*, 33 Fed. Cl. at 579. In that case, evidence of the government's compulsion took the form of a district court order requiring access. *Id.* Here, although no court order has been issued, compulsion is equally present, as evidenced in the government's assertion of its statutory access and response authorities and documented threats of enforcement and liability. *See* Statement of the Case, Section II, *supra*.

Decl., Exhibit 18.  The ROE did not create consent and therefore does not negate the government's liability for a taking.

## <u>CONCLUSION</u>

The undisputed facts demonstrate that Defendant has effected a *per se* taking of WVI's property without just compensation, in violation of the Fifth Amendment.  Accordingly, this Court should expeditiously grant WVI's motion for summary judgment and hold Defendant liable for committing a taking, such that the Court and the parties may proceed with adjudicating the amount of just compensation.

Respectfully submitted,

s/ *Clifford J. Zatz*
Clifford J. Zatz (Attorney of Record)
czatz@crowell.com

R. Timothy McCrum (Of Counsel)
rmccrum@crowell.com

Dawn K. Miller (Of Counsel)
damiller@crowell.com

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:     (202) 624-2500
Facsimile:     (202) 628-5116

April 17, 2015

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing Motion for Expedited Summary Judgment on

Defendant's Liability and Memorandum in Support by Plaintiff Waverley View Investors, LLC,

filed electronically in this case on April 17, 2015, was served via the CM/ECF electronic filing

system on today's date to:

Bruce Kenneth Trauben
U.S. Department of Justice – (ENRD)
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663

           Respectfully submitted,


           *s/ Clifford J. Zatz*
           Clifford J. Zatz (Attorney of Record)
           czatz@crowell.com
           CROWELL & MORING LLP
           1001 Pennsylvania Avenue, N.W.
           Washington, D.C. 20004
           Tel 202-624-2500
           Fax 202-628-5116

April 17, 2015