# In the United States Court of Federal Claims

No. 15-371 L

Filed: January 5, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| WAVERLEY VIEW INVESTORS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 (2012);<br>Just Compensation;<br>Right of Entry Agreement;<br>Tucker Act Jurisdiction, 28 U.S.C. § 1491 (2012);<br>U.S. CONST. amend. V, Takings Clause;<br>Voluntary Consent. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Clifford Jack Zatz**, Crowell & Moring LLP, Washington, D.C., Counsel for Plaintiffs.

**Jessica Michelle Held**, United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C., Counsel for the Government.

## POST-TRIAL MEMORANDUM OPINION AND ORDER REGARDING A PARTIAL PHYSICAL TAKINGS CLAUSE CLAIM

**BRADEN**, *Chief Judge*.

Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675, authorizes the United States Environmental Protection Agency (the "EPA") "to take action . . . at any . . . property[,] . . . if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant." 42 U.S.C. § 9604(e)(1).

In this case, the owner of real estate in Frederick, Maryland was faced with a demand for access to the property to install wells for the testing and monitoring of groundwater contamination. Faced with incurring the expenses of fighting federal authorities, potential civil penalties, and even potential cleanup costs, the property owner negotiated an agreement to allow federal authorities to access the property, install monitoring wells, and perform other necessary and incidental work. After the agreement expired, federal authorities withdrew from the property, but left behind the monitoring wells and a gravel access road. Some level of contamination was found on the

property, but, at present, the EPA and the United States Army (the "Army") do not have a plan for remediation and have represented that they have no need to continue testing on the property.

The property owner has filed suit under the Takings Clause of the Fifth Amendment to the United States Constitution. The court has determined that the continued presence of the monitoring wells and gravel access road on the property after expiration of the access agreement establish the requirements of a physical taking under the precedential decision *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991)" ("*Hendler III*"). Ascertaining the actual damage incurred, however, is problematic for the reasons discussed herein.

For the convenience of the parties, the court has prepared a Table Of Abbreviations, attached hereto as Exhibit A. To facilitate review of this Post-Trial Memorandum Opinion And Order, the court has provided the following outline:

I.    FACTUAL BACKGROUND.

    A.    Contamination And Remediation Of Area B Of United States Army Garrison, Fort Detrick, Maryland.

    B.    The History Of The Waverley View Property.

    C.    The Government's Interactions With RGHGAB at Frederick, LLC To Gain Access To The Waverley View Property.

    D.    The Government's Interactions With Waverley View Investors, LLC To Gain Access To The Waverley View Property.

II.   PROCEDURAL HISTORY.

III.  DISCUSSION.

    A.    Subject Matter Jurisdiction.

    B.    Standing.

    C.    Plaintiff's Takings Clause Claims Against The Government.

        1.    At Trial, Plaintiff Established That It Owns Private Property Under Maryland State Law.

        2.    At Trial, Plaintiff Established That The Government's Activities After Expiration Of The Right Of Entry Agreement Effected A Permanent Taking Of Those Portions Of The Waverley View Property Physically Occupied By The Army-Installed Monitoring Wells And Gravel Access Road.

            a.    Plaintiff's Argument.

                i.    "Plaintiff Has Proved A *Per Se* Taking."

                ii.   "The Right Of Entry Agreement Preserved Plaintiff's Takings Clause Claim."

                iii.  "The Right Of Entry Agreement Is Not A Contract."

            b.    The Government's Response.

i. "Plaintiff Has Failed To Prove A Physical Taking Of Its Property, Because It Consented To The Army's Groundwater Monitoring."

ii. "Plaintiff Did Not Establish That The Government Has Permanently Occupied Its Property."

iii. "Because Plaintiff Consented To The Installation Of The Monitoring Wells In A Valid Contract, Its Claims Are Governed By Contract Law."

c. Plaintiff's Reply.

i. "Plaintiff's Takings Clause Claim Is Ripe for Review."

ii. "The Right Of Entry Agreement Does Not Bar Plaintiff's Takings Clause Claim."

d. The Government's Sur-Reply.

i. "The Right Of Entry Agreement Vitiates Plaintiff's Takings Clause Claims."

ii. "The Right Of Entry Agreement Is Supported By Valid Consideration."

e. Plaintiff's Sur-Reply.

i. "The Right Of Entry Agreement Does Not Bar Plaintiff's Takings Clause Claim."

ii. "Plaintiff's Takings Clause Claim Is Ripe For Review."

iii. "The Framework From *Arkansas Game and Fish* Does Not Apply To Permanent Takings Cases Like This One."

f. The Court's Resolution.

i. Governing Precedent.

ii. Plaintiff Voluntarily Consented To The Government's Entry And Use Of The Waverley View Property.

iii. The Reservation Of Rights In The Right Of Entry Agreement Did Not Invalidate Plaintiff's Consent.

iv. The Government's Activities On The Waverley View Property During The Term Of The Right of Entry Agreement Did Not Exceed The Scope Of Work Described Therein.

v. The Continued Presence Of The Army-Installed Monitoring Wells And Gravel Access Road On The Waverley View Property After Expiration Of The Right Of Entry Agreement Effected A Permanent Taking Of Certain Portions Thereof.

3.      At Trial, Plaintiff Established That It Is Entitled To Just Compensation.

      a.      Plaintiff's Argument.

      b.      The Government's Response.

      c.      Plaintiff's Reply.

      d.      The Government's Sur-Reply.

      e.      Plaintiff's Sur-Reply.

      f.      The Court's Resolution.

         i.      Governing Precedent.

         ii.      Plaintiff Failed To Establish That The Taking Of Certain Portions Of The Waverley View Property Prohibited The Development Or Sale Thereof.

         iii.      Plaintiff Failed To Establish That Any Stigma Attached To The Waverley View Property Was Caused By The Government's Activities Thereon.

         iv.      Plaintiff Is Entitled To $1.06 Per Square Foot Of The Waverley View Property Physically Occupied By The Army-Installed Monitoring Wells And Gravel Access Road.

IV.      CONCLUSION.

I.      **FACTUAL BACKGROUND.**[1]

A.      **Contamination And Remediation Of Area B Of United States Army Garrison, Fort Detrick, Maryland.**

United States Army Garrison, Fort Detrick, Maryland ("Fort Detrick") is a Medical Command facility owned and operated by the Army.  PX 65 at 2.  For many years, "Fort Detrick was the center of the U.S. biological weapons program."[2]  PX 65 at 2.  "Since the discontinuation of that program, it has hosted elements of the U.S. biological defense program."  PX 65 at 2.  Today, Fort Detrick consists of three tracts of land: "Area A, comprising about 800 acres where the main post area and installation activities are located; Area B, comprising about 400 acres generally located west of Area A; and Area C, which consists of two parcels [of land] located on the west bank of the Monocacy River."  PX 65 at 2; *see also* DX 108 at US002779 (depicting Areas A and B).  Area B is the focus of this case.

In 1943, the Army established a Biological Warfare Research Center in Area A.  PX 24 at PL004077.  In 1944, the Army acquired Area C "to develop water and sewer treatment plants."  PX 24 at PL004077.  In September 1946, the Army acquired Area B, "as the primary location for Fort Detrick's waste management activities."  PX 24 at PL004077.

Until the 1970s, Area B was used as "both a proving ground and a disposal area for chemical, biological[,] and radiological material" (PX 65 at 2; *see also* PX 24 at PL004077), including Anthrax and "major components of . . . Agent Orange" (DX 41 at WVI00006710).  In addition, Area B-11, the "westernmost disposal area" of Area B, was used "from the early 1950s through approximately 1972" for disposal of "acids and chemicals, incinerated medical waste, waste herbicides and insecticides, [and] phosgene" in "unlined trenches or pits."  PX 24 at PL004079.

---

[1] The facts recited herein were derived from: testimony adduced at a trial held on January 17–18 and 24–26, 2017 in Washington, D.C. ("TR 1–1469"), including the parties' Joint Exhibits ("JX 1–31"), Plaintiff's Exhibits ("PX 1–163"), and the Government's Exhibits ("DX 1–142"); and information obtained during a site visit conducted on December 1, 2017 ("SVTR 1–44").

[2] Between 1943 and 1945, Fort Detrick was "the site of an exhaustive biological warfare research effort during World War II."  DX 142 at 12.  Shortly after the war, the fort was "designat[ed] . . . as a permanent installation for peacetime biological research[.]"  DX 142 at 12.  In 1956, Fort Detrick was re-designated "with a mandate of continuing biological research and remaining the world's leading research campus for biological agents that require special containment."  DX 142 at 12.



**Fort Detrick, Areas A and B.**

DX 108 at US002779.

In 1970 and 1971, "after the United States [banned] biological research for offensive operations, the Army began a decontamination and certification program at Fort Detrick[.]"  PX 24 at PL004078.  But, it was not until 1977 that "[c]ontamination assessments" commenced and the Army "determined that activities at [Fort Detrick] could have resulted in [the] release[] of chemicals [into] the environment."  PX 24 at PL004078.

In 1981, after completing a "Field Investigation of Uncontrolled Hazardous Waste Sites," the EPA "recommended that the State [of Maryland] and [the] EPA monitor the Army's investigations to address the potential for off-site migration of toxic materials[.]"  PX 24 at PL004078.

In 1988, Fort Detrick was "listed on the federal facilities compliance docket."  DX 142 at 13.  Later that year, the "Army conducted an environmental audit . . . to determine the existence of or potential for environmental contamination and to assess [the] risk to human health and the environment associated with the installation."  DX 142 at 13.

In February 1992, the Army discovered trichloroethylene ("TCE")[3] concentrations above the maximum contamination level (the "MCL") established under the Safe Drinking Water Act, 42 U.S.C. §§ 300f–300j-26, as well as elevated levels of trichlorofluoromethane ("TCFM")[4] in Area B.  PX 24 at PL004078; *see also* DX 142 at 13.  Thereafter, the United States Army Environmental Hygiene Agency "began a study of . . . Area B that included installation and sampling of monitoring wells."  PX 24 at PL004078; *see also* DX 142 at 13.

In October 1992, the Maryland Department of the Environment (the "MDE") "sampled 21 residential wells in the vicinity of Fort Detrick Area B and found TCE concentrations above the

---

[3] The Agency for Toxic Substances and Disease Registry, a federal public health agency within the United States Department of Health and Human Services, defines TCE as

a nonflammable, colorless liquid with a somewhat sweet odor and a sweet, burning taste.  It is used mainly as a solvent to remove grease from metal parts, but it is also an ingredient in adhesives, paint removers, typewriter correction fluids, and spot removers.  [TCE] is not thought to occur naturally in the environment.  However, it has been found in underground water sources and many surface waters as a result of the manufacture, use, and disposal of the chemical.

*Toxic Substances Portal: Trichloroethylene (TCE)*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (Mar. 3, 2011), https://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=30.  TCE is "[k]nown to be a [h]uman [c]arcinogen" and is classified as a volatile organic compound ("VOC").  *Id.*

[4] TCFM is a "[colorless] gas or highly volatile liquid," traditionally used as a refrigerant.  *Trichlorofluoromethane*, NAT'L INST. FOR OCCUPATIONAL SAFETY AND HEALTH (July 22, 2015), https://www.cdc.gov/niosh/ipcsneng/neng0047.html.  TCFM "can be absorbed into the body by inhalation . . . causing a serious risk of suffocation when in confined areas [and] . . . effects on the cardiovascular system and central nervous system, resulting in cardiac disorders and central nervous system depression."  *Id.*

MCL in four wells[.]" PX 24 at PL004078. In response, the Army provided bottled water to affected residents until their homes could be connected to the public water system. PX 24 at PL004079.

Beginning in 1992, and continuing into 1993, "[e]nvironmental investigations were performed at Fort Detrick, including Area B, to investigate, and evaluate conditions, locate potential dump sites, and determine whether contamination was present at various Areas of Concern[.]" DX 142 at 13.

In 1993, the Army also  convened a Restoration Advisory Board (the "Fort Detrick RAB") to "provide a forum for cooperation between the [Army and the EPA], State representatives, local community representatives, and natural resource trustees on actions and proposed actions at the [s]ite." PX 24 at PL004126. Since that time, the Fort Detrick RAB has held "semi-annual [or] quarterly" meetings, open to the public, at which it "present[s] information to the community on the restoration program, . . . provide[s the community] with updates, statuses of [the Fort Detrick RAB's] findings . . . [and] take[s] feedback from the community."[5] TR 921–22 (Gortva).

By 1997, the Army became concerned that contamination from Area B-11 had migrated southwest onto an adjacent property (the "Waverley View Property"). DX 128 at 19–20. On November 13, 1997, the Army reported to the Fort Detrick RAB that wells along a fence line abutting the Waverley View Property showed elevated levels of TCE and perchloroethylene ("PCE").[6] DX 128 at 2–3, 19–20. The report included images depicting a groundwater plume extending from Area B onto the Waverley View Property, which the Army believed to have carried TCE and PCE onto Phase II of the property. DX 128 19–20; *see also* TR 918–19 (Gortva). The Army's report was made available to the public at a Fort Detrick RAB meeting in 1997, at the Frederick County Public Library, and on the Fort Detrick website. TR 919–20 (Gortva).

---

[5] The Fort Detrick RAB's meeting minutes and presentations for years 1997 through 2017 are publicly available on the Fort Detrick website. *Restoration Advisory Board (RAB) Meeting Minutes*, FORT DETRICK, MD. (Aug. 8, 2017), http://www.detrick.army.mil/rab/meeting Minutes.cfm.

[6] PCE, also known as tetrachloroethylene, is "a manufactured chemical used for dry cleaning and metal degreasing. . . . It is also used as a starting material (building block) for making other chemicals and is used in some consumer products." *Toxic Substances Portal: Tetrachloroethylene (PERC)*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (Dec. 15, 2014), https://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=30. "Exposure to very high concentrations of [PCE] can cause dizziness headaches, sleepiness, incoordination, confusion, nausea, unconsciousness, and even death." *Id.* The EPA "considers [PCE] likely to be carcinogenic to humans by all routes of exposure." *Id.*



**Groundwater PCE Concentrations, 1997.**

DX 128 at 19



**Groundwater TCE Concentrations, 1997.**

DX 128 at 20

Beginning in 1999, "quarterly groundwater sampling [was] conducted at Area B monitoring wells and drinking water wells along the southern boundary of Area B." PX 65 at 4. The groundwater samples were discovered to include TCE and PCE as "major constituents." PX 24 at PL004079; *see also* PX 65 at 4 ("Since 1999, . . . the [chlorinated VOCs] TCE and [PCE] have consistently been the most widespread and thus the focus of chemical constituents detected in groundwater at Area B.").

On July 14, 2000, the Army began a "hot spot interim removal action," consisting of excavating hazardous waste, *i.e.*, "contaminated soil, chemical containers, compressed gas cylinders, and laboratory waste[,]" from the disposal pits in Area B-11, and backfilling and capping[7] the disposal pits. PX 24 at PL004079–80; PX 65 at 5. This interim removal action was completed in May 2004. PX 24 at PL004080; DX 142 at 13. During excavation of the disposal pits, "[h]owever, the discovery of live pathogens in medical wastes at [A]rea B-11 caused the suspension of [future] intrusive work at the disposal area[.]" PX 65 at 5; DX 142 at 13. As a result, "waste remains buried at [A]rea B-11." PX 65 at 5.

In addition, "[b]y 2004, several shallow (overburden) and deep (bedrock) monitoring wells were installed throughout Area B." PX 65 at 4. Groundwater samples along the southern property line of Area B, adjacent to the Waverley View Property, "demonstrated groundwater contamination by PCE and TCE at concentrations above the MCL . . . , with the highest concentrations present within the bedrock." PX 65 at 4. "Groundwater elevation maps prepared around 2004 . . . [also] suggest[ed] that groundwater may flow southwest from Area B onto [the Waverley View Property]." PX 65 at 4.

On September 3, 2008, "Fort Detrick Area B Groundwater" was proposed for listing on the National Priorities List (the "NPL").[8] PX 65 at 2.

On April 8, 2009, Fort Detrick Area B Groundwater was listed on the NPL as a CERCLA Superfund site. PX 65 at 2. "Four known source areas were identified [including the] Area B-11 Chemical Waste Disposal Pits[.]" PX 65 at 2.

In early 2010, the Kristen Renee Foundation, founded by Randy White, launched a public campaign, entitled "Fighting for Frederick," "to research and investigate the findings associated with Fort Detrick 'Area B' groundwater." DX 142 at 14. One of Mr. White's daughters, Kristen Renee, died from a brain tumor in April 2008 and another was diagnosed with growths in her

---

[7] "Capping involves placing a cover over contaminated material such as landfill waste or contaminated soil. Such covers are called 'caps.' Caps do not destroy or remove contaminants. Instead, they isolate them and keep them in place to avoid the spread of contamination." U.S. ENVTL. PROT. AGENCY, A CITIZEN'S GUIDE TO CAPPING (2012).

[8] The NPL is a "list of sites of national priority among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States and its territories. The NPL is intended primarily to guide the EPA in determining which sites warrant further investigation." *Superfund: National Priorities List (NPL)*, U.S. ENVTL. PROT. AGENCY, https://www.epa.gov/superfund/superfund-national-priorities-list-npl (last visited Oct. 24, 2017).

abdomen in 2009.  DX 41 at WVI00006709, WVI00006712.  Both daughters grew up near Fort Detrick, on property that "adjoins" the Waverley View Property, and their conditions were believed by doctors to be "likely caused by something in their environment."   TR 1187 (McPherson); DX 41 at WVI00006712.

On July 10, 2010, Mr. White, called a town hall meeting in Frederick, Maryland to discuss concerns about contamination at Fort Detrick and effects on the residents of the surrounding community.  DX 41 at WVI00006712; DX 142 at 14.  The meeting was attended by "[d]ozens of base neighbors who shared [Mr. White's] concerns."  DX 41 at WVI00006712.

On December 17, 2010, the Army and the EPA signed a Federal Facilities Agreement (the "FFA") that "was made effective [A]utumn 2011."  PX 65 at 2.  The FFA described the "procedures under which the Army, [the MDE], and the [EPA would] investigate and, if necessary, remediate sites at Area B in accordance with CERCLA."  PX 65 at 2.

On October 8, 2011, *The Baltimore Sun* published an article, entitled "A death from cancer, and a search for answers," about contamination at Fort Detrick and concerns for the surrounding community.  DX 41 at WVI00006709–12.  The article reported that "[f]or decades, Frederick residents had speculated about the possible effects of the experiments at [Fort Detrick] on the health of the surrounding community."  DX 41 at WVI00006709.  The article also discussed Mr. White's concerns and reported that "[o]fficials [began a] cancer cluster investigation . . . and have scheduled regular meetings to keep the community abreast of their findings."  DX 41 at WVI00006712.  In addition, the article reported that Mr. White "has filed a mass tort lawsuit [against the Army].  He has been joined by more than 100 fellow plaintiffs."  DX 41 at WVI00006709.

During 2011 and 2012, the Army installed additional wells throughout Area B, including "a nested group of four wells . . . installed on Fort Detrick property along the perimeter of Area B adjacent to [the Waverley View Property]."  PX 65 at 4; *see also* TR 926–27 (Gortva) (testifying that this "nested group" of wells was located less than 20 feet from the Waverley View Property). Groundwater sampling from these wells showed "contamination at concentrations 1000 times greater than the MCL[.]" PX 65 at 4; *see also* TR 927 (Gortva) (testifying that "[i]n [the] October, November time frame, [the Army] received . . . results that were significantly elevated, around 5000 parts per billion, and . . . in subsequent tests, . . . around 11,000 parts per billion").

During this time, the Army also requested permission to investigate properties in the vicinity of Fort Detrick to "complete the [R]emedial [I]nvestigation of the Area B groundwater." TR 924 (Gortva).[9]  To explain the purpose of its investigation, the Army prepared a "Project Overview" (JX 15), to inform property owners that groundwater contamination was present on the "western side of Area B at the highest concentrations and extends to the east, [and] that the [Army] suspected contamination also extended onto the Waverley [View P]roperty" (TR 930–31 (Gortva);

_____

[9] For example, on October 25, 2012, the Army entered into an agreement with Loch Inver Court, a residential subdivision near Fort Detrick, entitled "Right-Of-Entry for Environmental Assessment and Response" that allowed the Army to enter the property for the purpose of "environmental investigation."  DX 37.  On April 27, 2015, the Army entered into a similar agreement with another nearby subdivision, Carroll Park Manor.  DX 103.

*see also* JX 15 at US002781).  The "Project Overview" included an image depicting a groundwater plume extending from Area B onto the Waverley View Property, which the Army believed to have carried TCE and PCE onto Phase II of the property.  JX 15 at US002781.



**Distribution of PCE and TCE in Groundwater, 2011.**

JX 15 at US002781

B.      The History Of The Waverley View Property.

In 2001, Detrick Overlook, LLC ("Detrick Overlook") "purchased the land that comprises [the] Waverley View [Property]" from the Krantz Family Partnership.[10]   PX 65 at 2; DX 1 at WVI00008560.   The Waverley View Property consists of approximately 92.8 acres of land, located along the southwest border of Area B of Fort Detrick.   PX 76; TR 859 (Harvey).   "Area B forms the northern boundary of the Waverley View [P]ropert[y], and farmland and residences border [the] Waverley View [Property] to the west, east[,] and south."   PX 65 at 2; *see also* PX 70.

---

[10] The Krantz family continues to farm the Waverley View Property (SVTR 13; TR 449 (Anderson)), however, Waverley View Investors, LLC ("WVI"), the current owner of the property, receives no income for this use (SVTR 13–14).



**Fort Detrick Area B and the Waverley View Property.**

PX 70.

After purchasing the Waverley View Property, Detrick Overlook entered into agreements with several firms, including Geo-Technology Associates, Inc. ("GTA") and W. L. Gore & Associates, Inc. ("WLGA"), to investigate the environmental conditions of the property. PX 151 at 1; DX 1 at WVI00008560. On August 24, 2001, GTA provided an Environmental Site Assessment (the "2001 ESA") to Detrick Overlook. DX 1 at WVI00008560. The 2001 ESA concluded that, based on "two surface water samples" collected on land comprising what would later become Phase I of the Waverley View Property (*compare* DX 1 at WVI00008566, *with* PX 70), "no VOCs were reported above the laboratory's reporting limit . . . [and] TCE and PCE were not reported above the practical quantification limit" (DX 1 at WVI00008560, WVI00008564–65).

On October 4, 2001, WLGA provided Detrick Overlook with a "limited soil gas screening survey" concluding that "1,1,1 [t]richloroethane, tetrachloroethene, and trichloroethene were detected [on the Waverley View Property] in September/October 2001." PX 151 at 1.

On February 25, 2002, Detrick Overlook submitted an application to the MDE Voluntary Cleanup Program ("VCP"), seeking a "No Further Requirements Determination" ("NFRD") for the Waverley View Property.[11] PX 65 at 2; *see also* MD. DEP'T OF THE ENV'T, WAVERLY VIEW, ENVTL. RESTORATION & REDEVELOPMENT PROGRAM SITE FACTSHEET (Apr. 6, 2005), http://mde.maryland.gov/programs/LAND/MarylandBrownfieldVCP/Documents/www.mde.state.md.us/assets/document/brownfields/Waverly_View_Property.pdf. In turn, the MDE "requested additional information and further subsurface investigation in order to complete the application package." PX 65 at 3; *see also* MD. DEP'T OF THE ENV'T, WAVERLY VIEW, ENVTL. RESTORATION & REDEVELOPMENT PROGRAM SITE FACTSHEET (Apr. 6, 2005).

---

[11] The EPA provided the following relevant information on the MDE VCP and NFRDs:

The [MDE] . . . administers the [VCP] to provide state oversight for the voluntary cleanup of properties contaminated with hazardous substances. . . . Any property contaminated or perceived to be contaminated by controlled hazardous substances or oil is eligible for participation in the VCP. . . . The VCP provides two types of final site approval documents for properties contaminated or perceived to be contaminated by controlled hazardous substances or oil: a [NFRD] and a certificate of completion. . . . [The] MDE issues a [NFRD] for an eligible property when [the] MDE approves the application package and determines that a remedial action plan . . . is not required. The determination states there are no further requirements related to the investigation of controlled hazardous substances or oil at the property. The determination is based on VCP specific land use and may contain certain land use requirements.

U.S. ENVTL. PROT. AGENCY, CLEANING UP BROWNFIELDS UNDER STATE RESPONSE PROGRAMS – GETTING TO "NO FURTHER ACTION" (2015).

On July 1, 2002, Detrick Overlook retained Environmental Service & Technology Corporation ("ENSAT") to "perform an extensive site characterization of the Waverley View [P]roperty" to satisfy the requirements for participation in the MDE VCP.  PX 151 at 1.

In November 2002, Detrick Overlook submitted a draft site characterization report to the MDE VCP, prepared by ENSAT, seeking a NFRD for the property.  PX 151 at 1.

On February 3, 2003, "the MDE requested additional information and further subsurface investigation."  PX 65 at 3.

On November 11, 2003,[12] Rocky Gorge Homes, LLC ("RGH") and GAB Enterprises, Inc. ("GAB") formed RGHGAB at Frederick, LLC ("RGHGAB") to "buy, develop, and sell property in Frederick County."  PX 65 at 3.  RGH was the managing member of RGHGAB, with 80 percent ownership; and GAB was a minority member, with 20 percent ownership.  TR 78 (Anderson).  At that time, Christopher Dorment was the Chairman, Chief Executive Officer ("CEO"), and majority owner of RGH; John Anderson was a minority owner of RGH; and Gary Berman was President of GAB.  TR 78–79 (Anderson).

On January 29, 2004, RGHGAB submitted an application to the MDE VCP seeking a NFRD for the Waverley View Property,[13] as an inculpable person.[14]  PX 65 at 3; *see also* MD. DEP'T OF THE ENV'T, WAVERLY VIEW (Apr. 6, 2005).

The next day, on January 30, 2004, RGHGAB purchased approximately 90 acres of land for $5,600,000 from Detrick Overlook, that included most of the Waverley View Property.[15]  PX

---

[12] *See* Articles of Organization, RGHGAB at Frederick, LLC, MD. SEC'Y OF STATE: MD. BUS. EXPRESS, https://egov.maryland.gov/BusinessExpress/EntitySearch (last visited Dec. 18, 2017) (search by "Business Name" for "RGHGAB;" then follow the "W07656309" hyperlink under "Department ID;" then follow the "ARTICLES OF ORGANIZATION" hyperlink under the "Filing History" tab).

[13] RGHGAB appears to have filed this application as a "prospective purchaser."  *See Voluntary Cleanup Program Frequently Asked Questions*, MD. DEP'T OF THE ENV'T, http://mde.maryland.gov/programs/Land/MarylandBrownfieldVCP/Pages/vcp_ info.aspx (last visited Dec. 5, 2017) ("[A]n application may be submitted by the responsible person for a particular property, and, if the property is being marketed for sale, a prospective purchaser may also submit an application seeking inculpable person status.").

[14] "An inculpable person, . . . means a person who, at the time of application for participation in the VCP, has no prior or current ownership interest in an eligible property and has not caused or contributed to contamination at the eligible property."  MD. DEP'T OF THE ENV'T, FACTS ABOUT: VOLUNTARY CLEANUP PROGRAM, INCULPABLE & RESPONSIBLE PERSON STATUS (2017).

[15] WVI's June 16, 2017 Opening Post-Trial Brief ("Pl. Post-Tr. Br.") asserts that "[t]he [Waverley View] Property has been under the continuous control of Mr. Dorment since 2004."  Pl. Post-Tr. Br. at 4.

54.  RGHGAB financed a portion of the purchase with a loan secured by a promissory note (the "BB&T Note") held by BB&T Bank ("BB&T").  TR 123 (Anderson); *see also GAB Enters., Inc. v. Rocky Gorge Dev., LLC*, 108 A.3d 521, 523 (Md. Ct. Spec. App. 2015) ("*GAB v. RGD*") ("The parties secured the financing with a Promissory Note dated January 30, 2004 . . . held by BB & T Bank[.]");[16] *In re RGHGAB at Frederick, LLC*, Bankruptcy No. 11–10627PM, Adversary No. 11–0346PM, 2012 WL 1424684, at *1 (Bankr. D. Md. April 24, 2012) ("*In re RGHGAB*") ("Rocky Gorge executed a promissory note on January 30, 2004, for $2.75 million[.]").[17]  That same day, "[a]n 'inculpable person status' qualifying letter was issued to RGHGAB[.]"  PX 65 at 3; *see also* MD. DEP'T OF THE ENV'T, WAVERLY VIEW (Apr. 6, 2005).  Thereafter, RGHGAB divided development of the Waverley View Property into two non-contiguous phases: Phase I, approximately 70 acres of land separated from Fort Detrick by Shookstown Road; and Phase II, approximately 23 acres of land directly adjacent to Fort Detrick.  PX 70.

On February 4, 2004, in order to file a new application addressing the MDE's concerns regarding Detrick Overlook's November 2002 Application, RGHGAB engaged Chesapeake GeoSciences, Inc. ("CGS") to "determine the on-site extent . . . of contamination as a direct result of potential off-site migration from the adjacent Fort Detrick Military Reservation."  PX 151 at 1.  Thereafter, CGS "excavat[ed] seventeen (17) test pits, install[ed] seven (7) [groundwater] monitoring wells,[18] and . . . collect[ed] and analy[zed] soil, [groundwater], stream sediment, and surface water samples."  PX 151 at 1.  The groundwater monitoring wells were installed "to depths of about 115 feet below ground surface" (PX 155 at 5), and "were constructed of 6-inch diameter steel casing," except for GW-7 which "was constructed of 4-inch diameter . . . PVC [pipe]" (PX 151 at 2–3; *see also* PX 88 at A-14 (Image 7)).

---

[16] This opinion, by the Court of Special Appeals of Maryland, reversed the Circuit Court of Frederick County's partial dismissal of a complaint filed by GAB on September 28, 2012, alleging, among other things, "that Mr. Dorment 'secretly created [WVI] for the purpose of improperly transferring RGHGAB's assets to [WVI] and thus wiping out GAB's interest in RGHGAB."  *GAB v. RGD*, 108 A.3d at 527.

[17] This opinion, by the United States Bankruptcy Court for the District of Maryland, dismissed a bankruptcy complaint filed by the Bankruptcy Trustee in RGHGAB's involuntary bankruptcy proceeding, alleging, among other things, "that Mr. Dorment, [RGH], and [WVI] had 'engaged in inequitable conduct' and improperly engaged in self-dealing that harmed RGHGAB and its creditors."  *GAB v. RGD*, 108 A.3d at 526.  The bankruptcy complaint arose from a petition for involuntary bankruptcy filed by GAB on January 11, 2011.  *In re RGHGAB*, 2012 WL 1424684, at *3.

[18] The monitoring wells are labeled: GW-1–GW-7.  TR 433–34 (Anderson); *see also* PX 76 (Figures 11A and 11B).



**Image 7: CGS-Installed Monitoring Well.**

PX 88 at A-14 (Image 7).

In April 2004, CGS provided a Site Characterization Report (the "2004 Site Characterization Report") to RGHGAB summarizing CGS's findings, including that "[n]o contaminants of potential concern . . . were identified in [groundwater], sediment, and surface water through generic risk-based screening utilizing MDE Cleanup Standards."  PX 151 at 15. Thereafter, RGHGAB submitted an application, including the 2004 Site Characterization Report, to the MDE VCP seeking a NFRD.  TR 97 (Anderson).

On September 3, 2004, the MDE issued a NFRD for the Waverley View Property (the "2004 NFRD").  PX 65 at 3; DX 4.  The 2004 NFRD was conditioned on the Waverley View Property being used for "limited residential, commercial[,] or industrial purposes," and explicitly excluded "use of groundwater."  DX 4 at PL003175.

On September 13, 2004, the City of Frederick Planning Commission (the "Planning Commission") approved RGHGAB's Planned Neighborhood Development ("PND") Master Plan.[19]  JX 20; PX 156 at 5; TR 112 (Anderson).  The Planning Commission "conditioned [its] approval . . . on the preparation of 'an environmental assessment' to ensure that 'no negative impacts from Fort Detrick Area B exist.'  The approval required either that an independent environmental consultant or the [MDE] concur that the property would suffer no negative impacts from Fort Detrick Area B."  PX 156 at 5.  Another "condition of approval" required RGHGAB to

---

[19] "Generally speaking, a [PND m]aster [p]lan . . . is a land use plan that designates major land uses, commercial, residential[, or] open space.  It provides a general road network . . . [.]  It also establishes a maximum density of development."  JX 30 at 11.  In other words, a PND master plan is a "conceptual . . . plan."  JX 30 at 34.

"construct or contribute to five (5) major infrastructure improvements to roads and a sewer line extension."[20]  DX 114 at 39–40.

On April 6, 2005, the Planning Commission approved a "Preliminary Plan of Subdivision" for Phase I and Phase II of the Waverley View Property,  authorizing the "construction of 732 [residential] units, all of which could commence construction by 2011 so long as other infrastructure and development approvals were obtained[.]"  PX 156 at 5.

On April 24, 2006, the Planning Commission approved RGHGAB's Final Site Plan[21] for Phase I, allowing development of Phase I to begin.  PX 120; PX 156 at 6.

---

[20] The five "major infrastructure improvements" included:

1. Construct[ing] the extension of a sewer outfall from Shookstown Road through the Bartgis property.
2. Upgrad[ing] and reconstruct[ing] Shookstown Road for approximately 1,600 linear feet through [the] Waverley View [Property], including a major stream crossing.
3. Relocat[ing] and construct[ing] Waverley Drive from Waverley Elementary School to Shookstown Road.
4. Provid[ing] an appropriate monetary contribution to the cost of the future extension of Old Camp Road, south of Shookstown Road to the Waverley View [Property] property line.
5. Construct[ing] an approximately 2,100 linear foot section of Christopher's Crossing, across the northwest boundary of the [Waverley View] Property, which road section would provide no access to [the] Waverley View [Property].

DX 114 at 39–40.

Improvements 1–3 were conditions on developing Phase I, and Improvements 4 and 5 were conditions on developing Phase II.  DX 114 at 40.  In January 2013, after negotiations, a "Deferral Agreement" between the City of Frederick and WVI was executed, permitting WVI, "in lieu of constructing a 2,100 linear section of Christopher's Crossing, to pay a Regional Road Improvement Fee . . . in the amount of $880,000 to be paid upon application for building permits for the 293 units it proposed on . . . Phase II."  DX 114 at 40; *see also* TR 175–76 (Anderson). This "reduc[ed WVI's] up-front financial outlay" requirement by "$2 million."  TR 175–76, 471 (Anderson).  As of the December 1, 2017 site visit, however, neither RGHGAB, nor its successor-in-interest WVI, had completed each of the remaining "required" improvements.  *See* SVTR 36–37.

[21] "The final site plan . . . establishes . . . finer details of the development, unit locations, landscaping, lighting, sidewalk locations, all of that."  JX 30 at 12.  "After . . . [final] site plan approval, the next course of action is . . . to . . . fine-tune engineering of roadways, water and sewer infrastructure, things of that nature . . . through [the] Engineering Department.  And then it would move into building permits."  JX 30 at 12–13.

20

On June 29, 2006 and December 7, 2006, RGHGAB purchased two smaller land parcels, comprising approximately 2.8 acres of land for $1,200,000.  PX 55; PX 56.  These parcels, together with the land purchased by RGHGAB on January 30, 2004, became the entirety of the Waverley View Property.

By September 12, 2007, the principal amount of the BB&T Note had grown, so that RGHGAB "owe[d] the bank $9 million," much more than the value of the Waverley View Property, *i.e.*, "around $2 million."  TR 122–29 (Anderson); *see also* PX 152 at WVI00106322; *GAB v. RGD*, 108 A.3d at 524 ("As time went by, the principal amount of the [BB&T] Note was amended, ballooning to nearly $9 million as of September 12, 2007[.] . . . By late 2009, the [Waverley View] Property's value had dropped far below the increasing amount due under the [BB&T] Note."); *In re RGHGAB*, 2012 WL 1424684, at *1 ("Rocky Gorge executed [the BB&T N]ote on January 30, 2004, for $2.75 million, later increased to $8.95 million on September 12, 2007.")

On August 19, 2008, RGHGAB submitted a Final Site Plan for Phase II of the Waverley View Property to the Planning Commission for approval.  PX 156 at 6.  This plan quickly proceeded through the review process and the Planning Commission provided "review comments" to RGHGAB.  TR 119 (Anderson).  Late in 2008, however, a recession hit Maryland's housing market.  PX 156 at 6; TR 119–20 (Anderson); TR 1220–21 (McPherson).  As a result, RGHGAB withdrew the Final Site Plan for Phase II and never resubmitted it.[22]  JX 20; PX 120; PX 156 at 6; TR 471 (Anderson).

On June 23, 2010, Mr. Dorment and several other investors formed WVI, with Mr. Dorment as the managing member, to acquire the BB&T Note.  PX 152 at WVI00106335; *see also* Articles of Organization, Waverley View Investors, LLC, MD. SEC'Y OF STATE: MD. BUS. EXPRESS, https://egov.maryland.gov/BusinessExpress/EntitySearch (last visited Dec. 18, 2017) (search for "Waverley View Investors;" then follow the "W13627708" hyperlink under "Department ID;" then follow the "ARTICLES OF ORGANIZATION" hyperlink under the "Filing History" tab); TR 78 (Anderson).

In September 2010, WVI purchased the BB&T Note for $2.2 million.  TR 126 (Anderson) ("[T]he [BB&T N]ote was purchased by [WVI] from the bank. . . . I believe it was $2 million, $200,000 cash and then a deferral for the $2 million.  So, it was $2.2 million."); *see also GAB v. RGD*, 108 A.3d at 525 ("Rocky Gorge assigned the note purchase agreement to [WVI], completing the transaction . . . on September 17, 2010.").

On September 23, 2010, CGS conducted a "Site Investigation" of the Waverley View Property.  PX 150 at PL002152.  The Site Investigation entailed "the collection of 12 soil samples from six locations and one sediment sample."  PX 150 at PL002152.  From these samples CGS concluded, in an October 29, 2010 Site Investigation Report (the "2010 CGS Site Investigation Report"), that the Waverley View Property exhibited "normal background conditions" and that

---

[22] Subsequent promotional materials concerning the Waverley View Property provided that "[f]inal plan approval [of Phase II] will be necessary and will need to be completed by the purchaser . . . offering the potential to modify the current plan."  PX 29 at WVI00007847.

"Fort Detrick's historic testing of Agent Orange does not appear to have impacted the [property]." PX 150 at PL002153.

In October 2010, after RGHGAB defaulted on the BB&T Note, WVI began foreclosure proceedings on the BB&T Note (TR 82, 130–31 (Anderson);[23] *see also GAB v. RGD*, 108 A.3d at 525 ("[I]n October 2010, Waverley undertook to foreclose on the [p]roperty.")).

In January 2011, before the foreclosure proceedings were completed, GAB filed a petition for involuntary bankruptcy that halted foreclosure and subjected RGHGAB to involuntary bankruptcy proceedings.  TR 131–35 (Anderson); *see also GAB v. RGD*, 108 A.3d at 525 ("GAB . . . filed a Petition for Involuntary Bankruptcy (Chapter 7) in the Bankruptcy Court on January 11, 2011. . . .  The filing brought the foreclosure proceeding to an abrupt halt[,] because of the automatic stay that issued from the Bankruptcy Court[.]").  As a result, RGHGAB's assets, including the Waverley View Property, were turned over to a Bankruptcy Trustee.  TR 132–33 (Anderson).

After negotiations with the Bankruptcy Trustee, WVI offered to purchase the Waverley View Property out of bankruptcy for $4,000,000,[24] based on a 2010 appraisal value of "plus or [minus] $2 and a half million."  TR 133–34 (Anderson); *see also* PX 152 at WVI00106324, WVI00106350.  The Bankruptcy Trustee solicited other offers in order to "bid [WVI's offer] up some;" however, no other offers materialized.  TR 133–34 (Anderson); *see also* PX 152.

On November 15, 2012, WVI purchased the Waverley View Property out of bankruptcy for $4,000,000 "paid via credit bid."  PX 53; PX 152 at WVI00106363; TR 134–35 (Anderson);

---

[23] As Mr. Anderson testified at trial:

> [WVI] purchase[d] the bank's position.  So, [WVI] is now effectively the lender to RGHGAB, who has an asset that is not performing, doesn't have a way to make payments on the loan, though they weren't in default with BB&T.  I mean, they would have been in default in this.  It was just–there was no more money.
> So, [WVI], in its role as the–sort of the bank, the owner of the deed of trust on the property, as a lender can do, foreclosed on its rights under the deed of trust, which was secured by the property. So, the remedy is you go through a foreclosure and then the lender, after the foreclosure proceeding, owns the property free and clear of any other liens on the property. It just wipes out everything else.  So, RGHGAB's ownership is gone. And, now, [WVI] owns both the deed of trust on the property and the actual property.

TR 130–31 (Anderson).

[24] WVI's $4,000,000 offer was a "credit bid," *i.e.*, a non-cash bid, made against the amount owed on the BB&T Note owned by WVI (PX 152 at WVI00106363; *see also* TR 135 (Anderson)), which, as of June 30, 2012, was $10,160,787 (PX 152 at WVI00106334).

DX 88 at 28.  That same day, however, CL Group LLC ("CL Group") appraised the Waverley View Property as having an "as is" value of $12,800,000.[25]  PX 125 at WVI00006628–30.

On September 19, 2014, WVI entered into a "Sales/Purchase Agreement" with S.L. Nusbaum Realty Co. ("Nusbaum"), pursuant to which Nusbaum agreed to purchase approximately 13.72 acres of Phase I for $5,000,000.  PX 127 at WVI00109347, WVI00109377.  Nusbaum's obligation to purchase the property was subject to numerous conditions, some of which were to be undertaken by WVI.  PX 127; DX 112, TR 243–46 (Anderson).  In August 2016, WVI consummated the sale of the property to Nusbaum.  TR 215 (Anderson).

### C.    The Government's[26] Interactions With RGHGAB at Frederick, LLC To Gain Access To The Waverley View Property.

On March 10, 2011, the United States Army Corps of Engineers, Baltimore District (the "Army Corps") sent a letter to RGHGAB[27] requesting permission to enter the Waverley View

---

[25] The CL Group appraisal, however, provided that:

> *The values estimated in this report are based upon the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions.*
>
> As previously noted, Fort Detrick adjoins the property to the northeast.  In 2009 the [EPA] put the site of major toxic waste contamination at Fort Detrick in Frederick on its Superfund [NPL].  Environmental clean-up specialists created a landfill "cap" on the area known as "Area B" in a remote northwest corner of the Fort Detrick installation.  In 1992, off-post contamination from Area B was first detected in residential wells.  The remediation project at the installation should be completed by 2014.
>
> The Kristen Renee Foundation has launched a campaign to research and investigate the findings associated with Fort Detrick "Area B" groundwater. . . . [I]t should be emphasized that the subject was submitted to the State of Maryland's [VCP] and later issued a letter of [NFRD].
>
> Per the subject representative, with regard to the site's close proximity to Area B, tests have revealed no contamination on the subject property. The future residents of Waverley View will be served through public water and sewer, so any potential for groundwater issues is further removed.

PX 125 at WVI00006703 (emphasis in original omitted and emphasis added).

[26] Numerous agencies, including the Army and the EPA, interacted with various owners of the Waverley View Property, on behalf of the Government, seeking access to the property.

[27] The Government asserts in its July 14, 2017 Post-Trial Response Brief ("Gov't Post-Tr. Resp. Br.") that, as of March 10, 2011, the Army believed that RGHGAB owned the Waverley View Property; unbeknownst to the Army, however, the property was under the control of the Bankruptcy Trustee from January 11, 2011 to November 15, 2012, and RGHGAB never advised

Property for the purpose of "conducting site investigation activities in connection with the Fort Detrick Area B Groundwater Remedial Investigation[.]" DX 16 at US007141. This letter included a "Right of Entry . . . for Environmental Response Form" (the "ROE form") and requested that RGHGAB "sign and return the [ROE] form" to the Army Corps. DX 16 at US007138. The letter and the ROE form were sent to an incorrect mailing address, however, and were returned as "undeliverable." TR 924–25 (Gortva).

On March 22, 2011, the Army Corps resent the letter and the ROE form to RGHGAB. DX 16 at US007134. The Army Corps did not receive a response. DX 17 at US001211.

On May 5, 2011, the Army Corps sent another letter and the ROE form to RGHGAB, again requesting permission to enter the Waverley View Property. DX 16 at US007138–39; DX 17.

On May 9, 2011, Mr. Anderson, on behalf of RGHGAB, sent a letter to the Army Corps "in response to [its] request for right-of-entry." JX 1. The letter provided "Your request is denied. Any entry on the [Waverley View] Property by the . . . [Army Corps] or [its] contractors will be treated as trespassing." JX 1. The letter also provided that, although RGHGAB "appreciate[d] the efforts to clarify the impact of the Fort Detrick Area B groundwater on the area, [RGHGAB] ha[d] already performed extensi[ve] investigation on the [Waverley View] Property," and included copies of numerous documents as evidence on a compact disc ("CD").[28] JX 1.

On May 11, 2011, Mr. Anderson contacted Christine Milligan, Realty Specialist for the Army Corps, to inform her of the May 9, 2011 letter and stated that RGHGAB "[didn't] want to be the 'bad guy' but [was] declining to sign the ROE [form]." DX 16 at US007134. Thereafter, the Army reviewed the documents on the CD included with Mr. Anderson's May 9, 2011 letter to determine whether there was a continued need for access to the Waverley View Property. TR 1039 (Gortva). After reviewing the documents, however, the Army decided that it could not accept the results of RGHGAB's testing in lieu of conducting its own groundwater monitoring. TR 925 (Gortva).

In October 2011, the Army took groundwater samples from several deep monitoring wells in Area B-11, located about 20 feet from the Waverley View Property, that showed "significantly elevated" levels of contaminants. TR 926–27 (Gortva); *see also* PX 65 at 4 (Groundwater sampling from these wells showed "contamination at concentrations 1000 times greater than the MCL[.]").

---

the Army of the bankruptcy proceedings. Gov't Post-Tr. Resp. Br. at 16; see also, e.g., TR 420, 490 (Anderson).

[28] The CD included the following documents: (1) a "Preliminary Subsurface Exploration," dated December 18, 2000; (2) the 2004 Site Characterization Report; (3) a "Phase I ESA Screening," dated August 25, 2004; (4) the 2004 NFRD; (5) a "Professional Opinion Regarding Testing of Agent Orange at Fort Detrick;" (6) a "Site Investigation Proposal," dated September 14, 2010; (7) a "Laboratory Report," dated October 12, 2010; and (8) the 2010 CGS Site Investigation Report. JX 1.

On October 17, 2011, the Army Corps sent another letter to Mr. Anderson, confirming receipt of RGHGAB's "acknowledgement and intent to decline participation in . . . [the] site investigation activities for the Fort Detrick Area B Groundwater Remedial Investigation[.]"  DX 16 at US007135.  Therein, the Army Corps stated that "[it] would like the opportunity to discuss the program and address any of [RGHGAB's] concerns or questions" and provided a list of various times during which the Army Corps would be "in [RGHGAB's] area and available to meet[.]"  DX 16 at US007135.  The letter included a "copy of the 'P[rogram] O[verview] P[amphlet]' for the Fort Detrick Area B Groundwater Remedial Investigation . . . [and] an additional copy of the [ROE] form."  DX 16 at US007135.

Sometime in late October 2011, Mr. Anderson contacted Ms. Milligan again to inform her that "even though he [was] not inclined to sign [the] ROE [form], he [would] meet with [the Army Corps], at his office, to hear what [the Army Corps had] to say."  DX 16 at US007134; TR 148 (Anderson).

On November 16, 2011, Messrs. Anderson and Dorment met with representatives from the Army Corps, including John Buck, Project Manager, at RGH's office in McLean, Virginia.  DX 22; TR 150–51 (Anderson).  At this meeting, the Army Corps informed Messrs. Anderson and Dorment of the "significantly elevated" levels of contaminants found less than 20 feet from the Waverley View Property (TR 926–27 (Gortva)), and again requested access to the Waverley View Property (TR 151 (Anderson)).  Relying on the 2004 NFRD, however, Messrs. Anderson and Dorment indicated that they believed the Waverley View Property was "neat [and] clean."  TR 151 (Anderson).  Thereafter, when the Army Corps declined to "offer . . . any compensation for the use of [the] property . . . [Messrs. Anderson and Dorment] said, thank you very much, but [access is] denied."  TR 151 (Anderson).

On February 7, 2012, the Army Corps sent another letter to Mr. Anderson, requesting permission to enter the Waverley View Property.  JX 3.  This letter stated that access to the Waverley View Property was "critical to achieving [the Army's] project goals and no viable alternative locations exist."  JX 3 at WVI00009453.  The letter included "a modified [ROE form] that contain[ed] non-intrusive activities that may be more amenable to [RGHGAB]."[29]  JX 3 at WVI00009453.  Again, RGHGAB refused to grant the Army access.  TR 152 (Anderson).

On September 6, 2012, the MDE contacted the Army to report that

the owner of the Waverley [View] Property . . . ha[s] requested a "comfort letter" from the [VCP] regarding the NFRD that [the] MDE issued for the property in 2004.  They hoped that [the] MDE would be willing to state that there would be no known health risk if the property were to be developed under the constraints of the [2004] NFRD (essentially no groundwater use).  [The] MDE politely declined to

---

[29] The modified ROE form "eliminate[d] all activities on [the Waverley View P]roperty with the exception of access to the stream to conduct stream surveys, collect surface water and sediment samples, and conduct dye trace sampling/monitoring activities."  JX 3 at WVI00009453.

issue such a letter, citing the unknown . . . extent of groundwater contamination associated with Area B.

DX 33 at US000157.

On November 8, 2012, the Army Corps sent another letter to Mr. Anderson, requesting permission to enter the Waverley View Property, emphasizing that access was "critical for the completion of [the Army's] efforts." PX 7 at WVI0008362. The letter also included a "Program Overview Pamphlet" and an original, unmodified, ROE form. PX 7 at WVI00008365–69. RGHGAB continued to refuse to grant the Army access. TR 152 (Anderson).

On November 15, 2012, despite the Army's "susp[icion of] groundwater contamination on [Phase II of [the] Waverley View [Property]," and without "further environmental testing or other due diligence" (TR 393 (Anderson)), WVI purchased the Waverley View Property out of bankruptcy (PX 53; TR 134–35 (Anderson)).

### D.    The Government's Interactions With Waverley View Investors, LLC To Gain Access To The Waverley View Property.

On February 8, 2013, the Associate Director of the EPA's Office of Federal Facility Remediation and Site Assessment, sent a letter to Mr. Anderson,[30] requesting permission to enter the Waverley View Property. DX 44. This letter "strongly urge[d]" [Mr. Anderson] to consent to federal government access to undertake groundwater sampling on [the Waverley View Property] . . . as requested by the [Army.]" DX 44 at US000008. The letter also indicated that the "EPA believe[d] the proposed work [was] necessary and appropriate to better understand the nature and extent of contamination migrating from the Fort Detrick Area B Superfund NPL [S]ite, and to ensure the protection of human health and the environment." DX 44 at US000008. The letter stated that the Waverley View Property "lies immediately adjacent to the Area B-11 trenches, where contaminated groundwater has been detected flowing in the direction of [the Waverley View P]roperty[,]" and that the "EPA and the Army believe[d] . . . that the groundwater contaminant plume extend[ed] beneath" the Waverley View Property. DX 44 at US000008. The letter also emphasized that,

> [r]epresentatives of the United States government have authority granted by federal law to gain access to [the] property to perform response activities related to the contaminated groundwater plume migrating from the Fort Detrick Area B Superfund NPL [S]ite. Under Section 104(e)(1) of [CERCLA], any officer, employee, or representative of the President has the authority to take action at any facility, property, or location, at which there is a reasonable basis to believe that there may be a release or threat of release of a hazardous substance, pollutant, or contaminant. Section 104(e)(1) extends the entry authority to any property or

---

[30] Although WVI owned the Waverley View Property by this time, and Mr. Anderson "[had] no ownership, [and] no role in [WVI]" (TR 78 (Anderson)), the EPA's February 8, 2013 letter was nevertheless received by Mr. Dorment, the managing member of WVI (TR 644 (Dorment)).

location, such as [the Waverley View P]roperty, that lies adjacent to any place, such as the Fort Detrick Area B Superfund NPL [S]ite, where such representative has a reasonable basis to believe that there may be a release or threat of release of a hazardous substance, pollutant, or contaminant.

Section 104(e)(3) of CERCLA gives the federal government the authority to gain entry *at reasonable times* to any place, including [the Waverley View P]roperty, where there may be a release or threatened release of a hazardous substance, pollutant, or contaminant, or where entry is needed to determine the need for response, to determine the appropriate response, or to effectuate a response action under CERCLA.

Under CERCLA, the categories of parties liable for investigation and cleanup costs include generators and transporters of hazardous substances disposed of at a facility or property, and owners and operators of the facility or property at the time of disposal, as well as current owners and operators.  (See Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).)  Section 107(q) of CERCLA, 42 U.S.C. § 9607(q), provides a limitation from CERCLA liability, under certain conditions, for a person who owns property that is contiguous, or is otherwise similarly situated, to a facility or property that is the only source of contamination found on that person's property.  However, one of the conditions for the limitation from liability is that the owner of the contiguous property must provide full cooperation, assistance, and access to authorized persons to conduct response actions.  *See* 42 U.S.C. § 9607(q)(l)(A)(iv).  If you do not agree to provide access for the work authorized by CERCLA, you will no longer have the benefit of the "contiguous properties" defense to liability provided by Section 107(q) of CERCLA.

Furthermore, CERCLA Sections 104(e)(5)(A) and (B), 42 U.S.C. 9604(e)(5)(A) and (B), provide the federal government with enforcement authorities to issue a unilateral order to the property owners to grant the request for access for response actions, including sampling and other investigation activities; and, if access is not granted, to seek a court order to compel cooperation with such unilateral order.  If the United States does not obtain . . . consent for access to perform the necessary sampling on [the Waverley View P]roperty related to the contaminated groundwater plume migrating from the Fort Detrick Area B Superfund NPL [S]ite, the United States may exercise any other options available to it under the law to obtain access, which could include issuing an administrative order for access or seeking a warrant for access.

DX 44 at US000009.

On February 13, 2013, *The Frederick News-Post*, after obtaining a copy of the EPA's February 8, 2013 letter, reported that "[t]he federal government wants access to a residential development site near Fort Detrick's Area B to drill wells and complete groundwater testing[,]" but the owner "has repeatedly ignored requests from the Army to gain access to monitor the 90-

acre Shookstown Road property." DX 48 at US144422.  On that same day,[31] Thomas Lynch, an attorney for Messrs. Anderson and Dorment, sent a letter to the EPA agreeing to meet to discuss "a plan for addressing [the] EPA's and the Army's request." DX 48 at US144420.  The letter also provided that "the [Waverley View P]roperty is in the process of being reviewed for purposes of development by the City of Frederick and the media has commented in news stories today about the request for further investigation on [the] property[,]" and attached a copy of *The Frederick News-Post*'s article.

On February 25, 2013, representatives from the Army, an Army environmental contractor, Arcadis, and the Army Corps met with Messrs. Dorment, Anderson, and Lynch in Frederick, Maryland.  DX 126.  At this meeting, the Army provided Messrs. Dorment, Anderson, and Lynch with a presentation prepared by Arcadis, entitled "Waverley Property Right of Entry Discussion," that included a map of proposed drilling locations, all on Phase II of the Waverley View Property. DX 52.

On March 14, 2013, Messrs. Dorment, Anderson, and Lynch met with representatives from the Army, the EPA, and the MDE to discuss "on-going efforts to both identify remediation issues at Area B and ask that [WVI] grant access to the [Waverley View P]roperty to the [Army] to conduct groundwater sampling[.]"  DX 125.  At this meeting, Mr. Dorment "expressed his frustration that the Army [wasn't] moving faster to financially compensate him for the damage . . . caused to his property." DX 125.  Mr. Dorment was advised that he would need to "file a tort claim . . . to begin the compensation process." DX 125.

Thereafter, on March 25, 2013, WVI filed an administrative tort claim against the Army claiming $37,199,488 in property damage, of which $12,800,000 represented the appraisal value of the Waverley View Property.  PX 1 at PL000873–85.[32]

On April 24, 2013, Messrs. Dorment, Anderson, and Lynch again met with representatives from the Army, the EPA, and the MDE, in Philadelphia, Pennsylvania, together with: representatives from Arcadis; and WVI's environmental contractor, S.S. Papadopulos & Associates, Inc. ("SSPA").  DX 126.  At this meeting, SSPA presented "justifications and reasoning why [Phase I] of the Waverley [View P]roperty did not need to have any sampling conducted on it." TR 941–42 (Gortva).  WVI's concern focused on Phase I, because "[t]hey [had] 'offers on the table' . . . for [the] Phase I lots."  DX 126; *see also* TR 942 (Gortva).  After the presentation, a tentative agreement was reached to allow the Army to access Phase II of the Waverley View Property.  TR 945 (Gortva).

---

[31] In a July 7, 2013 "mid-year update," Mr. Dorment indicated to WVI's investors that "[l]ocal media has extensively covered [WVI's interactions with the Army Corps] which impeded our sales program of the parcels in Phase [I] for the time being.  The reality is that our site has passed test after test . . . , but the 'perception' of a problem can trump the reality."  JX 22 at WVI00008412.

[32] WVI's administrative tort claim was later dismissed without WVI "collect[ing] any judgement from the United States." TR 716–17 (Dorment).

On May 10, 2013, after "weeks . . . [of] negotiations" (PX 10 at WVI00004486), in which WVI was represented by counsel (JX 22; TR 724–25 (Dorment)), and during which WVI "exchanged several drafts of [a ROE form] with the EPA and . . . the Army" (TR 725 (Dorment)), the Army Corps, on behalf of the Army, sent a final ROE form (the "WVI ROE") to Mr. Lynch, and indicated that "[i]f acceptable, please have [WVI] sign the [WVI ROE] and then return . . . for signature by the [Army]" (DX 77).  On that same day, Mr. Dorment, on behalf of WVI, signed the WVI ROE, granting

> the Government[33] an irrevocable right to enter in, on, over and across [34.75 ± acres of Phase II (the "ROE Property")], for a period not to exceed eighteen (18) months, unless further extended by [a]greement of the parties commencing on May 14, 2013, and running through November 13, 2014, or, if sooner, the date of completion of the [R]emedial [I]nvestigation.

JX 5 at US000001, US000004.

> The WVI ROE also granted

> the Government . . . the right to store, move, and remove equipment and supplies; investigate and collect samples . . . ; construct, operate, maintain, alter, repair, and remove groundwater monitoring wells, appurtenances thereto, and other devices for the monitoring of contamination in soil, air, and water; and, perform any other such work which may be necessary and incident to the Government's use for the investigation and determination of need for response on [the ROE Property.]

JX 5 at US000001–02.

> In exchange, the Army and the EPA "agree[d] to provide [WVI with] a copy of all validated laboratory results derived from [the] Government's investigation on the [ROE Property] within a reasonable time, but in no event later than four (4) weeks after the completion of such validated laboratory results."  JX 5 at US000002.  The Army and the EPA also promised that, "[if] any action of the Government's employees or agents in the exercise of [the WVI ROE] results in damage to the real property, the Government will . . . either repair such damage or make an appropriate settlement with [WVI]."  JX 5 at US000003.

> The WVI ROE also provided the following:

> 3.  All tools, equipment, and other property taken upon or placed upon the [ROE Property] by the Government shall remain the property of the Government and may be removed by the Government at any time within a reasonable period, not to exceed thirty (30) days, after the expiration of [the WVI ROE].  However, if it appears from the monitoring results that they remain necessary for the continuing investigation, or for the monitoring and assessment of the need for any necessary response action, the monitoring wells installed by the Government shall remain the

---

[33] The WVI ROE defines "Government" to include both the Army and the EPA.  JX 5 at US000001.

property of the Government, and may be maintained on the land, subject to further extension of [the WVI ROE] by the parties.

\* \* \*

5.  [WVI] expressly reserves any and all rights it may have to make a claim under the Takings Clause of the Fifth Amendment, U.S. Const., amend. V.  The Government acknowledges this reservation without any concession that any such rights or claim may exist.

JX 5 at US000003–04.

In addition, the WVI ROE included a map showing the proposed location of "drilling areas" and described the "Scope of Work" as follows:

1.  Evaluation, logging, surveying, measuring, and testing of existing wells (GW-1, GW-2, GW-3, GW-4) on the [ROE Property], including regular access during the groundwater tracer study (e.g., weekly, biweekly, or monthly for the duration of the study and/or right-of-entry period).

2.  Drilling, logging, and borehole testing in three areas on the [ROE Property] (see Figure 1), including rig access to each drill area, monitoring well construction (multiple), surveying, measuring, and testing of completed wells for the duration of the right-of-entry period.  Any other drilling areas identified by [the] EPA, [the] MDE, or the Army would be restricted to the [ROE Property].

3.  Access to any streams, seeps, springs, or other surface water features that may exist on the [ROE Property] for surveying, monitoring, and sampling[.]

JX 5 at US000006.



# Figure 1. Drilling Areas

⭐ = Shallow boring area

⭐ = Deep boring areas for clustered wells

 = Land affected by the right-of-entry (approximate)

JX 5 at US000006.

On May 24, 2013, Mr. Dorment sent a letter to the Army and the EPA, reiterating that: (1) he felt pressured into signing the WVI ROE; (2) the Army and the EPA were interfering with WVI's ability to develop the Waverley View Property; (3) WVI had "made abundantly clear to [the Army and the EPA] that the [Waverley View Property] is valuable for real estate development purposes[;]" (4) WVI "ha[d] concrete plans to develop" the Waverley View Property because "[m]arket conditions [were then] quite favorable[;]" and (5) WVI's "business plans [were] jeopardized by [the Government's] activities." PX 10 at WVI00004486. Mr. Dorment concluded that "if [the Army] require[s] a substantial and/or prolonged use of [the Waverley View P]roperty, [WVI] expect[s] a good faith offer to purchase the property at fair market value and to do so soon." PX 10 at WVI00004487.

On July 7, 2013, in a "mid-year update," Mr. Dorment advised WVI's investors that the Army has

> enlisted Ben Cardin, the junior senator from Maryland, to offer an amendment to the Defense appropriations bill authorizing Fort Detrick to purchase [the] Phase [II] section. [The Army] used a figure of 8 million dollars in the amendment for the acquisition.[34]

> [WVI] currently [has] two lobbyists and a team of six lawyers working on advocacy for the amendment as well as pursuit of the [administrative] tort claim. Although this effort is expensive, and a bit frustrating, from an investor's viewpoint there is a great deal of equity in this property[.] . . . [I]f the Army paid 8M for 40% of the property, the valuation for the whole property would grow extensively so we see opportunity in crisis.

JX 22 at WVI00008412–13.

On, or just prior to, November 21, 2013, the Army entered the Waverley View Property pursuant to the terms of the WVI ROE, to construct a gate[35] and gravel access road. TR 199 (Anderson). The gravel access road consisted of several inches of stone and was "20 [to] 25 feet wide and hundreds of feet long." TR 200 (Anderson); TR 953 (Gortva); *see also* PX 88 at A-14 (Image 8). The stone was laid upon "geotextile fabric" to make removal of the gravel access road easier. TR 953 (Gortva); SVTR 21–22, 38.

---

[34] Contrary to Mr. Dorment's statement, John Tesner, Director for Restoration in the Office of the Deputy Assistant Secretary of the Army for Environmental, Safety, and Occupational Health, testified that the Army never "approach[ed] members of Congress about the possibility of purchasing the Waverley View [P]roperty." TR 1335–36 (Tesner).

[35] During the December 1, 2017 site visit, WVI's counsel stated that the gate is not located on the Waverley View Property; instead, the gate is situated on the boundary between the property and Fort Detrick. SVTR 37–38.   Therefore, because the gate is not located on the Waverley View Property, the installation and continued presence of the gate does not constitute a taking of WVI's property. *See Oscanyan v. Arms Co.*, 103 U.S. 261, 263–64 (1880) (holding counsel's statement during a trial binding on client); *see also Jones v. Morehead*, 68 U.S. 155, 165 (1863) (holding that a client is bound by his counsel's statements, despite evidence to the contrary).



**Image 8: Gravel Access Road on Phase II.**

PX 88 at A-14 (Image 8).

In December 2013, drilling began on Phase II of the Waverley View Property.  TR 949 (Gortva).  At times, drilling could not be performed in the planned location, because of certain geologic features that posed a risk of sink holes, requiring the location to be moved or "offset." TR 949–50 (Gortva).  When these features were encountered, the Army would contact Mr. Lynch to inform WVI of the proposed offset location where the Army wanted to install an alternative monitoring well.  TR 950, 1142–44 (Gortva); *see also* DX 127.  The Army, however, never received any response from WVI.  TR 951 (Gortva).  Nevertheless, four deep monitoring wells[36] and eleven shallow monitoring wells (or temporary monitoring wells) were installed on Phase II of the Waverley View Property.[37]  TR 951–52 (Gortva).

The deep monitoring wells are approximately the size of a "dinner plate" in diameter.  TR 335 (Thomson).  These wells are "installed into the bedrock" (TR 951 (Gortva)), range in depth

---

[36] A fifth deep monitoring well, labeled WVLY-4, was "pilot" drilled but abandoned "due to sinkhole concerns."  PX 86; TR 1058 (Gortva); SVTR 36.

[37] The deep monitoring wells are labeled: WVLY-1–WVLY-3 and WVLY-5; and the shallow monitoring wells are labeled TW-1–TW-11.  PX 76 (Figures 11A and 11B).  The Government also was given access to four of the preexisting CGS-installed monitoring wells labeled: GW-1–GW-4.  JX 5 at US000006.

from 142 to 400 feet below the ground surface (PX 86), and feature "steel casings that typically go down to a depth of 30 to 40 feet" (TR 1008 (Gortva)).  The shallow monitoring wells on the other hand, are constructed of smaller diameter "PVC pipe," and are "only installed down through the dirt overburden" (TR 952, 955–56 (Gortva)), approximately 10 to 15 feet below the ground surface (SVTR 36).  The deep monitoring wells project "2 ½ [ to] three feet" above ground and are surrounded by concrete and bollards, whereas the shallow monitoring wells project "18 inches" above ground and "[t]here is no surface casing . . . [or] protective bollards."[38]  TR 951, 955–56, 1159–60 (Gortva); *see also* PX 68 (Figures 1, 4).



**Figure 1: Deep Monitoring Well on Phase II.**

PX 68 (Figure 1).

---

[38] If necessary, all the monitoring wells can be "cut down so [as to be] slightly below ground surface," and the bollards may be removed.  TR 507 (Gortva); *see also* DX 120 (showing "flush-mounted" monitoring wells installed at Cameron Station, a neighborhood community in Alexandria, Virginia).



**Figure 4: Shallow Monitoring Well on Phase II.**

PX 68 (Figure 4).

The Army did not detect PCE in deep monitoring wells WVLY-3 and WVLY-5, however, "very low[]level[s]" of PCE were detected in deep monitoring well WVLY-2.  PX 76 (Figure 11A); TR 954 (Gortva).  TCE was not detected in deep monitoring wells WVLY-2, WVLY-3, or WVLY-5.  PX 76 (Figure 11B); *see also* TR 954 (Gortva).  Levels of PCE and TCE, however, were detected in deep monitoring well WVLY-1 at 12 parts per billion and 340 parts per billion respectively, with the level of TCE exceeding the MCL by "50 times."  TR 355–56 (Thomson).  Deep monitoring well WVLY-1 is located closest to Area B of Fort Detrick, "about 90 to 100 feet" away.  PX 76 (Figures 11A and 11B); TR 355–56 (Thomson).  PCE and TCE also were detected in several shallow monitoring wells along the boundary between Phase II of the Waverley View Property and Area B of Fort Detrick.  PX 76 (Figures 11A and 11B); TR 954–55 (Gortva).  Overall, however, the levels of PCE and TCE detected on Phase II "were significantly lower than the [levels detected] . . . on Fort Detrick."  TR 956 (Gortva).



**Figure 11A – Concentration of PCE on Phase II.**

PX 76 (Figure 11A).



**Figure 11B – Concentration of TCE on Phase II.**

PX 76 (Figure 11B).

In August 2014, the Army contacted Mr. Lynch to inquire about a "possible extension" of the WVI ROE.  JX 7 at WVI00009396.  On August 27, 2014, Mr. Lynch sent an email to the Army, "asking for a written request."  JX 7 at WVI00009396.

On October 16, 2014, the Army Corps, on behalf of the Army, sent a letter to Mr. Dorment requesting a "one year extension of [the WVI] ROE, through November 13, 2015 . . . [because c]ontinued access [was] needed . . . due to the difficulties of, and delays from, attempting to successfully drill monitoring wells in the karst[39] geology underlying [the Waverley View P]roperty[.]"  JX 6 at WVI00009383.  This letter included a copy of a ROE form indicating that it would expire on November 13, 2015 (the "renewal ROE").  JX 6 at WVI00009392–95.

On October 24, 2014, Mr. Dorment sent a letter to the Army Corps, refusing to grant the extension requested in the Army Corps' October 16, 2014 letter.  JX 7.

On October 31, 2014, WVI "sent a letter to the [United States Department of Justice (the "DOJ")], with copies to . . . the . . . Army and the . . . EPA, stating that [WVI] would cooperate and sign the renew[al ROE], so long as the [DOJ] signed a concurrent stipulation to be filed in the [United States] Court of Federal Claims, stating that the signing of [the renewal ROE] would not waive or diminish [WVI's] . . . claim for just compensation[.]"  JX 9 at WVI00009406, WVI00009408.

On November 6, 2014, the DOJ declined WVI's offer.  JX 9 at WVI00009406.

On November 13, 2014, the WVI ROE expired.  JX 5 at US000001; TR 959–60 (Gortva).  Since that time, the Army has not entered the Waverley View Property, but the gravel access road and the monitoring wells remain on the property.[40]  TR 1160–61 (Gortva).

On February 5, 2015, the EPA sent a letter to WVI's counsel, Clifford J. Zatz, stating that "much remains to be done with regard to the continuing [Remedial Investigation] of the groundwater plume" and "urg[ing] WVI to continue to provide access to the Army to allow it to pursue its investigation of the groundwater plume that extends beneath [the Waverley View Property]."  JX 8 at WVI00009414.  This letter also stated that

> Mr. Dorment, in his October 24, 2014 letter, states that the Army and the EPA have not provided him with an estimate of the expected duration of the Army's activities on the property.  At this time, since the full extent of the contaminated groundwater plume is not yet known, the Army and [the] EPA cannot estimate the total length

---

[39] The United States Geological Survey defines "karst" as "[a] distinctive topography that indicates dissolution of underlying soluble rocks by surface water or ground water."  *Karst Topography - Teacher's Guide and Paper Model*, U.S. GEOLOGICAL SURVEY (Apr. 21, 2017, 4:35 PM), https://geomaps.wr.usgs.gov/parks/cave/karst.html; *see also* TR 296–97 (Thomson) (explaining that there is the "ability to form sink holes in karst geology").

[40] WVI has never asked the Army to remove or relocate the monitoring wells (TR 1422 (Tesner)), and also has never consented to the Army reentering the Waverley View Property to do so (TR 961, 1161 (Gortva)).

of time needed to address the contamination on WVI's property. Once the [Remedial Investigation] is completed, and a Feasibility Study . . . to analyze remedial alternatives has been performed, the Army and [the] EPA will be in a better position to estimate the length of time required to implement a remedy. However, in order to get to this point, the Army will need continued access to complete the sampling required under the [Remedial Investigation].

JX 8 at WVI00009415.

On February 11, 2015, Mr. Zatz sent a letter to the EPA, declining to execute the Renewal ROE unless "the [DOJ] execute[d] the requested stipulation, communicated . . . on October 31, 2014[.]" JX 9 at WVI00009407.

## II.   PROCEDURAL HISTORY.

On April 13, 2015, WVI filed a Complaint in the United States Court of Federal Claims (ECF No. 1 ("Compl.")) alleging: (1) a permanent physical taking by the Government of WVI's private property, without just compensation (Compl. ¶¶ 56–63); and (2) a temporary physical taking by the Government of WVI's private property, without just compensation (Compl. ¶¶ 64–74). On April 17, 2015, WVI filed a Motion For Summary Judgment, arguing that the Government's "installation and servicing of groundwater monitoring wells and other related activities on WVI's property constitute a *per se* taking" and that the WVI ROE does not negate the Government's liability. ECF No. 7 at 15, 18.

On July 27, 2015, the Government filed an Answer to WVI's April 13, 2015 Complaint (ECF No. 10 ("Gov't Ans.")) asserting three affirmative defenses: (1) "[WVI] fails to state a claim upon which relief can be granted;" (2) "[WVI] granted the right to the [Government] to access certain portions of its property;" and (3) any liability for compensation is "offset by the special benefit [WVI] will derive from the [Government's] activities." Gov't Ans. at 13.

On July 28, 2015, the parties filed a Joint Motion To Stay Proceedings For Three Months ("Motion To Stay"), *i.e.*, until October 28, 2015, while the parties engaged in settlement discussions. ECF No. 11. On that same day, the court granted the parties' Motion To Stay. ECF No. 12.

On October 28, 2015, the parties filed a Joint Status Report, requesting an additional three-month stay to continue settlement discussions. ECF No. 13. On November 4, 2015, the court convened a status conference. Thereafter, on November 5, 2015, the court issued an Order, staying the case until February 4, 2016 "for settlement negotiations." ECF No. 14. Thereafter, the court convened status conferences and issued additional Orders staying the case until July 21, 2016. ECF No. 15 (February 8, 2016 Order, staying the case until March 16, 2016); ECF No. 16 (March 16, 2016 Order, staying the case until May 16, 2016); ECF No. 17 (March 30, 2016 Order, setting a status conference for April 13, 2016); ECF No. 18 (April 13, 2016 Order, setting a status conference for April 22, 2016); ECF No. 19 (April 22, 2016 Order, setting a status conference for May 23, 2016); ECF No. 20 (May 23, 2016 Order, staying the case until June 20, 2016); ECF No. 21 (June 20, 2016 Order, staying the case until July 19, 2016 and setting an "open court status conference [for that same day] . . . [i]f the parties have not reached a settlement by then"); ECF

No. 22 (June 29, 2016 Order, changing the date of the open court status conference to July 21, 2016).

On July 20, 2016, the Government filed an Expedited Motion For Relief From Order ("Motion For Relief") (ECF No. 23) requesting "that the General Counsel of the Army be relieved from the obligation to appear in [c]ourt on . . . July 21, 2016 . . . [to] explain . . . why the settlement has not yet been approved" (ECF No. 23 at 1, 4). On that same day, the court issued an Order granting the Government's Motion For Relief (ECF No. 24) and a second Order providing that "the court will convene the July 21, 2016 Status Conference by telephone" (ECF No. 25). On July 21, 2016, the court convened a status conference. ECF No. 26 (status conference transcript).

On August 10, 2016, the parties filed a Joint Preliminary Status Report. ECF No. 28. On that same day, the court issued an Order, denying WVI's April 17, 2015 Motion For Summary Judgment as moot, and setting a trial date and pretrial schedule. ECF No. 29. On August 29, 2016, the parties filed a Joint Motion For Entry Of An Order Consistent With Fed. R. Evid. 502(d) ("Joint Motion For Entry"). ECF No. 30. On August 30, 2016, the court issued an Order, granting the parties' Joint Motion For Entry. ECF No. 31.

On September 30, 2016, the Army Corps sent a letter to WVI, indicating that "[t]he [WVI ROE] . . . has expired, the Army's rights under [the WVI ROE] are at an end, as specified in the [WVI ROE] itself, and the Army has no continuing rights with respect to the [Waverley View P]roperty that was the subject of [the WVI ROE], or the wells located thereon." JX 10 at WVI00009417.

On October 6, 2016, the parties filed a Joint Motion To Extend Time To Complete Fact Discovery, requesting "that the deadline for the completion of fact discovery be extended to December 23, 2016." ECF No. 32. On October 11, 2016, the court issued an Order, granting that motion. ECF No. 33.

On November 6, 2016, the Government filed a Motion To Amend Scheduling Order And Continue Trial, requesting "that the [c]ourt continue the trial date for seven weeks – from January 17, 2017 to March 6, 2017 and adjust interim deadlines," because the Government's counsel of record was retiring and the case was being assigned to a new trial team. ECF No. 35. On November 7, 2016, WVI filed an Opposition to that motion. ECF No. 37. On November 14, 2016, the court issued an Order, denying the Government's November 6, 2016 Motion. ECF No. 38. On November 22, 2016, the parties filed a Joint Certification Of Meeting Of Counsel. ECF No. 39.

On December 16, 2016, WVI filed a Pre-Trial Brief (ECF No. 40), Witness List (ECF No. 41), Exhibit List (ECF No. 42, Ex. 1–3), and Direct Testimony Of Expert Witnesses (ECF No. 43).

On January 4, 2017, the Government filed a Pre-Trial Brief (ECF No. 47), Witness List (ECF No. 46), Exhibit List (ECF No. 46, Ex. A), and Direct Testimony Of Expert Witnesses (ECF No. 44–45). On January 5, 2017, the court convened a pre-trial conference. ECF No. 54. On that same day, WVI filed Expert Witness Reports. ECF No. 48.

On January 9, 2017, WVI filed an Expert Rebuttal Report. ECF No. 49. On January 12, 2017, the Government filed a Response to that report, "oppos[ing WVI's] untimely submission of

[its January 9, 2017] rebuttal report, and [stating its] inten[t] to object to its use at trial." ECF No. 51. On that same day, WVI filed a Reply To Defendant's Response, stating that submission of the January 9, 2017 Expert Rebuttal Report was proper, because no deadline was specified and it was requested by the Government's counsel. ECF No. 52.

On January 17–18 and 24–26, 2017, the court held a trial at the United States Court of Federal Claims in Washington, D.C. ECF No. 58, 60, 62, 64, 66.

On January 25, 2017, the Government filed a Notice Of Objection To Admission Of Evidence Of Claims Not Pleaded, because "any testimony or other evidence beyond the scope of the claims in [WVI]'s Complaint," and reaffirming that it did not "consent to the trial of issues or claims that were not raised in [WVI]'s pleadings." ECF No. 55. On January 30, 2017, WVI filed a Motion To Complete The Examination Of John Tesner And Close The Trial Record. ECF No. 56.

On February 3, 2017, the court sent an email to the parties, instructing the Government to file a status report regarding a "pilot project/study" meeting scheduled for February 9, 2017 in Newton, Pennsylvania. On February 15, 2017, the Government informed the court that the February 9, 2017 meeting "between individuals from the . . . Army and its contractors regarding the pilot project/study to be conducted on government-owned property at Fort Detrick regarding the remediation of the Area B Groundwater Superfund Site," was canceled and rescheduled for March 14, 2017. ECF No. 67. On March 16, 2017, the Government filed a Status Report, informing the court that the March 14, 2017 meeting was canceled and rescheduled for March 30, 2017. ECF No. 68. On March 20, 2017, the court issued an Order staying the case until April 3, 2017 and instructing the Government to file a status report on April 3, 2017 "regarding the pilot project/study meeting." ECF No. 69.

On April 3, 2017, the Government informed the court that the March 30, 2017 meeting "took place . . . [and t]he meeting participants . . . confirmed that the pilot project/study would not require access to the Waverley View [P]roperty." ECF No. 70. In addition, the Government stated "that completion of [the] meeting ha[d] no bearing on the parties' ability to complete the trial and . . . that it [was joining WVI's] request that the [c]ourt set a date for the completion of trial." ECF No. 70.

On May 15, 2017, the court re-convened the trial at the United States Court of Federal Claims in Washington, D.C. ECF No. 74. On May 16, 2017, WVI filed a Notice Of Filing Of Trial Exhibit 160, Deposition Transcript Of Paul Leonard. ECF No. 71. On May 22, 2017, the parties filed a Joint Status Report On Proposed Post-Trial Briefing Schedule. ECF No. 72. On May 24, 2017, the court issued a Post-Trial Scheduling Order. ECF No. 75.

On June 16, 2017, WVI filed an Opening Post-Trial Brief. ECF No. 76. On June 27, 2017, WVI also filed a Motion To Compel Disclosure Of Minutes From March 30, 2017 Pilot Project/Study Meeting. ECF No. 77. On July 11, 2017, the Government filed a Response. ECF No. 78. On July 13, 2017, WVI filed a Reply. ECF No. 79. On July 18, 2017, the court issued an Order, granting WVI's June 27, 2017 Motion To Compel Disclosure. ECF No. 81.

On July 14, 2017, the Government filed a Post-Trial Response Brief.  ECF No. 80.  On July 31, 2017, WVI filed a Post-Trial Reply Brief.  ECF No. 82 ("Pl. Post-Tr. Reply Br.").

On August 11, 2017, WVI filed a Motion To Submit Supplemental Trial Exhibits 161, 162, And 163—Minutes Of The March 30, 2017 Pilot Project/Study Meeting.  ECF No. 83.

On August 15, 2017, the Government filed a Post-Trial Sur-Reply Brief.  ECF No. 86 ("Gov't Post-Tr. Sur-Reply Br.").  On August 31, 2017, WVI filed a Post-Trial Sur-Reply Brief. ECF No. 87 ("Pl. Post-Tr. Sur-Reply Br.").

On November 16, 2017, the court issued an Order, granting WVI's August 11, 2017 Motion and ordering the parties to "file a final Joint Exhibit List, Plaintiff's Exhibit List, and Defendant's Exhibit List on, or before, November 27, 2017."  ECF No. 89.

On November 27, 2017, WVI filed a Plaintiff's Exhibit List.  ECF No. 90.  That same day, the Government filed a Joint Exhibit List and a Defendant's Exhibit List.  ECF No. 91.

On December 1, 2017, the court convened a site visit of the Waverley View Property in Frederick, Maryland.  ECF No. 93.

On December 5, 2017, WVI filed a Response To Questions Posed By The Court Following December 1, 2017 Site Visit To The Waverley View Property.  ECF No. 94.  That same day, the Government filed a Response To Questions Posed By The Court Following December 1, 2017 Site Visit To The Waverley View Property.  ECF No. 95.

## III.   DISCUSSION.

### A.   Subject Matter Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists."  *United States v. Testan*, 424 U.S. 392, 398 (1976). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages.  *See Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.").   The burden of establishing jurisdiction falls upon the plaintiff.  *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction); *see also* Rule of the United States Court of Federal Claims 12(b)(1).

The United States Court of Appeals for the Federal Circuit has held that the Takings Clause of the Fifth Amendment is "money-mandating." *See Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009) ("The Tucker Act waives sovereign immunity and provides jurisdiction for certain types of claims, including . . . where there is a money-mandating provision on which the plaintiff may base its recovery.  In this case, that provision is the Fifth Amendment." (internal citations omitted)); *see also Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005).  Therefore, "to the extent [WVI has] a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper." *See Moden*, 404 F.3d at 1341.

WVI's April 13, 2015 Complaint alleges: (1) a permanent physical taking by the Government of WVI's private property, without just compensation (Compl. ¶¶ 56–63); and (2) a temporary physical taking by the Government of WVI's private property, without just compensation (Compl. ¶¶ 64–74).  Since WVI's April 13, 2015 Complaint alleges "a taking of property within the meaning of the Fifth Amendment to the Constitution of the United States for which compensation is due and owing," it properly invokes the jurisdiction of the United States Court of Federal Claims under 28 U.S.C. § 1491(a)(1).  Compl. ¶¶ 3–4, 56–74.

For these reasons, the court has determined that it has jurisdiction to adjudicate the Takings Clause claims alleged in WVI's April 13, 2015 Complaint.

### B.      Standing.

"[S]tanding is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  The standing requirements derived from Article III of the United States Constitution also apply to the United States Court of Federal Claims.  *See Starr Int'l Co. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (holding that the United States Court of Federal Claims, "though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III.")), *petition for cert. filed*, No. 17-540 (Oct. 11, 2017).  Therefore, a plaintiff must establish "an injury-in-fact that is both fairly traceable to the challenged conduct of the defendant and likely redressable by a favorable judicial decision." *Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006).  In addition, the party invoking jurisdiction bears the burden of establishing constitutional standing.  *See Myers Investigative*, 275 F.3d at 1369 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[T]he party invoking federal jurisdiction bears the burden of establishing [its] elements.")).

WVI's April 13, 2015 Complaint alleges an injury-in-fact that is traceable to the Government's activities on the Waverley View Property that have caused economic injury that can be determined in a specific amount.  Compl. ¶¶ 56–74.

For these reasons, the court has determined that WVI has standing to seek an adjudication of the Takings Clause claims alleged in WVI's April 13, 2015 Complaint.

### C.      Plaintiff's Takings Clause Claims Against The Government.

The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V.  The purpose of the Takings Clause is to prevent the "Government from forcing some

people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The protections of the Takings Clause apply to real property. *See Acceptance Ins. v. United States*, 583 F.3d849, 854 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit has "developed a two-part test for determining whether 'fairness and justice' require compensation for burdens imposed by a particular governmental action." *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008) ("First, . . . the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment. . . . Second, after having identified a valid property interest, the court must determine whether the government action at issue amounted to a compensable taking of that property interest." (internal citations omitted)).

## 1.     At Trial, Plaintiff Established That It Owns Private Property Under Maryland State Law.

As a threshold matter, the court must determine "whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Acceptance Ins.*, 583 F.3d at 854; *see also Huntleigh USA Corp.*, 525 F.3d at 1377–78 ("[O]nly persons with a valid property interest at the time of the taking are entitled to compensation.") (citations and quotation marks omitted). Because "the Constitution protects rather than creates property interests, [however,] the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

Subtitle 6 of Title 14 of the Maryland Code, Real Property, defines "property" as "real property or any interest in or appurtenant to real property, including fixtures." MD. CODE ANN., Real Property § 14-601 (2016). Subtitle 3 of Title 9 of the Maryland Code, Real Property, defines "owner," in part, as "[t]he owner of the land." *Id.* § 9-301; *see also id.* § 7-105.2 (defining "record owner," in part, as "the person holding record title to property").

WVI proffered evidence at trial that it is the owner of the Waverley View Property, as defined by the Maryland Code. PX 53; TR 134–35 (Anderson); *see also* Real Property Data, MD. DEP'T OF ASSESSMENT & TAXATION, https://sdat.dat.maryland.gov/RealProperty/Pages/default. aspx (last visited Dec. 18, 2017) (select "FREDERICK COUNTY" as the "county in which to search" and "PROPERTY ACCOUNT IDENTIFIER" as the "search method;" using "02" as the "District," search the following "Account Identifiers" listed in PX 53: "069970;" "070014;" "069954;" and "241641") (listing "Waverley View Investors, LLC" as the current owner of each parcel of land).

For these reasons, the court has determined that WVI established at trial that it is the owner of the Waverley View Property, *i.e.*, a "cognizable Fifth Amendment property interest," under Maryland state law. *See Acceptance Ins.*, 583 F.3d at 854.

2.      **At Trial, Plaintiff Established That The Government's Activities After Expiration Of The Right Of Entry Agreement Effected A Permanent Taking Of Those Portions Of The Waverley View Property Physically Occupied By The Army-Installed Monitoring Wells And Gravel Access Road.**

a.      **Plaintiff's Argument.**

i.      **"Plaintiff Has Proved A *Per Se* Taking."**

WVI argues that the Army and the EPA engaged in a *per se* taking, because the EPA "used its CERCLA authority to take . . . a dominant easement . . . across all of . . . [Phase] II . . . for which the [Army and the EPA have] paid nothing." Pl. Post-Tr. Br. at 35–36. That this is a *per se* taking is "borne out by the [United States Court of Appeals for the Federal Circuit's] decision in *Hendler* [*III*]." Pl. Post-Tr. Br. at 36. *Hendler III* "involved [an EPA] investigation of a groundwater contaminant plume from a Superfund site. The [c]ourt had little trouble concluding that the Government's occupation of the plaintiff's nearby property for purposes of installing, servicing, and using groundwater monitoring wells constituted a *per se* taking of the plaintiff's property[,]" because the EPA: (1) occupied private property, without valid consent; (2) "took for itself the right to use the private property to conduct a CERCLA investigation and remediation;" (3) used its access "to drill wells that were permanent fixtures;" and (4) never "suggested that its intrusion would be brief, or gave any indication of when [it] would return to the plaintiffs the full use of their property." Pl. Post-Tr. Br. at 36–37; *see also Hendler III*, 952 F.2d at 1376–77. WVI contends that the taking in this case goes "far beyond [that] . . . in *Hendler* [*III*]," because "the [Army's] repeated delays and complete uncertainty[,]" with respect to further investigation and remediation, has impaired WVI's "ability to develop or sell any part of [Phase] II" of the Waverley View Property. Pl. Post-Tr. Br. at 37. In addition, "the value of [Phase] I has been dramatically diminished," because of "the uncertainty surrounding the [Army's] continued occupation of [Phase] II," making it "impracticable for WVI to move forward with new development plans." Pl. Post-Tr. Br. at 37–38.

The Army's promise that it "will work with WVI [to] locat[e] future impediments on the [Waverley View] Property is unreliable" for three reasons: (1) no documents commit the Army to work with WVI; (2) the EPA's Model Access Order "states that the property owner shall not interfere with or otherwise limit any [CERCLA] activity conducted at the [p]roperty," confirming that WVI's "use is subservient to the [EPA's] dominant use;" and (3) regardless of "where future wells or remedial structures are located, they will almost inevitably require a new site plan," made impracticable by the Army's lack of cooperation. Pl. Post-Tr. Br. at 39–40.

In addition, contradicting letters from the different federal agencies "aggravate[] the uncertainty [that] WVI faces." Pl. Post-Tr. Br. at 40. For example, the EPA's February 5, 2015 letter emphasized the "ongoing need for access to the [Waverley View] Property" and indicated that the EPA "did not require WVI's permission to access and use the wells." Pl. Post-Tr. Br. at 41. In contrast, the Army Corps' September 30, 2016 letter, written after a trial date was set in this case, "disclaim[ed] any ongoing ownership interest in the wells or right to access the [p]roperty." Pl. Post-Tr. Br. at 40.

At present, "the [WVI ROE] has expired.  Yet the Army's . . . gravel access road, and costly monitoring well network remain on [the Waverley View] Property.  [And, t]he [Army] has not said if or when it will remove them.  At a minimum, this ongoing physical occupation plainly constitutes a *per se* taking under *Hendler* [*III*] for which just compensation is owed."  Pl. Post-Tr. Br. at 41.

### ii.      "The Right Of Entry Agreement Preserved Plaintiff's Takings Clause Claim."

The WVI ROE "provides that WVI 'expressly reserves any and all rights it may have to make a claim under the Takings Clause of the Fifth Amendment, U.S. Const., amend. V.'"  Pl. Post-Tr. Br. at 41 (citing JX 5 at US000003–04).  The United States Court of Claims's decision in *Fonalledas v. United States*, 107 F. Supp. 1019 (Ct. Cl. 1952), confirms that such a reservation preserves a Takings Clause claim.  Pl. Post-Tr. Br. at 41.

According to the Government, "the reservation of rights gives WVI the right to bring a takings claim, but the [WVI ROE] — of which the reservation of rights is a part — simultaneously dooms that claim to defeat.  If that were the case, a [r]ight of [e]ntry with a reservation of rights would have no different effect from one without a reservation."  Pl. Post-Tr. Br. at 42.  A "familiar rule of interpretation, known as the rule against superfluities," provides that "[a]n interpretation which gives effect to all provisions of the [document] is preferred to one which renders part of the writing superfluous, useless, or inexplicable."  Pl. Post-Tr. Br. at 42 (quoting 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32.5 (4th ed.)).  This supports WVI's interpretation of the WVI ROE's reservation of rights and "shows why the Government's reading is wrong."  Pl. Post-Tr. Br. at 42.

### iii.     "The Right Of Entry Agreement Is Not A Contract."

The WVI ROE is not "a contractual bar to WVI's takings claim," because there was no bargained-for consideration.  Pl. Post-Tr. Br. at 43.  Although the Government claims that WVI received a benefit "in the form of certainty about the [Army's] use [of] WVI['s p]roperty," the Army's use has not been limited, because "CERCLA authorizes the [EPA] to force its way onto the property wherever and whenever it finds there is a need to do so."  Pl. Post-Tr. Br. at 43.  Therefore, "[a]ny limitations identified in the [WVI ROE] are . . . illusory and inadequate as consideration."  Pl. Post-Tr. Br. at 43 (citing RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT OF CONTRACTS") § 77 (1981)).

### b.      The Government's Response.

### i.      "Plaintiff Has Failed To Prove A Physical Taking Of Its Property, Because It Consented To The Army's Groundwater Monitoring."

The Government responds that, "to constitute a taking, the intrusion . . . must be without consent."  Gov't Post-Tr. Resp. Br. at 40.  In this case, "the parties negotiated and signed a written contract[,] the [WVI ROE,] pursuant to which WVI allowed the Army's installation of groundwater monitoring wells on [Phase] II" of the Waverley View Property.  Gov't Post-Tr. Resp. Br. at 40.  But, "a person's property cannot be said to have been 'taken' if the property owner and

the government negotiate a purchase agreement, lease or some other sort of contract allowing for entry beforehand." Gov't Post-Tr. Resp. Br. at 41.

In *Hendler III*, "after the landowner plaintiff refused [the] EPA's request for access to their property, the EPA issued an 'administrative order granting itself and the State of California access to plaintiff['s] property for, *inter alia*, locating, constructing, operating, maintaining and repairing monitoring/extraction wells.'" Gov't Post-Tr. Resp. Br. at 42 (italics added) (quoting *Hendler III*, 952 F.2d at 1369) (internal quotation marks omitted)). Thereafter, "without any effort to reach an agreement with [the] plaintiff as to well placement, the EPA installed a series of wells on [the] plaintiff['s] property." Gov't Post-Tr. Resp. Br. at 42. In this case, however, "the Army entered WVI's property with WVI's express written consent [pursuant to] an agreement negotiated over the course of many weeks with the assistance of counsel." Gov't Post-Tr. Resp. Br. at 42.

The WVI ROE "is a valid contract . . . [as it] includes an unambiguous offer and acceptance; consideration; and was signed by both parties." Gov't Post-Tr. Resp. Br. at 42. In exchange for "WVI's agreement to permit the Army [and the EPA] to access [Phase] II [of the Waverley View Property] for a period of eighteen months, . . . the Army agree[d] to install groundwater monitoring wells . . . and obtain samples from those wells, all at the Army's expense." Gov't Post-Tr. Resp. Br. at 43. In addition, "the Army agreed to provide WVI with the results of its testing and to repair damages caused to the property by the Army or its contractors." Gov't Post-Tr. Resp. Br. at 43. All of "[t]his constitutes consideration." Gov't Post-Tr. Resp. Br. at 43.

Once consideration is established, "courts do not weigh the adequacy of that consideration." Gov't Post-Tr. Resp. Br. at 43 (quoting *Davis Wetlands Bank, LLC v. United States*, 114 Fed. Cl. 113, 121 n.9 (Fed. Cl. 2013)). WVI's argument that no consideration supports the WVI ROE, "because it does not limit the [Army's or the EPA's] use of the [Waverley View] Property[,] is specious." Gov't Post-Tr. Resp. Br. at 44. WVI asserts that, "notwithstanding the express language of the [WVI] ROE, its limitations are 'illusory and inadequate as consideration' because the [EPA] is supposedly authorized under CERCLA 'to force its way onto the property.'" Gov't Post-Tr. Resp. Br. at 44 (quoting Pl. Post-Tr. Br. at 43). If that were the case, "then all government contractual agreements entered into in lieu of taking unilateral administrative action would be illusory." Gov't Post-Tr. Resp. Br. at 44.

Although the WVI ROE reserved "any and all rights [WVI] may have to make a claim under the Takings Clause," it also provided that "[t]he Government acknowledges this reservation without any concession that any such rights or claim may exist." Gov't Post-Tr. Resp. Br. at 44 (citing JX 5 at US000003–04). It is well established that "[a]n interpretation that gives meaning to all parts of the contract is to be [preferred] over one that leaves a portion of the contract useless, [inexplicable], void, or superfluous." Gov't Post-Tr. Resp. Br. at 44–45 (quoting *NVT Techs, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). WVI construes the WVI ROE "to mean that . . . the Army is liable for the very conduct that the [WVI] ROE purportedly authorizes. That construction swallows the *entire* bargained-for agreement. Moreover, it ignores [that] the Government expressly refuse[d] to acknowledge that any such rights or claim may exist." Gov't Post-Tr. Resp. Br. at 45. In short, WVI's construction "obliterates its consent to access the property and indeed the agreement in its entirety." Gov't Post-Tr. Resp. Br. at 45.

In *Scogin v. United States*, 33 Fed. Cl. 568 (Fed. Cl. 1995), the United States Court of Federal Claims determined that because the "plaintiff did not demonstrate that the EPA undertook activity on his property 'beyond the scope of valid agreements granting the [g]overnment access to the subject property for specified purposes,' the plaintiff failed to prove that he did not consent fully to the EPA's presence on his property." Gov't Post-Tr. Resp. Br. at 45 (quoting *Scogin*, 33 Fed. Cl. at 578). Similarly, in this case, "WVI presented no evidence that the Army's activities on WVI's property exceeded those authorized under the [WVI] ROE." Gov't Post-Tr. Resp. Br. at 45. Consequently, the consent provided in the WVI ROE "vitiates WVI's takings claim." Gov't Post-Tr. Resp. Br. at 45.

In addition, WVI's reliance on *Fonalledas* "is misplaced," because that "decision . . . has never been followed or approved by the [United States Court of Appeals for the] Federal Circuit and . . . has been called into question by the [United States] Supreme Court's subsequent development of takings jurisprudence." Gov't Post-Tr. Resp. Br. at 45–46. And, "[u]nlike this case, . . . in *Fonalledas* the permit included no refusal on the part of the [government] to acknowledge that any . . . 'rights' existed. By that omission, the government essentially conceded that such rights existed." Gov't Post-Tr. Resp. Br. at 46. In contrast, here

> the Army's explicit refusal to acknowledge that WVI had any right to assert a takings claim preserved its argument that the permission given in the [WVI] ROE to access the [ROE] Property subject to explicit limitations, vitiated any takings claim except to the extent that the Army exceeded the scope of the agreement.

Gov't Post-Tr. Resp. Br. at 46.

Finally, WVI argues that the Government's construction of the WVI ROE "renders the reservation of rights . . . meaningless. This is not so." Gov't Post-Tr. Resp. Br. at 45. Although WVI effectively waived "any taking claim based on a physical intrusion authorized by the [WVI] ROE" by signing that agreement, "WVI retained the right to assert either a regulatory taking claim or a taking claim for exceeding the access rights in the [WVI] ROE." Gov't Post-Tr. Resp. Br. at 45.

### ii.     "Plaintiff Did Not Establish That The Government Has Permanently Occupied Its Property."

WVI's argument that the EPA "used its CERCLA authority to take for itself [and the Army] a dominant easement for CERCLA investigation and remediation purposes across all of the [Phase] II property," is speculative. Gov't Post-Tr. Resp. Br. at 54 (quoting Pl. Post-Tr. Br. at 36). WVI's permanent Takings Clause claim is "based on actions the [EPA or the Army] *may* take in the future to remediate contaminated groundwater from Area B on WVI's property. Thus, WVI's takings claims . . . are not ripe." Gov't Post-Tr. Resp. Br. at 54. In addition, "[c]ontrary to the thrust of WVI's argument, there is no such thing as an action for 'anticipatory taking,[']" *i.e.*, a suit such as that filed by WVI alleging that the mere possibility the [Army or the EPA] might take the party's property at some unknown date and time in the future gives rise to a cause of action in the present." Gov't Post-Tr. Resp. Br. at 54–55.

The CERCLA process is "ongoing" and the Remediation/Feasibility Study has not determined "what remediation plan will proceed for the Fort Detrick Area B groundwater Superfund Site." Gov't Post-Tr. Resp. Br. at 56 (citing DX 136 at 3–4). In addition, "there is no evidence at this time that active remediation would be required on the Waverley View [P]roperty." Gov't Post-Tr. Resp. Br. at 56 (citing DX 136 at 3–4). And, "even if the [Army or the EPA] does ultimately require additional access to the Waverley View [P]roperty, that access would be tailored to work with any existing or planned development." Gov't Post-Tr. Resp. Br. at 56 (citing DX 136 at 7–8). Accordingly, "the determination of what, if any, taking may occur in the future is speculative, [and] WVI cannot assert a ripe claim based on such speculation." Gov't Post-Tr. Resp. Br. at 56.

### iii. "Because Plaintiff Consented To The Installation Of The Monitoring Wells In A Valid Contract, Its Claims Are Governed By Contract Law."

WVI is entitled to recover, "only to the extent that the [Army or the EPA] did not comply with the [WVI] ROE, and WVI has provided no evidence that the [Army's or the EPA's] actions did not conform to the provisions of that [a]greement." Gov't Post-Tr. Resp. Br. at 56. Even if the court concludes that "the [WVI] ROE required the Army to decommission the wells and the gravel road installed on the [Waverley View P]roperty, the failure to do so constitutes at most a breach of contract, not a taking." Gov't Post-Tr. Resp. Br. at 56.

WVI also has "adduced no evidence that the Army entered WVI's property without . . . consent before, during, or after the time in which the [WVI] ROE was in place." Gov't Post-Tr. Resp. Br. at 57. And, the WVI ROE "did not require, the decommissioning of the wells or removal of the gravel road the Army installed on [the Waverley View P]roperty." Gov't Post-Tr. Resp. Br. at 57. Therefore, "[t]he fact that the wells and gravel road remain on WVI's property is consistent with the parties' negotiated agreement." Gov't Post-Tr. Resp. Br. at 57. Because WVI "did not plead and prove a breach of the [WVI ROE] and[,] because the relationship between the [Army] and WVI is governed by the terms of that [a]greement, WVI is not entitled to any recovery in this action." Gov't Post-Tr. Resp. Br. at 57.

In addition, the "continued existence of the wells and gravel road on [WVI's] property after expiration of the [WVI] ROE" is not a "permanent taking," because "the [WVI] ROE did not require removal of the monitoring wells or gravel road." Gov't Post-Tr. Resp. Br. at 57. Moreover,

> even if the continued presence of the wells or road . . . exceeded the scope the [WVI] ROE, any taking would only last from the expiration of the [WVI] ROE, November 13, 2014, until the issuance of the September 30, 2016 letter from the Army [Corps], confirming the expiration of the [WVI] ROE and [the Army's] lack of further rights or interest in the monitoring wells.

Gov't Post-Tr. Resp. Br. at 57–58 (citing DX 109).

c.      **Plaintiff's Reply.**

i.      **"Plaintiff's Takings Clause Claim Is Ripe for Review."**

WVI replies that "[t]here is nothing 'anticipatory' about [its] taking" claim.  Pl. Post-Tr. Reply Br. at 8 (quoting Gov't Post-Tr. Resp. Br. at 54).  "[The taking] began in 2013 and persists to this day.  The [Army] . . . forced its way onto WVI's [p]roperty and installed a network of wells [and] a gravel road[.] . . . That is a *per se* physical taking."  Pl. Post-Tr. Reply Br. at 8 (citing *Hendler III*, 952 F.2d at 1375–76).  Moreover, in addition to the ongoing physical occupation, the Army and the EPA have "effectively asserted an easement across whole swaths" of the Waverley View Property.  Pl. Post-Tr. Reply Br. at 9 (citing JX 8).

ii.     **"The Right Of Entry Agreement Does Not Bar Plaintiff's Takings Clause Claim."**

Regardless of WVI's consent, "one way or another, the [Army and the EPA were] inevitably going to occupy [WVI's] [p]roperty."  Pl. Post-Tr. Reply Br. at 11.  WVI was coerced into signing the WVI ROE and Mr. Dorment only agreed, because "'[WVI] had no leverage, no negotiating capacity . . . , and [Mr. Dorment's] attorneys had informed [him] that [the Army and the EPA] were going to get whatever they wanted to get.'"  Pl. Post-Tr. Reply Br. at 11 (quoting TR 647 (Dorment)).  Communications from the Army and the EPA made clear that WVI had two choices: "admit the [Army and the EPA] to the [Waverley View] Property involuntarily by [agreement], or . . . involuntarily by unilateral administrative order."  Pl. Post-Tr. Reply Br. at 11.  The Government's argument that "choos[ing] between 'unpleasant' alternatives is not the same thing as being coerced" is unsupported by legal authority.  Pl. Post-Tr. Reply Br. at 11 (quoting TR 57 (Held)).  In addition, WVI did not "contaminate the groundwater beneath the property" nor did it bring about this "untenable 'choice.'"  Pl. Post-Tr. Reply Br. at 12.  Because "the [Army] is responsible for both of the 'unpleasant alternatives' and [WVI was forced] to yield control of its [p]roperty, the [WVI] ROE is a product of coercion."  Pl. Post-Tr. Reply Br. at 12.

In addition, the WVI ROE is not supported by any bargained-for consideration and is not a contract.  Pl. Post-Tr. Reply Br. at 14–15.  Neither the "provisions about duration, hour of entry, notice, installation of the wells, and sampling," nor "[t]he . . . commitment to supply test results" constitute consideration.  Pl. Post-Tr. Reply Br. at 14–15.

Finally, the Government "either mischaracterizes or misunderstands WVI's argument about the reservation of rights in the [WVI] ROE."  Pl. Post-Tr. Reply Br. at 15.  The reservation of rights does not mean that the Army and the EPA cannot enter WVI's property; instead, it means that, although WVI did not stop the Army and the EPA from entering the ROE Property, WVI will "insist on just compensation under the Fifth Amendment for . . . taking of the [p]roperty."  Pl. Post-Tr. Reply Br. at 15–16.  Likewise, the Government's argument that WVI may only assert a takings claim "for exceeding the access rights in the [WVI] ROE" is without support.  Pl. Post-Tr. Reply Br. at 16 (quoting Gov't Post-Tr. Resp. Br. at 45).  The reservation of rights does not "distinguish between types of takings claims, whether 'for exceeding the access rights in the [WVI] ROE' or otherwise.  It simply says that WVI preserves its right to bring a takings claim[.]"  Pl. Post-Tr. Reply Br. at 16.

### d.    The Government's Sur-Reply.

#### i.    "The Right Of Entry Agreement Vitiates Plaintiff's Takings Clause Claims."

The Government adds that, "because the groundwater monitoring wells on which WVI bases its takings claims were installed with WVI's permission, there was no 'taking' within the meaning of the Fifth Amendment." Gov't Post-Tr. Sur-Reply Br. at 4. As the United States Supreme Court explained in *Yee v. City of Escondido*, 503 U.S. 519 (1992), "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land. 'This element of required acquiescence is at the heart of the concept of occupation.'" *Id.* at 527 (internal citations omitted). As such, "whether the government floods a landowner's property[] or does no more than require the landowner to suffer the installation of a cable, the Takings Clause requires compensation[,] if the government authorizes a compelled physical invasion of property." *Id.* Because WVI's right to exclude was voluntarily relinquished, [its property was] not taken. Gov't Post-Tr. Sur-Reply Br. at 5.

The WVI ROE is enforceable, because "[c]oercion sufficient to negate WVI's consent requires far more" than the Government's actions in this case. Gov't Post-Tr. Sur-Reply Br. at 5. Simply because "WVI was unhappy about entering into the [WVI ROE] after the fact does not negate its consent to the entry. And that consent vitiates WVI's *per se* permanent physical taking claim." Gov't Post-Tr. Sur-Reply Br. at 8. And, for these same reasons, the reservation of rights language in the WVI ROE only "preserve[d] a takings claim for an intrusion exceeding the access rights in the [WVI ROE], or for a regulatory taking[.]" Gov't Post-Tr. Sur-Reply Br. at 11.

In any event, if the court determines that there was a taking, the court must "determine whether such taking was permanent or temporary." Gov't Post-Tr. Sur-Reply Br. at 13. This requires an analysis of the factors set forth in *Arkansas Game and Fish Commission v. United States*, 568 U.S. 23 (2012). Gov't Post-Tr. Sur-Reply Br. at 13–14. The Army's presence "lasted for less than two years," and "WVI had extensive knowledge of the 'character of the land' and likelihood of contamination when it purchased the [Waverley View] Property." Gov't Post-Tr. Sur-Reply Br. at 14. As such, the "investment-backed expectations" and the "extent of interference" weigh against finding a temporary taking. Gov't Post-Tr. Sur-Reply Br. at 17.

#### ii.    "The Right Of Entry Agreement Is Supported By Valid Consideration."

WVI does not cite a single case in support of the contention that the WVI ROE "is not a contract because it is not supported by consideration." Gov't Post-Tr. Sur-Reply Br. at 8 (quoting Pl. Post-Tr. Reply Br. at 14). The Government "is aware of no case that has held a [r]ight of [e]ntry [a]greement . . . invalid for lack of consideration." Gov't Post-Tr. Sur-Reply Br. at 8. Apart from the specific terms of any such agreement, both the Government and WVI benefited: "[t]he [Army and the EPA] gain[ed] access to obtain necessary data and to remediate environmental contamination," and "[b]y cooperating with the [R]emedial [I]nvestigation, [WVI] avoid[ed] the risk of relinquishing any defenses it may have under CERCLA and further benefits[,] because the cost of drilling wells and sampling [was] borne by the [Army]." Gov't Post-Tr. Sur-Reply Br. at 8. The WVI ROE also provided other benefits that can be seen "by comparing the [WVI]

ROE . . . with standard [r]ight of [e]ntry [a]greements the Army entered into with neighboring subdivisions, Carroll Park . . . and Loch Inver Court[.]" Gov't Post-Tr. Sur-Reply Br. at 9 (citing JX 5; DX 37; DX 103).

### e.    Plaintiff's Sur-Reply.

#### i.    "The Right Of Entry Agreement Does Not Bar Plaintiff's Takings Clause Claim."

WVI argues that the WVI ROE "is not supported by consideration." Pl. Post-Tr. Sur-Reply Br. at 7. WVI did not "get anything from the terms of the [WVI] ROE that it did not already have." Pl. Post-Tr. Sur-Reply Br. at 7. And, the Government's argument that the WVI ROE is "supported by consideration because it contains terms not found in other rights of entry," ignores that "[t]he concept of consideration . . . looks to whether *this* document recites consideration bargained for by *these* parties." Pl. Post-Tr. Sur-Reply Br. at 7.

In determining whether the WVI ROE was the product of coercion, the United States Court of Appeals for the Federal Circuit has held that a party must establish: "(1) that the [g]overnment 'effectively imposed the terms' of the action at issue; (2) that the party 'had no realistic alternative' but to accept the [g]overnment's terms; and (3) that the party's action 'was the result of improper acts by the agency.'"  Pl. Post-Tr. Sur-Reply Br. at 9 (quoting *Staats v. United States Postal Service*, 99 F.3d 1120, 1124 (Fed. Cir. 1996)).  Although *Staats* "arose in the employment context, the principles articulated are not inherently limited to that setting.  And[,] the Government has not identified any other [United States Court of Appeals for the] Federal Circuit precedent to guide this [c]ourt."  Pl. Post-Tr. Sur-Reply Br. at 10.

The Government's construction of the WVI ROE's reservation of rights requires the court impermissibly to "insert terms and qualifiers into the reservation of rights."  Pl. Post-Tr. Sur-Reply Br. at 10.  Even if the court could do so, the "most glaring defect in the Government's arguments about the reservation of rights[, however,] remains [its] inability to account for the [United States] Court of Claims'[s] decision in *Fonalledas*[.]"  Pl. Post-Tr. Sur-Reply Br. at 11.

#### ii.    "Plaintiff's Takings Clause Claim Is Ripe For Review."

The Army's continued occupation of the Waverley View Property "rendered [Phase] II [of the Waverley View Property] . . . essentially worthless, and caused a significant loss in the market value of [Phase] I," but the "Government continues to urge that this case is not ripe." Pl. Post-Tr. Sur-Reply Br. at 11.  The uncertainty that the Government points to is not only an issue of damages . . . rather than one of ripeness; it is *a part of the taking*."  Pl. Post-Tr. Sur-Reply Br. at 12.  In fact, "[i]t is precisely because the [Army] admittedly cannot provide any specifics about its continuing and future occupation . . . that WVI cannot move forward with developing its land."  Pl. Post-Tr. Sur-Reply Br. at 12.  The court should not dismiss WVI's claim as "unripe," simply because the Army is unable to provide "a concrete end date to the [Army's] occupation of the [p]roperty."  Pl. Post-Tr. Sur-Reply Br. at 12.  Instead, this is a "component of the claim[.]"  Pl. Post-Tr. Sur-Reply Br. at 12.

iii.     **"The Framework From *Arkansas Game and Fish* Does Not Apply To Permanent Takings Cases Like This One."**

Finally, the Government argues, for the first time, that the framework set out in *Arkansas Game and Fish Commission* controls in this case, because any taking was only temporary.  Pl. Post-Tr. Sur-Reply Br. at 12.  But, "*Hendler* [*III*] could not be clearer: the [Army's] investigative activities on the [Waverley View] Property constitute a permanent physical invasion sufficient to establish a *per se* taking under *Loretto* [*v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)]."  Pl. Post-Tr. Sur-Reply Br. at 13.  "[T]his case is a textbook example of a permanent physical occupation;" therefore, *Arkansas Game and Fish Commission* is irrelevant.  Pl. Post-Tr. Sur-Reply Br. at 13.

f.     **The Court's Resolution.**

i.     **Governing Precedent.**

A compensable taking occurs when the government "physical[ly] inva[des] or appropriat[es] . . . private property."  *Huntleigh USA Corp.*, 525 F.3d at 1378; *see also Acceptance Ins.*, 583 F.3d at 854 ("The Fifth Amendment to the United States Constitution proscribes the taking of private property for public use, without just compensation.") (internal quotations omitted).  A physical invasion or appropriation occurs when "the government itself occupies the property or requires the landowner to submit to physical occupation of its land."  *Stearns Co. v. United States*, 396 F.3d 1354, 1357 (Fed. Cir. 2005) (emphasis and internal quotations omitted).  Although physical takings "are relatively rare," they are "easily identified, and usually represent a greater affront to individual property rights."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002).  Therefore, when the government physically takes property, "it has a categorical duty to compensate the former owner, . . . regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."  *Id*. at 322 (internal citations omitted).

As the United States Supreme Court observed in *Arkansas Game and Fish Comm'n*, however, "permanent physical occupations" of property must be distinguished from "temporary [physical] invasions."  *Ark. Game & Fish Comm'n*, 568 U.S. at 36.  And, as the United States Court of Appeals for the Federal Circuit explained in *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345 (Fed. Cir. 2006),

"[p]ermanent" has a special meaning in the determination of whether a physical occupation has occurred.  In the context of physical takings "'permanent' does not mean forever, or anything like it."  A government occupation is "permanent" when the government's "intrusion is a substantial physical occupancy of private property."  The government's occupation may be permanent[,] even if it is not "exclusive, or continuous and uninterrupted."  The [United States] Supreme Court held in *Loretto* that the placement of cable and connection boxes on the plaintiff's property was a physical taking.  In *Hendler* [*III*], [the United States Court of Appeals for the Federal Circuit] held that the placement of groundwater monitoring wells on the plaintiff's property and the government's periodic presence for installing and servicing the wells was "permanent" and therefore a physical taking.

53

In contrast, [the court] noted that a transient and relatively inconsequential incursion by the government, such as a truckdriver parking on a vacant lot to eat lunch, is not sufficiently permanent to comprise a taking. Similarly, in *Boise Cascade* [*Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002)], [the same court] determined that government surveyors who briefly entered the plaintiff's land over a period of five months to perform owl surveys did not "permanently" occupy the plaintiff's property. Thus, the determination of whether government occupancy is "permanent" is highly fact-specific. In any event, the installation of fixed physical structures, such as the cable and cable connections in *Loretto* or the groundwater monitoring wells in *Hendler* [*III*] is typical of a "permanent" occupation, while the transient entry of persons via government authority on a plaintiff's property is generally not "permanent."

*Id.* at 1357 (internal citations omitted), *aff'd*, 552 U.S. 130 (2008).

A claim for a physical taking, however, may not arise where a property owner voluntarily consents to the government's entry onto private property and to those governmental activities giving rise to such a claim. *See, e.g.*, *J. J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct. Cl. 1969)[41] ("[W]here the government possesses property under the color of legal right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment. The amendment has limited application to the relative rights in property of parties . . . which have been voluntarily created by contract."); *see also, e.g.*, *Nat'l Bd. of YMCA v. United States*, 396 F.2d 467, 474 (Ct. Cl. 1968), (denying just compensation for damage to plaintiffs' properties, in part, because "the structural changes were made with the consent of the plaintiffs"), *aff'd*, 395 U.S. 85 (1969); *Scogin*, 33 Fed. Cl. at 578 (determining there was no taking, based on physical use and occupation, where plaintiff failed to demonstrate any EPA activity that exceeded the scope of plaintiff's consent).

In this case, the parties argue at length about whether the WVI ROE is a "valid" contract. Although a contract may reflect an agreement to allow the government access to and use of private property, the relevant inquiry is only whether there was voluntary consent to the same. As the United States Supreme Court explained in *Yee*, "[t]he government effects a physical taking only where it *requires* the landowner to submit to . . . physical occupation of his land. This element of required acquiescence is at the heart of the concept of occupation." *Yee*, 503 U.S. at 527. Required acquiescence, however, cannot exist when consent is voluntarily given. Accordingly, whether the Army or the EPA *required* WVI to "submit to . . . physical occupation" of the Waverley View Property is dispositive of whether a taking occurred during the term of the WVI ROE, *i.e.*, from May 14, 2013 to November 13, 2014.

### ii. Plaintiff Voluntarily Consented To The Government's Entry And Use Of The Waverley View Property.

On April 8, 2009, Fort Detrick Area B Groundwater was listed on the NPL as a CERCLA Superfund site, thereby triggering the EPA's authorities under CERCLA. PX 65 at 2.

---

[41] The United States Court of Appeals for the Federal Circuit has held that United States Court of Claims decisions issued prior to September 30, 1982, are binding precedent. *See S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982).

Nevertheless, on November 15, 2012, WVI purchased the Waverley View Property.  PX 53; TR 134–35 (Anderson).  Thus, the EPA's authority to enter the property, pursuant to § 104(e)(3) of CERCLA, 42 U.S.C. § 9604(e)(3), predated WVI's ownership by more than three and a half years.  As such, when WVI purchased the Waverley View Property, it did so subject to the EPA's "significant enforcement authorities under . . . CERCLA," including the right to access the Waverley View Property, with or without WVI's consent.  PX 10 at WVI00004487.

In attempting to gain access to the Waverley View Property, however, the Army and the EPA did not exercise the EPA's CERCLA authority or the power of eminent domain to compel WVI's consent.  *See United States v. Dow*, 357 U.S. 17, 21 (1958) ("[T]he United States may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings.").  Instead, after weeks of negotiations, during which WVI was represented by counsel and "exchanged several drafts of the [WVI ROE] with the EPA and . . . the Army" (TR 725 (Dorment)), the parties agreed on terms of access and memorialized them in the WVI ROE (JX 5).  Neither the Army nor the EPA required WVI to sign the WVI ROE.  Instead, the WVI ROE was the culmination of "weeks . . . [of] negotiations" between the parties.  PX 10 at WVI00004486; *see also* TR 725 (Dorment).  Although WVI may have felt pressure to participate in these negotiations,[42] WVI retained the right to walk away; a right that Messrs. Dorment and Anderson exercised on numerous prior occasions.  *See, e.g.*, JX 1; TR 151–52 (Anderson).  Accordingly, when WVI gave its consent by signing the WVI ROE, it did so voluntarily.

WVI nevertheless argues that the WVI ROE was the product of coercion or duress.  Pl. Post-Tr. Resp. Br. at 12.  To render an agreement unenforceable for coercion or duress, a party "must establish that (1) it involuntarily accepted [the other party's] terms, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of [the other party's] coercive acts."  *Dureiko v. United States*, 209 F.3d 1345, 1358 (Fed. Cir. 2000).

Although some evidence[43] suggests that WVI signed the WVI ROE "under protest,"[44] WVI nevertheless failed to establish the second and third elements of the duress test.

_____

[42] In his May 24, 2013 letter, Mr. Dorment indicates that "all of the negotiations . . . were conducted within the coercive context of [the EPA's] significant enforcement authorities under the CERCLA statute."  PX 10 at WVI00004487.

[43] *See, e.g.*, PX 10 WVI00004486–87 (Mr. Dorment explaining that WVI "could not accept" a proposal to include language in the WVI ROE that WVI "'*freely and voluntarily*' grants access . . . because all of the negotiations concerning such demanded access were conducted within the coercive context of [the EPA's] significant enforcement authorities under the CERCLA statute.")

[44] *See N. Star Steel Co. v. United States*, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (holding that signing an agreement "under protest" may satisfy the first element of the duress test, *i.e.*, involuntary acceptance of the other party's terms, but that alone is insufficient to demonstrate duress).

As to the second element, WVI could have refused to sign the WVI ROE.  Although such refusal may have subjected WVI to liability for "investigation and cleanup costs" under CERCLA as described in the EPA's February 8, 2013 letter (DX 44 at US000009), the "threat of considerable financial loss" is not sufficient to establish duress (*see Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1330 (Fed. Cir. 2003)).  Instead, WVI could have continued to refuse to sign the WVI ROE as Messrs. Dorment and Anderson had done on numerous prior occasions.  *See, e.g.*, JX 1; TR 151–52 (Anderson).

Regarding the third element, "coercion requires a showing that the [g]overnment's action was wrongful, *i.e.*, (1) illegal, (2) a breach of an express provision of the [agreement] without a good-faith belief that the action was permissible under the [agreement], or (3) a breach of the implied covenant of good faith and fair dealing."  *N. Star Steel Co.*, 477 F.3d at 1334 (internal citations and quotation marks omitted).  There is no evidence that the Army or the EPA acted illegally.  Nor was the EPA's February 8, 2013 letter an "improper threat."  *See David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981) (defining "improper threat" as "threats to commit a crime or a tort . . . [or] that would accomplish . . . economic duress . . . includ[ing] threats that would breach a duty of good faith and fair dealing under a contract as well as threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms[,] because they exploit prior unfair dealing on the part of the party making the threat") (internal citations omitted).  Instead, the EPA'S February 8, 2013 letter described relevant CERCLA provisions and the EPA's authority thereunder, including that the EPA had legal authority to access the Waverley View Property, with or without WVI's consent.

Accordingly, the EPA's February 8, 2013 letter did not threaten WVI; instead, it described relevant CERCLA provisions and the EPA's authority thereunder, including that the EPA had legal authority to access the Waverley View Property.

For these reasons, the court has determined that the WVI ROE was not the product of coercion or duress; instead, WVI voluntarily consented to the terms of that agreement, authorizing the Army and the EPA to enter and use the ROE Property from May 14, 2013 to November 13, 2014.

### iii.    The Reservation Of Rights In The Right Of Entry Agreement Did Not Invalidate Plaintiff's Consent.

The WVI ROE provided that WVI "expressly reserves any and all rights it *may* have to make a claim under the Takings Clause of the Fifth Amendment, U.S. Const., amend. V.  The Government acknowledges this reservation *without any concession* that any such rights or claim may exist."  JX 5 at US000004 (emphasis added).  WVI argues that this reservation of rights preserved its right to bring Takings Clause claims based on the Army's activities pursuant to the WVI ROE.  Pl. Post-Tr. Br. at 41–43.  In effect, WVI argues that the reservation or rights renders its voluntary consent, and thus the entire WVI ROE, meaningless.  WVI insists, however, that *Fonalledas*, "shows that [the] reservation [of rights] is effective to preserve a takings claim."  Pl. Post-Tr. Br. at 41.  But, WVI construes the holding in *Fonalledas* too broadly.

In *Fonalledas*, the dredging of a channel in San Juan Harbor, Puerto Rico caused "mud, silt and salt water" to flow over the plaintiffs' lands.  *See Fonalledas*, 107 F. Supp. at 1020–21. The plaintiffs "protested . . . to various [g]overnment officials and finally brought a suit in the

United States District Court to enjoin the [dredging]." *Id.* at 1021.  Thereafter, the government "advised . . . the plaintiffs that dredging operations . . . would stop, [and] that a drainage canal would be dug to drain off the salt water already accumulated on the plaintiffs' lands and afford future drainage." *Id.*  Based on these assurances, plaintiffs' counsel "gave the [g]overnment a letter of authorization to construct the canal," providing "[i]t is expressly understood that this permit is granted[,] without prejudice to any and all rights of our clients, or, in other words, it is expressly understood that our clients waive no rights whatsoever by reason of this permit." *Id.* The drainage canal "was thereupon constructed and the injunction suit was dismissed." *Id.* Thereafter, plaintiffs' filed suit in the United States Court of Claims "to recover for the alleged taking of [plaintiffs'] lands." *Id.* at 1020.  The government "contend[ed] that the permission given by the plaintiffs for the construction of the canal was a waiver of any claims which the plaintiffs might otherwise have had for its construction and the harmful effects thereof." *Id.* at 1022.  The *Fonalledas* court disagreed, explaining that, "the statement in the written permission that 'it is expressly understood that our clients waive no rights whatsoever by reason of this permit' is a complete answer to the [g]overnment's contention." *Id.*

Unlike this case, however, in *Fonalledas*, the plaintiffs' Takings Clause claims accrued *before* any agreement to permit dredging was reached with the government, *i.e.*, the plaintiffs' Takings Clause claims predated its consent, as the letter from plaintiffs' counsel reflected. Therefore, the *Fonalledas* court determined that a reservation of rights may preserve Takings Clause claims predating a consent agreement, not that a reservation of rights invalidates consent, as WVI would have it.

Nevertheless, it is an established canon that, "[w]hen interpreting [an agreement], the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc.*, 370 F.3d at 1159.  Therefore, the court has determined that the reservation of rights in the WVI ROE preserves any Takings Clause claim that WVI had prior to signing that agreement or which arose outside the scope and duration thereof, but not any claim that arose within the scope and duration of the WVI ROE.

> **iv.** **The Government's Activities On The Waverley View Property During The Term Of The Right of Entry Agreement Did Not Exceed The Scope Of Work Described Therein.**

The WVI ROE *broadly* granted the Army and the EPA authority to perform a number of activities on the ROE Property.  First, the WVI ROE granted the Army and the EPA

> an irrevocable right to enter in, on, over and across [the ROE Property], for a period not to exceed eighteen (18) months, unless further extended by [a]greement of the parties commencing on May 14, 2013, and running through November 13, 2014, or, if sooner, the date of completion of the [R]emedial [I]nvestigation.

JX 5 at US000001.

Second, the WVI ROE granted the Army and the EPA

the right to store, move, and remove equipment and supplies; investigate and collect samples . . . ; *construct, operate, maintain, alter, repair, and remove groundwater monitoring wells, appurtenances thereto, and other devices for the monitoring of contamination in soil, air, and water*; and, perform *any other such work which may be necessary and incident to the Government's use* for the investigation and determination of need for response on [the ROE Property.]

JX 5 at US000001–02 (emphasis added).

The WVI ROE also included a map showing proposed locations of "drilling areas," and described the "Scope of Work" as follows:

> 1.  Evaluation, logging, surveying, measuring, and testing of existing wells (GW-1, GW-2, GW-3, GW-4) on the [ROE Property], including regular access during the groundwater tracer study (e.g., weekly, biweekly, or monthly for the duration of the study and/or right-of-entry period).

> 2.  Drilling, logging, and borehole testing in three areas on the [ROE Property] (see Figure 1), including rig access to each drill area, monitoring well construction (multiple), surveying, measuring, and testing of completed wells for the duration of the right-of-entry period.  Any other drilling areas identified by [the] EPA, [the] MDE, or the Army would be restricted to the [ROE Property].

> 3.  Access to any streams, seeps, springs, or other surface water features that may exist on the [ROE Property] for surveying, monitoring, and sampling[.]

JX 5 at US000006.

Pursuant to the WVI ROE, on or about, November 21, 2013, the Army entered the ROE Property and constructed a gravel access road.  TR 199 (Anderson).  This work was within the Army's authority to "perform any other . . . work which may be necessary and incident to the Government's use" under the WVI ROE.  JX 5 at US000002.  Beginning in December 2013, the Army also installed and maintained fifteen monitoring wells on the ROE Property.  TR 949 (Gortva).  And, during the term of the WVI ROE, the Army collected samples from these monitoring wells.  TR 954 (Gortva).  All of this work was included within the Army's authority to "investigate and collect samples . . . ; [and] construct, operate, maintain, alter, repair, and remove groundwater monitoring wells, appurtenances thereto, and other devices for the monitoring of contamination in soil, air, and water" under the WVI ROE.  JX 5 at US000002.

Moreover, all of this work occurred during the term of the WVI ROE, *i.e.*, between May 14, 2013 and November 13, 2014, and the Army complied with the WVI ROE's notice and timing requirements "[f]or all [of its] activities."  TR 959–60 (Gortva).  On expiration of the WVI ROE, the Army ceased all work on the ROE Property and has not re-entered the Waverley View Property since.  JX 5 at US000001; TR 959–60 (Gortva).

In addition, all of the monitoring wells installed by the Army were located on the ROE Property.  *Compare* JX 5 at US000006, *with* PX 76.  And, despite the need to offset some monitoring wells (TR 949–50 (Gortva)), there appears to be an attempt to cluster most of the

monitoring wells within the three "drilling areas" proposed in the WVI ROE's "Scope of Work" (*compare* JX 5 at US000006, *with* PX 76). This was done, without any feedback from WVI about the proposed offset locations (TR 951 (Gortva)), and despite the Army's broad authority to identify "[a]ny other drilling areas" on the ROE Property (JX 5 at US000006 ("Any other drilling areas identified by [the] EPA, [the] MDE or the Army would be restricted to the [ROE Property].")).

For these reasons, the court has determined that the Army's and the EPA's activities throughout the duration of the WVI ROE, *i.e.*, from May 14, 2013 to November 13, 2014, did not exceed the scope of work described by that agreement. Therefore, no Takings Clause claims arose from those activities.

> **v.** **The Continued Presence Of The Army-Installed Monitoring Wells And Gravel Access Road On The Waverley View Property After Expiration Of The Right Of Entry Agreement Effected A Permanent Taking Of Certain Portions Thereof.**

The duration of the WVI ROE was "*not to exceed eighteen (18) months, unless further extended by* [*a*]*greement of the parties* commencing on May 14, 2013, and running through November 13, 2014, or, if sooner, the date of completion of the [R]emedial [I]nvestigation." JX 5 at US000001 (emphasis added). Despite the Army Corps' attempts, on behalf of the Army, to extend the WVI ROE, an extension agreement was not reached. JX 6; JX 7; TR 959–60 (Gortva). Therefore, on November 13, 2014, the WVI ROE, and the Army's and the EPA's "right to enter in, on, over and across" the ROE Property, expired. JX 5 at US000001; TR 959–60 (Gortva). Nevertheless, the access road and monitoring wells, installed by the Army, remain on the Waverley View Property to this day. TR 1160–61 (Gortva); SVTR 19, 24.

The WVI ROE, however, provided that,

> [a]ll tools, equipment, and other property taken upon or placed upon the [ROE Property] by the Government *shall remain the property of the Government* and *may* be removed by the Government at any time within a reasonable period, *not to exceed thirty (30) days, after the expiration of* [*the WVI ROE*].

JX 5 at US000003 (emphasis added).

Accordingly, the gravel used for the access road, as "other property taken upon or placed upon the [ROE Property] by the [Army]," "remain[s] the property of the [Army,]" despite expiration of the WVI ROE. And, although the Army was given "a reasonable period, not to exceed thirty (30) days, after the expiration of [the WVI ROE]," to remove the gravel access road, it remains on the Waverley View Property. TR 1160–61 (Gortva); SVTR 20.

In addition, the WVI ROE provided that,

> if it appears from the monitoring results that they remain necessary for the continuing investigation, or for the monitoring and assessment of the need for any necessary response action, the monitoring wells installed by the Government *shall*

> *remain the property of the Government*, and *may* be maintained on the land, *subject to further extension of* [*the WVI ROE*] *by the parties.*

JX 5 at US000003 (emphasis added).

Therefore, the Army's continued ownership of the monitoring wells depends upon whether "it appears from the monitoring results that they remain necessary." Relevant to this determination, the Government's expert, Keith White,[45] testified that

> [t]he available data demonstrate that the source of . . . contamination and . . . the vast majority of the contaminant mass occurs beneath Area B, not [the] Waverley View [Property]. A relatively small amount of contamination is present beneath a fraction of [the] Waverley View [Property], adjacent to Area B-11. Based on these facts, investigatory efforts and remedial efforts, will logically be focused on Area B-11.

DX 136 at 3–4.

Mr. K. White also testified, however, that "it is evident that some monitoring wells will likely be needed on [Phase] II [of the Waverley View Property] to complete the [Remedial Investigation] and potentially to monitor the effects of potential future remedial actions." DX 136 at 4. Mr. K. White's opinion is consistent with statements the EPA made in its February 5, 2015 letter, including that "much remains to be done with regard to the continuing [Remedial Investigation] of the groundwater plume," and "urg[ing] WVI to continue to provide access to the Army to allow it to pursue its investigation of the groundwater plume that extends beneath [the Waverley View Property]." JX 8 at WVI00009414.

Accordingly, as of the expiration of the WVI ROE, *i.e.*, November 13, 2014, the monitoring wells "remain[ed] necessary for the continuing investigation, or for the monitoring and assessment of the need for any necessary response action." JX 5 at US000003. Therefore, "the monitoring wells installed by the [Army] . . . remain the property of the [Army]" despite expiration of the WVI ROE. But, the Army's right to maintain the monitoring wells on the ROE Property, was "subject to further extension of [the WVI ROE] by the parties." JX 5 at US000003. No extension

---

[45] To avoid confusion with Randy White, the court will refer to Keith White as "Mr. K. White."

At trial, the Government proffered Mr. K. White as an expert in "hydrogeology with a particular expertise in karst geology." TR 1065. WVI did not object. TR 1066. Mr. K. White has "over 28 years' consulting experience in evaluating the nature, extent, and transport of contaminants in groundwater—20 of those years focused on karst geology" and "currently leads [Arcadis's] *Karst Hydrology Focus Area*[.]" DX 136 at 2, Appendix A. Mr. K. White's education includes a Bachelor of Science ("BS") in Geology from the State University of New York and Graduate Studies at Syracuse University in Containment Hydrogeology and Geochemistry and Advanced Hydrogeology. DX 136 at Appendix A. Therefore, the court considers Mr. K. White an expert in "hydrogeology with a particular expertise in karst geology." TR 1065–66; *see also* FED. R. EVID. ("FRE") 702.

agreement was reached, however, and the Army's right to maintain the monitoring wells on the property expired with the WVI ROE, on November 13, 2014.

Therefore, although the Army was not required to remove either the gravel access road or the monitoring wells, by failing to do so, the Army has, and continues to, physically occupy certain portions of the Waverley View Property. Such "physical occupation," amounts to a compensable taking. *See Stearns Co.*, 396 F.3d at 1357 ("A physical taking occurs "when the government itself occupies the property or 'requires the landowner to submit to physical occupation of its land.") (internal quotations omitted); *see also Huntleigh USA Corp.*, 525 F.3d at 1378 ("A compensable taking . . . occurs . . . through the government's physical invasion or appropriation of private property[.]").

Having determined that the Army's activities after expiration of the WVI ROE amounted to a compensable taking,[46] the court must next determine whether this taking is a "permanent physical occupation[]" or a "temporary [physical] invasion[]." *See Ark. Game & Fish Comm'n*, 568 U.S. at 36.

As in *Hendler III*, "[t]here is nothing 'temporary' about the wells the [Army] installed on [WVI's] property." *See Hendler III*, 952 F.2d at 1376. More than three years have passed since the WVI ROE expired and more than four since the Army first began installing the wells. TR 949 (Gortva). The four deep monitoring wells are 142 to 400 feet deep, lined with steel casings, and are surrounded by concrete and protective bollards at the surface. PX 86; TR 951, 1008 (Gortva). These wells are significant structures. Although the eleven shallow monitoring wells are less intrusive, they are by no means "transient [or] relatively inconsequential." *See John R. Sand & Gravel Co.*, 457 F.3d at 1357. And, in this case, all of the Army-installed monitoring wells "are at least as 'permanent' . . . as the CATV equipment in *Loretto*, which comprised only a few cables attached by screws and nails and a box attached by bolts." *See Hendler III*, 952 F.2d at 1376. The same is true for the gravel access road which consists of several inches of stone and is "20 [to] 25

---

[46] The Government insists that WVI's Takings Clause claims are "speculat[ive]" or "anticipatory," and thus "not ripe." *See, e.g.*, Gov't Post-Tr. Resp. Br. at 54–56. But, by leaving the Army-installed gravel access road and monitoring wells on the property, the Army has, and continues to, physically occupy certain portions of the Waverley View Property. There is nothing speculative or anticipatory about the presence of these structures.

The Government's arguments that WVI's claims are governed by contract law are also without merit. *See, e.g.*, Gov't Post-Tr. Resp. Br. at 56–57. As the Government acknowledges, the WVI ROE did not require the Army to remove the Army-installed gravel access road or monitoring wells. Gov't Post-Tr. Resp. Br. 57. Instead, the WVI ROE permitted the Army to remove these structures, and provided a "reasonable period, not to exceed thirty (30) days" during which it could do so. JX 5 at US000003. Therefore, the Army's failure to remove the gravel access road and the monitoring wells was not a breach of the WVI ROE, because it was not required by that agreement. Instead, by leaving the Army-installed gravel access road and monitoring wells on the Waverley View Property *after* the expiration of the WVI ROE, the Army effected a physical taking.

feet wide and hundreds of feet long." TR 200 (Anderson); TR 953 (Gortva); *see also* PX 88 at A-14 (Image 8).

In addition, nothing in the Army's or the EPA's actions "suggests that the [Army-installed monitoring] wells [are] a momentary excursion shortly to be withdrawn." *See Hendler III*, 952 F.2d at 1376. The deep monitoring wells are "designed to last for up to 30 years." TR 1010 (Gortva). And, "[u]nder the best circumstances" it may take "five years" to complete a "pilot study," after which, a "full scale" remedial program could take "decades." TR 295–99 (Thomson); TR 1080–82 (White). Nor do the Army's or the EPA's actions "disclose any indication of a timetable for withdrawal." *See Hendler III*, 952 F.2d at 1376. As the EPA's February 5, 2015 letter stated, "*since the full extent of the contaminated groundwater plume is not yet known*, the Army and EPA *cannot estimate the total length of time needed to address the contamination on WVI's property*." JX 8 at WVI00009415 (emphasis added). In short, the Army, doesn't know if, or when, it can remove the monitoring wells from the Waverley View Property.[47]

The Army Corps' September 30, 2016 letter does not provide further clarity. This letter states that "the Army's rights under [the WVI ROE] are at an end . . . and the Army has no continuing rights with respect to the [ROE P]roperty[.]" JX 10 at WVI00009417. Although this is true, the gravel access road and the monitoring wells nevertheless remain on the Waverley View Property. TR 1160–61 (Gortva). And, the Government's argument that the Army Corps' September 30, 2016 letter terminated its "rights or interest in the monitoring wells" and ended its physical occupation of the Waverley View Property, is without merit. Gov't Post-Tr. Resp. Br. at 57–58. The Army Corps cannot unilaterally burden WVI with the task of removing the gravel access road and the monitoring wells by announcing, after this case was filed, that it was terminating its ownership interests in these structures. As the court in *Hendler III* observed, "the government[,] when it has taken property by physical occupation[, may] subsequently decide to . . . release its interest in . . . property. Yet no one would argue that that would somehow absolve the government of its liability for a taking[.]" *See Hendler III*, 952 F.2d at 1376. Otherwise, "[a]ll takings [would be] 'temporary' . . . [because] the government can always change its mind." *Id.* And, as the United States Supreme Court held in *Arkansas Game and Fish Commission*, "[o]nce the government's actions have worked a taking of property, 'no subsequent action by the government can relieve it of the duty to provide compensation[.]'" *Ark. Game & Fish Comm'n*, 568 U.S. at 33.

Neither the Army nor the EPA has entered the Waverley View Property since expiration of the WVI ROE (TR 1160–61 (Gortva)), however, and have no immediate or certain plans to do so (DX 111 at 3–5; TR 1080–83, 1085 (White); TR 1385–99 (Tesner); ECF No. 70, 95). Therefore, the existence of ongoing or future activities that may give rise to additional Takings

---

[47] Recently, the Government has indicated that neither the Army nor the EPA has an immediate or certain need for the Army-installed monitoring wells on the Waverley View Property. DX 111 at 3–5; TR 1080–83, 1085 (White); TR 1385–99 (Tesner); ECF No. 70 (April 3, 2017 Status Report, reporting that representatives from the Army, the EPA, the MDE, and the "Army's contractors concerning the pilot project/study" met on March 30, 2017 to "discuss the pilot project/study," and "confirmed that the pilot project/study would not require access to the Waverley View [P]roperty."); ECF No. 95.

Clause claims is not an issue the court can resolve at this time. And, as such, the court is left with only those portions of the Waverley View Property that were physically occupied by the Army-installed gravel access road and monitoring wells.

For these reasons, the court has determined that the Army's activities after expiration of the WVI ROE on November 13, 2014 effected a permanent physical taking of those portions of the Waverley View Property actually occupied by the Army-installed gravel access road and monitoring wells.

### 3.   At Trial, Plaintiff Established That It Is Entitled To Just Compensation.

#### a.   Plaintiff's Argument.

WVI argues that it is entitled to "[c]ompensation for the [t]otal [l]ost [v]alue of the [Waverley View] Property." Pl. Post-Tr. Br. at 44. As a practical matter, "continuing CERCLA operations on the [p]roperty . . . [have] taken from WVI the opportunity to make its intended use on [Phase] II and caused a substantial diminution in the value of [Phase] I." Pl. Post-Tr. Br. at 44. This is evidenced by the fact that, "the [Army's] physical occupation of the [p]roperty is of indefinite duration. . . . [E]ven after the [Army] completes its remedial investigation of the [p]roperty and selects a remedy — which by itself is years away — it will still likely take many more years beyond that to implement the remedy, and decades more to monitor the outcome." Pl. Post-Tr. Br. at 44. During this time, WVI cannot develop Phase II, "so long as [the monitoring] wells and appurtenances remain in place, and the potential for EPA or Army intrusions and remedial actions remains real[,] but uncertain in their scope and duration[.]" Pl. Post-Tr. Br. at 44.

In takings cases, "the [g]overnment must . . . compensate a property owner for the entirety of its loss, even when it has occupied something less than the totality of the property." Pl. Post-Tr. Br. at 45. As the United States Supreme Court explained in *United States v. Grizzard*, 219 U.S. 180 (1911), "[w]hen the part [of the property] not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account." *Id.* at 185; *see also United States v. Miller*, 317 U.S. 369, 376 (1943) ("If only a portion of a single tract is taken[,] the owner's compensation for that taking includes any element of value arising out of the relation of the part of the entire tract."); *Hendler III*, 952 F.2d at 1383–84 ("[O]nce a taking is adjudged, plaintiffs will have the opportunity to establish their severance damages, the damages accruing to their retained land as a result of the taking.").

At trial, Messrs. Dorment and Anderson and Eric Soter[48] testified that the Army's "occupation of . . . [Phase II] has made it impracticable for WVI to develop or sell the [Waverley View] Property." Pl. Post-Tr. Br. at 24.

---

[48] Mr. Soter is a principal at Rodgers Consulting, Inc., a "civil engineering, land planning, and surveying firm, headquartered in Germantown, Maryland" that also does work in Frederick, Maryland and Prince George's County. TR 547–48. Mr. Soter previously worked for the County of Frederick, where he "oversaw all aspects of land development, including comprehensive planning and development review[.]" TR 548. At trial, WVI proffered Mr. Soter as an expert in

First, the . . . gravel [access] road[] and [the] existing well network have rendered obsolete WVI's existing development plans as they pertain to [Phase] II. Second, the uncertainty surrounding all aspects of the [Army's] ongoing occupation and use of the [p]roperty has made it foolhardy for WVI to spend the time and money to revise its preliminary plans for [Phase] II. Third, and perhaps most significantly, the uncertainty surrounding the [Army's] occupation and use of the [p]roperty has destroyed any interest among buyers in purchasing the parts of the [p]roperty that were developed as [Phase] I.

Pl. Post-Tr. Br. at 24.

Because "the [Army's] entry onto and ongoing occupation of [Phase] II has severely impaired the marketability of [Phase] I," WVI asserts that it is "entitled to . . . severance damages," because

[p]otential buyers are understandably leery of investing in land adjacent to an ongoing CERCLA action on the same private land parcel. They are especially leery of doing so when the parameters of that investigation are uncertain, so that there exists the real — and highly visible — threat of the [Army or the EPA] someday demanding access to and use of the very land the potential buyers are evaluating for purchase. Buyers with multiple options will take their money elsewhere.

Pl. Post-Tr. Br. at 45.

Moreover, as a practical matter, "WVI has permanently lost the chance to make its planned use of [Phase] II, and [Phase] I will remain stigmatized by [the Army's] activities on the [p]roperty." Pl. Post-Tr. Br. at 46 (citing PX 88 at 73–76; PX 157 at 15). And, "[w]hen government action permanently deprives a landowner of the use of the landowner's property, 'the conventional method of valuation is the "before-and-after" method, *i.e.*, the difference between the value of the property before and after the [taking] was imposed.'" Pl. Post-Tr. Br. at 46 (quoting *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012)) (citing *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998) ("The just compensation for a permanent taking is generally the fair market value of the property taken[.]")).

---

"land use planning . . . in the City of Frederick, Maryland." TR 551. The Government objected. TR 551. The court does not consider Mr. Soter an expert in "land use planning . . . in the City of Frederick, Maryland," because he "never worked for the City of Frederick," which has its own unique "land use planning laws and regulations" and Mr. Soter never spoke "with anyone from the City of Frederick [before] preparing [his] report." TR 558, 560. Instead, the court considers Mr. Soter's testimony as a lay witness.

In this case, as William Harvey[49] testified, that value, "including severance damages to [Phase] I, is $9.2 million."[50]  Pl. Post-Tr. Br. at 46–47.

WVI argues that the Government's appraisal does not "account for the fact that the [Army's] presence on the [Waverley View] Property during an ongoing Superfund NPL Site Remedial Investigation has rendered [Phase] II undevelopable and diminished the value of [Phase] I." Pl. Post-Tr. Br. at 48.  In addition, the Government's appraisal "assume[s] that if any . . . stigma exists, it entirely predated the [Army's] installation of wells and is solely the result of the [p]roperty's proximity to Fort Detrick Area B." Pl. Post-Tr. Br. at 49.

In the alternative, if the court "determines that the [Army's] open-ended, decades-long, physical occupation of the [p]roperty is a temporary taking, then it should apply the standard measure of damages in a temporary takings case — 'the fair rental value of the property for the period of the taking.'"  Pl. Post-Tr. Br. at 50 (quoting *Otay Mesa Prop.*, 670 F.3d at 1364) (citing *Yuba Nat. Res. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("The usual measure of just compensation for a temporary taking . . . is the fair rental value of the property for the period of the taking.")).  In this case, "[b]ecause not even the Government can reasonably estimate the end date of the taking, calculating just compensation using this method requires a number of assumptions.  Based on those assumptions, . . . the fair rental value of the property for the period in question is $9,080,000." Pl. Post-Tr. Br. at 50 (citing PX 157 at 17; TR 749 (Harvey)).

In addition, WVI states that it is "entitled to compounded interest on the $9.2 million value of the [p]roperty." Pl. Post-Tr. Br. at 50.  This is so, because it is well established that "something more than fair market value is required to make [a] property owner whole, to afford him 'just compensation' when the government takes his property.  *Albrecht v. United States*, 329 U.S. 599, 602 (1947).  That "something more" has been "measured in terms of reasonable interest." *Id.*  In sum, "'just compensation' in the constitutional sense, has been held[] . . . to be the fair market value at the time of taking[,] plus interest from that date to the date of payment." Pl. Post-Tr. Br. at 50 (internal quotations omitted) (quoting *Albrecht*, 329 U.S. at 602).

Applying the factors set forth in *Georgia-Pacific Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980), the United States Court of Federal Claims "has repeatedly found that prudent investors

---

[49] At trial, WVI proffered Mr. Harvey as an "expert appraiser." TR 749.  The Government did not object. TR 749.  Since 1986, Mr. Harvey has severed as President of William C. Harvey & Associates, Inc., a real estate appraisal and brokerage firm. PX 88 at 90.  Prior to that, he served as Vice President and Regional Manager of Legg Mason Appraisal Group from 1983 to 1986, as President and Director of Appraisal Service of America, Inc. from 1981 to 1983, and as a Staff Appraiser at Accredited Real Estate Appraisal Service, Inc. from 1977 to 1980.  PX 88 at 90.  Mr. Harvey has been qualified as an expert on "well over a hundred" occasions. TR 739.  Therefore, the court considers Mr. Harvey an "expert appraiser."  TR 749; *see also* FRE 702.

[50] This represents the difference between $13,040,000, the estimated "fair market value of the [Waverley View] Property prior to installation of groundwater monitoring wells," and $3,840,000, the estimated "fair market value of the [p]roperty after installation of groundwater monitoring wells," as determined by Mr. Harvey. Pl. Post-Tr. Br. at 32.

would collect quarterly compounded interest on their investments at a rate like the Moody's Seasoned AAA Corporate Bond Index[.]" Pl. Post-Tr. Br. at 50–51 (citing *Sears v. United States*, 124 Fed. Cl. 730, 735–36 (Fed. Cl. 2016)).   "Between the time the [Army] entered onto WVI's [p]roperty on November 21, 2013, and today, that rate has fluctuated between 4.7% and 3.3%." Pl. Post-Tr. Br. at 51.   Although the Government "will likely encourage the Court to adopt a lower rate — such as the U.S. Treasury [B]ill compounded rate of interest — . . . [the c]ourt should decline the Government's invitation."  Pl. Post-Tr. Br. at 51.

### b.    The Government's Response.

The Government responds that WVI failed to prove that "the Army 'has, as a practical matter, taken from WVI the opportunity to make its intended use of [Phase] II and caused a substantial diminution in the value of [Phase] I.'" Gov't Post-Tr. Resp. Br. at 46 (quoting Pl. Post-Tr. Br. at 44).  Specifically, "WVI . . . failed to show that any action by the [Army or the EPA] prevented it from moving forward with its plans to develop [Phase] II [of the Waverley View Property], or reduced the value of [Phase] I[.]"  Gov't Post-Tr. Resp. Br. at 46.  Instead, "[t]he only discrete government action – the installation of . . . monitoring wells . . . pursuant to the [WVI ROE] – occupied a miniscule portion of [Phase] II and none of [Phase] I."  Gov't Post-Tr. Resp. Br. at 46.

In addition, WVI failed to identify any "government action that barred development of [Phase] II."  Gov't Post-Tr. Resp. Br. at 47.  Messrs. Dorment and Anderson both admit that "no one on behalf of the government told them that they could not go forward with developing [Phase] II or getting approvals to develop [Phase] II[,] until groundwater monitoring was completed." Gov't Post-Tr. Resp. Br. at 47 (citing TR 477 (Anderson); TR 729–30 (Dorment)).  In addition, "the [C]ity of Frederick Planning Department testified that the presence of groundwater monitoring wells would not preclude final site plan approval."  Gov't Post-Tr. Resp. Br. at 47 (citing JX 30 at 20).

Moreover, "[i]n none of the meetings between the parties from 2011-2013 did WVI discuss any preliminary plans for [Phase] II or indicate that it had plans in the short term to develop [Phase] II."  Gov't Post-Tr. Resp. Br. at 47 (citing TR 956–57 (Gortva)).  Nor did WVI "raise[] the issue of whether the wells would conflict with the preliminary site plan[,]" despite the Army's repeated requests for input.  Gov't Post-Tr. Resp. Br. at 47 (citing TR 727 (Dorment)).  And, despite the fact that the Army "notified WVI of well locations both before the first wells were installed and later when certain well locations needed to be [offset]," WVI never complained.  Gov't Post-Tr. Resp. Br. at 48 (citing DX 127; DX 139; TR 950–51, 1142–44 (Gortva)).

WVI's silence "about the proposed well locations – prior to filing this lawsuit – is not surprising in light of the fact that the buyer of [Phase] II, [and] not WVI, would be responsible for obtaining final site plan approval."  Gov't Post-Tr. Resp. Br. at 48 (citing PX 29 at WVI00007847). WVI's "silence is further explained by its unilateral conclusion – by at least March 2013 – that, if contamination were discovered through the Army's groundwater monitoring, the Army would purchase [Phase] II."  Gov't Post-Tr. Resp. Br. at 49.

If WVI had informed the Army of its development plans,[51] or "responded to the Army's repeated requests for feedback, the wells on [Phase] II could have been located so as not to conflict with the preliminary plan." Gov't Post-Tr. Resp. Br. at 51. As Mr. Tesner,[52] "the Army's Director for Restoration," testified:

> There's nothing . . . about the placement of the wells on the Waverley [View P]roperty, either there now or contemplated, that couldn't be addressed, even today . . . any of the wells that are there right now could be moved, they could be removed. It's not hard. It's done all the time.

Gov't Post-Tr. Resp. Br. at 51 (quoting TR 1336 (Tesner)).

Nevertheless, WVI insists, without support, that "the Army's well-established environmental restoration policies and practices . . . [are] non-existent, supposedly because neither of the Government witnesses who testified about it could 'identify a single Government document supporting [Mr. Tesner's] contention.'" Gov't Post-Tr. Resp. Br. at 51–52 (quoting Pl. Post-Tr. Br. at 27).

In contrast to the Government's environmental restoration expert, Mr. Tesner, WVI's proffered expert, Mr. Soter, is not qualified to "provide expert testimony on the impact of groundwater monitoring wells on development of [Phase] II" for numerous reasons. Gov't Post-Tr. Resp. Br. at 52–53 (citing TR 558, 560–62, 583–84 (Soter)).

Were the court to determine that the Army is liable for a permanent taking, "the trial testimony and applicable legal standards do not support an award of just compensation in [the amount of $9,200,000]." Gov't Post-Tr. Resp. Br. at 58 (citing Pl. Post-Tr. Br. at 44). Instead, as

---

[51] Although "miniscule diagram[s]" of WVI's development plans were "buried in the soils report Mr. Anderson mailed to the Army with his May 9, 2011 letter," WVI never "raised the diagram[s] or any other reproduction of its preliminary site plan at any time during the numerous meetings with the Army . . . or in response to the Army's communications about proposed well locations." Gov't Post-Tr. Resp. Br. at 34 n.6. Moreover, the "diagram[s] do[] not appear in any groundwater monitoring report provided to the Army. Rather, [they are] only in a soils report – which was not the focus of the Army's investigation." Gov't Post-Tr. Resp. Br. at 34 n.6.

[52] At trial, the Government proffered Mr. Tesner as an expert in "Army Environmental Restoration Program policies and practices." TR 1295. WVI did not object. TR 1295. Mr. Tesner has served as the Director for Restoration in the Office of the Deputy Assistant Secretary of the Army for Environmental, Safety, and Occupational Health for nine years. TR 1287. In that position, he oversees "[l]iterally thousands" of "cleanup sites." TR 1292–93. Previously, Mr. Tesner served as "Cleanup Branch Chief for Cleanup and Restoration Activities" at the Army National Guard for three years, where he oversaw "hundreds" of "cleanup sites," and also as Project Manager for the Army Corps' Hazardous Toxicological and Radiological Waste Branch for nine years. TR 1293. Therefore, the court considers Mr. Tesner an expert in "Army Environmental Restoration Program policies and practices." TR 1295; *see also* FRE 702.

explained by the Government's "expert appraiser, [Terrence] McPherson,[53] the difference in value of the property with perpetual easements for the location of the wells versus without is $250,000." Gov't Post-Tr. Resp. Br. at 58 (citing DX 142 at 4).  As Mr. McPherson testified, if the court finds a temporary taking, "the rental value for the physical occupation of the wells from November 14, 2014 through September 30, 2016 would be $19,000."  Gov't Post-Tr. Resp. Br. at 58 (citing DX 142 at 3; *Yuba Nat. Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed. Cir. 1987) (explaining that rental value is a proper means of just compensation for a temporary, physical taking)).

WVI's $13,040,000 "before" valuation of the Waverley View Property also is inconsistent with the Uniform Appraisal Standards for Federal Land Acquisitions (the "UASFLA"), that provides:

a hypothetical condition may be used only if:

- use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;

- use of the hypothetical condition results in a credible analysis; and

- the appraiser complies with the disclosure requirements set forth in [the Uniform Standards of Professional Appraisal Practice (the "USPAP")] for hypothetical conditions.

Gov't Post-Tr. Resp. Br. at 58–59 (citing THE APPRAISAL FOUNDATION, UNIFORM APPRAISAL STANDARDS FOR FEDERAL LAND ACQUISITIONS § 1.2.7.1 (5th ed. 2000)).  Despite "undisputed facts" to the contrary, Mr. Harvey "assumed that before the Army installed groundwater monitoring wells, the [p]roperty was in pristine condition and unaffected by any environmental stigma."  Gov't Post-Tr. Resp. Br. at 59.  As a result," Mr. Harvey "artificially and unreasonably inflate[d] the supposed value of the [p]roperty before the taking."  Gov't Post-Tr. Resp. Br. at 60.

WVI's $3,840,000 "after" valuation is likewise flawed.  Gov't Post-Tr. Resp. Br. at 60–61.  Mr. Harvey was instructed by WVI to assume that "once groundwater monitoring wells were installed, it was both legally and physically impossible to develop Phase II."  Gov't Post-Tr. Resp. Br. at 60 (citing TR 774 (Harvey)).  This assumption is contrary to the "unrebutted" testimony of Mr. Tesner and Joseph Gortva, Installation Restoration Manager and Hazardous Waste Manager for Fort Detrick (TR 904 Gortva), and is "unsupportable," since the City of Frederick never

---

[53] At trial, the Government proffered Mr. McPherson as an expert in "real estate appraisal."  TR 1164.  WVI did not object.  TR 1164.  Mr. McPherson is the owner of McPherson & Associates, Inc., a real estate appraisal and consulting firm in Frederick, Maryland.  TR 1162.  He has worked as a "professional appraiser" for over 35 years and has acquired MAI and SRA designations.  TR 1163.  Mr. McPherson has testified as an "expert appraiser" in federal and state court between "twenty [and] 30 times."  TR 1164.  Therefore, the court considers Mr. McPherson an expert in "real estate appraisal."  TR 1164; *see also* FRE 702.

instructed WVI that it could not develop the Waverley View Property while groundwater monitoring wells were in place (Gov't Post-Tr. Resp. Br. at 60).

> In addition,

>> WVI admits that the Army has never told [WVI] that [it is] unable to develop [its] property; . . . WVI has yet to submit a development plan (or re-submit [RGHGAB's] proposed plan) to the City of Fredrick; and . . . the Army has worked with owners of other residential developments to conduct monitoring and remediation activities in a manner that does not interfere with development, and would do so [on the Waverley View Property].

Gov't Post-Tr. Resp. Br. at 67–68. Instead, WVI's decision not to develop the Waverley View Property represents "a business decision not to sell [Phase] II[,] based on its unsupported speculation that the Army would purchase . . . the [p]roperty." Gov't Post-Tr. Resp. Br. at 68.

> In addition, "WVI seeks an award for the value lost to the remainder of the Waverley [View P]roperty that was never physically occupied by the [Army], *i.e.*, [Phase] I[,]" based on "an alleged reduction in value caused by the purported stigma imposed on [Phase] I." Gov't Post-Tr. Resp. Br. at 61–62. Any stigma associated with the Waverley View Property, however, "existed long before WVI's purchase in 2012." Gov't Post-Tr. Resp. Br. at 62 (citing DX 142 at 12–15). Nor did the Army's groundwater monitoring of Phase II cause WVI to lose buyers of Phase I. Gov't Post-Tr. Resp. Br. at 65. Instead, each "deal" for the purchase of Phase I discussed by Mr. Dorment, fell through for other reasons, not the least of which was that WVI "could not *truthfully* . . . assur[e potential buyers] that [the Waverley View Property was] clean so there was no risk of Government intrusion on the [p]roperty.'" Gov't Post-Tr. Resp. Br. at 65–66 (internal quotations omitted) (quoting Pl. Post-Tr. Br. at 29).

> Likewise, WVI's arguments that Mr. McPherson's appraisal is based on flawed assumptions "are not supported by the evidence." Gov't Post-Tr. Resp. Br. at 68. First, Mr. McPherson's assumption that WVI "could proceed with development on [Phase] II despite the existence of the monitoring wells" is based on conversations with "officials at the Frederick Planning Office . . . confirm[ing] that the wells' existence would not impact [WVI's] ability to develop Phase [II]." Gov't Post-Tr. Resp. Br. at 68; *see also* TR 1178–80 (McPherson). Second, Mr. McPherson assumed that "any stigma associated with the WVI property existed prior to the Army's installation of the monitoring wells" because of the "comprehensive list of activities that he believed stigmatized the [Waverley View P]roperty at the time of its purchase in 2012, prior to the installation of the wells on Phase [II]." Gov't Post-Tr. Resp. Br. at 68 (citing DX 142 at 12–15). In contrast, "WVI's appraiser, Mr. Harvey, does not address why the long history of contamination at Fort Detrick . . . would not have placed an environmental stigma on the [Waverley View P]roperty." Gov't Post-Tr. Resp. Br. at 68. Third, "WVI's assertion that Mr. McPherson's temporary taking valuation is unreliable, because it does not consider potential future remediation activities . . . is legally unsupported[,]" because it is "based on potential actions . . . in the future [that are] unripe, speculative, and cannot form the basis for compensation in this action." Gov't Post-Tr. Resp. Br. at 68–69 (citing Pl. Post-Tr. Br. at 48).

Finally, the "proper interest rate" that the court should apply is "the rate set forth in the Declaration of Takings Act (the "DTA"), 40 U.S.C. § 3116, which "provides a standardized and uniform method for calculating delay compensation in the direct condemnation context, . . . [and] has been [applied] in other inverse condemnation actions." Gov't Post-Tr. Resp. Br. at 69 (citing *Textainer Equip. Mgmt. Ltd. v. United States*, 99 Fed. Cl. 211, 223 (Fed. Cl. 2011) (determining that "the DTA rate, and not the Moody's Corporate Bond Index rate" should apply to damages for an alleged taking of subleased containers lost by the government)); *see also NRG Co. v. United States*, 31 Fed. Cl. 659, 670 (Fed. Cl. 1994) (applying the DTA rate as "a more accurate measure of the economic harm . . . than the CDA interest rates" to claims for damages resulting from the "cancel[ation of] three mineral prospecting permits owned by plaintiffs"); *Vaizburd v. United States*, 67 Fed. Cl. 499, 504 (Fed. Cl. 2005) (explaining that "[i]n the absence of special proof that a rate other than [the DTA rate] is appropriate, [the court] use[s the DTA] rate" to assess interest on damages resulting from the government's "deposition of sand on plaintiffs' property"). The DTA rate "fully compensate[s] plaintiffs for any delay in payment and ensure[s] uniformity in delay compensation awards among plaintiffs in condemnation actions." Gov't Post-Tr. Resp. Br. at 69. In sum, the court has considered the DTA rate as the "default," and "WVI has not established that a departure from the [DTA] rate[] . . . is warranted in this case." Gov't Post-Tr. Resp. Br. at 70.

In the alternative, "[t]o the extent that the Court finds it necessary to determine interest in this case through an 'investment' lens, the United States' unsecured borrowing rate represents the return on investment that WVI has lost, at the risk WVI faced." Gov't Post-Tr. Resp. Br. at 70. In this regard, "[t]he 1-year T[reasury B]ill provides the best legal measure of interest as a component of just compensation." Gov't Post-Tr. Resp. Br. at 70.

### c. Plaintiff's Reply.

WVI replies that detailed development plans for Phase II of the Waverley View Property were included in the 2010 CGS Site Investigation Report provided to the Army Corps with Mr. Anderson's May 9, 2011 letter. Pl. Post-Tr. Reply Br. at 21. Mr. Gortva "confirmed twice during his cross-examination that he received and reviewed this report." Pl. Post-Tr. Reply Br. at 21 (citing TR 990–92, 1035–37 (Gortva)). In Mr. Dorment's May 24, 2013 letter, he also "informed the Army and the EPA . . . that WVI had 'concrete plans' for real estate development that were being 'jeopardized' by the Government's planned CERCLA activities on the [p]roperty." Pl. Post-Tr. Reply Br. at 24 (quoting PX 10). These plans, "for which WVI had obtained preliminary approval from the City of Frederick . . . were public documents readily available to any interested person." Pl. Post-Tr. Reply Br. at 24.

Therefore, it is "disingenuous for the Government to claim that it would have accommodated WVI's real estate development plans[,] if only it had known about them." Pl. Post-Tr. Reply Br. at 24. At no time did the Army "mention . . . any such accommodation policy and practice in any of the multiple letters it sent to Mr. Anderson seeking access to the [Waverley View] Property from 2011 to 2012." Pl. Post-Tr. Reply Br. at 24. The Government relies heavily and almost exclusively on the testimony of Mr. Tesner to attempt to establish the existence of a federal "policy" of accommodating planned real estate development in the context of a CERCLA investigation and remedial action. Pl. Post-Tr. Reply Br. at 27. But, Mr. Tesner's testimony neither "disprove[s] a taking" nor "demonstrate[s] that WVI can develop [the Waverley View]

Property merely by asking the Army to relocate [its] groundwater monitoring wells." Pl. Post-Tr. Reply Br. at 27–28. Although the Army is responsible for "thousands of contaminated sites . . . Mr. Tesner . . . produced just four examples of [the Army's] alleged accommodation practice." Pl. Post-Tr. Reply Br. at 28 (citing TR 1292 (Tesner)). In contrast, Mr. K White "testified that he was aware of no Army or EPA written policy directive to accommodate planned real estate development at a CERCLA remedial investigation and remedial action site." Pl. Post-Tr. Reply Br. at 32 (citing TR 1097–98 (White)).

More importantly, "[t]he EPA model order makes perfectly clear that any real estate use of a property that is the subject of a CERCLA action by the EPA is *entirely subordinate* to the EPA's needs to promptly carry out a CERCLA remedial investigation and remedial action." Pl. Post-Tr. Reply Br. at 33 (citing PX 6 at US000168–69, US000174 ("This Order further requires [r]espondent to refrain from interfering with access to the [p]roperty by [the] EPA and its authorized representatives for the purposes set forth herein. . . . Any such conveyance shall restrict the use of the [p]roperty so that the use will not interfere with activities undertaken or to be undertaken by [the] EPA and its representatives.")).

As a practical matter, Mr. Soter testified that, "accommodating the Army's current groundwater wells in WVI's very compact development would require WVI to redesign its site plans, at considerable effort and expense." Pl. Post-Tr. Reply Br. at 34 (citing PX 156 at 3). The Government does not contest this, and "[i]ts own expert, Mr. McPherson, actually agreed with Mr. Soter[.]" Pl. Post-Tr. Reply Br. at 34 (citing DX 142 at 90). In addition, "[t]he Government's slew of objections to Mr. Soter's testimony go only to its weight, not its admissibility. Mr. Soter is well qualified to give the opinions he offered at trial." Pl. Post-Tr. Reply Br. at 34. Despite the Government's views to the contrary, Mr. Soter "does not need to have been a former employee of the City of Frederick to be an expert in this case." Pl. Post-Tr. Reply Br. at 35.

Next, the "Government criticizes Mr. Harvey for carrying out his 'before valuation' by assuming that the [Waverley View] Property was not affected by the presence of TCE and PCE[,]" but his assumption is consistent with the USPAP. Pl. Post-Tr. Reply Br. at 37. Mr. Harvey "relied on the fact that the [p]roperty had been investigated by environmental engineers, including through groundwater well drilling and sampling, and no hazardous substances were found on the [p]roperty." Pl. Post-Tr. Reply Br. at 37–38 (citing PX 157 at 3). And, "the NFRD certification by the State of Maryland provided a sound basis for Mr. Harvey's hypothetical assumption [and] . . . did not result in an inflated valuation of the [Waverley View] Property, as the Government erroneously suggests." Pl. Post-Tr. Reply Br. at 38. In fact, Mr. Harvey's appraisal is "directly in line with the range of appraisals by Mr. McPherson and other appraisers from late 2012 through 2015." Pl. Post-Tr. Reply Br. at 39. Therefore, "[t]he Government's attack on Mr. Harvey's assumption that it was impossible to develop [Phase] II of the [Waverley View] Property for the foreseeable future is baseless." Pl. Post-Tr. Reply Br. at 41. To the contrary, "[t]he . . . 15 wells on the [Waverley View] Property are physical impediments to its development, have been since November 2013, and will be as long as they are present." Pl. Post-Tr. Reply Br. at 41. Moreover, "[n]o rational home builder, given a choice of other properties on the market, would be willing to step into this quagmire, subject to the unretracted EPA letters of February 2013 and February 2015 threatening CERCLA liability[.]" Pl. Post-Tr. Reply Br. at 41. As Mr. Harvey testified, "'[g]iven that the EPA already raised the risk of CERCLA-related liability to an owner of the subject property, the risks . . . include market resistance or stigma.'" Pl. Post-Tr. Reply Br. at 44 (quoting

PX 157 at 15).  "[M]arket resistance" was "borne out by the actual experience of the real estate market," as interest in the Waverley View Property "dissipated" by 2014, despite several developers expressing interest in early 2013.  Pl. Post-Tr. Reply Br. at 44.  Other than the "Nusbaum Company, which proceeded with the HUD-financed, tax credit apartment complex on a portion of [Phase] I[,]" there have been no other offers for any other part of the [p]roperty, despite an increasingly improved market for real estate development since 2013."  Pl. Post-Tr. Reply Br. at 44–45.

The Government's suggestion that "WVI is seeking just compensation based on an inflated [']before' value of the property, given its $4 million stated purchase price in RGHGAB's bankruptcy[,]" is unfounded.  Pl. Post-Tr. Reply Br. at 45. In fact, "the bankruptcy sale price . . . reflected several unusual factors, including[:] (1) the depressed value of the [Waverley View] Property during the Great Recession . . . , and (2) the $10,250,000 in debt carried by RGHGAB[.]"  Pl. Post-Tr. Reply Br. at 45.  As Mr. Harvey testified, because the "bankruptcy sale, [w]as 'a forced sale between related parties that were atypically motivated by duress[,] . . . [it] does not provide a meaningful indication of fair market value[.]'"  Pl. Post-Tr. Reply Br. at 45 (quoting PX 88 at 28).  In addition, the Government's objection "to the severance damage analysis conducted by Mr. Harvey, which reduced the value of the remainder of the [Waverley View] Property, the [Phase] I area, by 28%" is unfounded.  Pl. Post-Tr. Reply Br. at 46 (citing Gov't Post-Tr. Resp. Br. at 61).  When the Army entered Phase II, it "effectively announc[ed] to the real estate market that [Phase] II is now a CERCLA remedial investigation site, [thereby] . . . adverse[ly] impact[ing] . . . the remainder of the larger 92-acre parcel."  Pl. Post-Tr. Reply Br. at 47.  This was "borne out by Mr. Harvey's analysis. . . . On the other hand, Mr. McPherson did not perform any severance damage analysis and conclusorily states that any stigma associated with the [Waverley View] Property predates the [Army's] entry onto it."  Pl. Post-Tr. Reply Br. at 47–48.  In sum, Mr. Harvey's appraisal and valuation conclusions regarding severance damages "are unrebutted by Mr. McPherson.  The same is true of Mr. Harvey's overall conclusions on value."  Pl. Post-Tr. Reply Br. at 51.

Moreover, Mr. McPherson's appraisal is "fatally flawed[,]" because it is "based on [the] entirely unsupported assumption[] that the Army will readily move the CERCLA wells (and any remedial structures) upon request."  Pl. Post-Tr. Reply Br. at 51.  Mr. McPherson did not "interview a single EPA official to evaluate th[is] assumption" and Mr. McPherson does not have any "experience conducting an appraisal at a CERCLA [NPL] site, subject to control by the EPA."  Pl. Post-Tr. Reply Br. at 52 (citing TR 1181–83 (McPherson)).

Finally, although the Government argues that "the measure of just compensation should be uniform as between direct takings cases and inverse condemnation cases[,] . . . the purpose of awarding interest as part of just compensation in a takings case is to put the property owner in 'as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.'"  Pl. Post-Tr. Reply Br. at 52–53 (quoting *Kirby Forest Indus. v. United States*, 467 U.S. 1, 10 (1984)) (citing Gov't Post-Tr. Resp. Br. at 69).  "[A]n award of less than the Moody's AAA Corporate Bond Index rate will not fulfill that purpose."  Pl. Post-Tr. Reply Br. at 53 (citing Pl. Post-Tr. Br. at 50–52).  In addition, "WVI's position is entirely consistent with the cases on which the Government relies."  Pl. Post-Tr. Reply Br. at 53.

### d.     The Government's Sur-Reply.

The Government adds that WVI's "reticence" regarding its development plans "becomes clear in the context of WVI's admission at trial that, in March 2013, it made a business decision to stop marketing [Phase] II based on Mr. Anderson's speculation that the Army would buy the property if contamination was found." Gov't Post-Tr. Sur-Reply Br. at 21. And, even if WVI sold Phase II, "it planned to require *the purchaser* to obtain final site plan approval. Thus, if the site plan was going to change – and it did not have to – any attendant expense would be borne by the purchaser, not WVI." Gov't Post-Tr. Sur-Reply Br. at 21.

Mr. Tesner "unequivocally [testified] that the Army not only would have accommodated WVI's development plans in 2013-14, it would do so today – if WVI were interested in developing [Phase] II[, of the Waverley View Property]" and "WVI offers no evidence to the contrary." Gov't Post-Tr. Sur-Reply Br. at 22 (citing TR 1418 (Tesner)). Mr. Tesner "has been responsible for 'literally thousands' of active cleanup sites under a variety of different programs," and "[t]he four examples he provided are illustrative of how the Army's general policy is applied in practice." Gov't Post-Tr. Sur-Reply Br. at 22 (citing TR 1292 (Tesner)). These examples were not exhaustive and the Government was "not required to introduce further cumulative evidence of how the policy and practices have been applied to specific sites." Gov't Post-Tr. Sur-Reply Br. at 22.

Failing to "produce a witness to testify that the policies Mr. Tesner has developed and worked with . . . [do] not exist, WVI attempts to rely upon an EPA Model Administrative Access Order as the 'only' federal policy that 'addresses how real estate development and use is to be addressed in the context of a CERCLA remedial investigation[.]" Gov't Post-Tr. Sur-Reply Br. at 26 (quoting Pl. Post-Tr. Reply Br. at 26). In this case, however, "no administrative access order was even sought, much less entered, [and] . . . Mr. Tesner's testimony that [the] EPA's policy and practice of accommodating private real estate development is the same as the Army's is unrebutted." Gov't Post-Tr. Sur-Reply Br. at 26.

Mr. Harvey's appraisal was "based on a proposition that a non-public right of access agreement and resulting installation of a dozen small monitoring wells stigmatized the [Waverley View] Property." Gov't Post-Tr. Sur-Reply Br. at 28. But, Mr. Harvey fails to consider "that it had been publicly known for years that the [p]roperty abutted a superfund site where various chemical warfare waste products had been disposed." Gov't Post-Tr. Sur-Reply Br. at 28. And, Mr. Harvey "pretends there was no environmental stigma associated with the [p]roperty prior to the date of alleged taking . . . based primarily on the . . . 2004 NFRD, which does not itself show a 'clean' property." Gov't Post-Tr. Sur-Reply Br. at 28. Moreover, in 2011,

> more than a year before WVI purchased the [Waverley View] Property, the Army informed [Messrs.] Anderson and Mr. Dorment that: (1) groundwater monitoring results from wells just across the boundary between Fort Detrick and Waverley View [Phase] II showed high levels of contamination; (2) contamination had likely migrated to WVI's property; and (3) the Army felt strongly that it needed to conduct groundwater monitoring on WVI's [p]roperty to determine the extent of any contamination.

Gov't Post-Tr. Sur-Reply Br. at 28–29.

Therefore, it was "unreasonable for Mr. Harvey to rely on the 2004 NFRD to assume that the property did not suffer any pre-existing environmental stigma in 2012 due to its location adjacent to Ft. Detrick." Gov't Post-Tr. Sur-Reply Br. at 29. In addition, although "WVI bears the burden of proving severance damages," WVI "continues to fail to show that Mr. Harvey's severance damages analysis is factually or legally supported." Gov't Post-Tr. Sur-Reply Br. at 30. Moreover, arguments similar to those underlying WVI's claim for severance damages were rejected by the United States Court of Appeals for the Federal Circuit in *Hendler v. United States*, 175 F.3d 1374 (Fed. Cir. 1999) ("*Hendler VI*"). Gov't Post-Tr. Sur-Reply Br. at 30 (citing *Hendler VI*, 175 F.3d at 1383). That is the situation in this case, as WVI argued that the Waverley View Property was unmarketable or at least greatly depreciated because of the access order, as it would significantly interfere with development. Gov't Post-Tr. Sur-Reply Br. at 30 (citing *Hendler VI*, 175 F.3d at 1384).

### e.    Plaintiff's Sur-Reply.

WVI adds that Mr. Harvey considered any and all environmental stigma from Fort Detrick in assessing the 'before' valuation of the [Waverley View] Property." Pl. Post-Tr. Sur-Reply Br. at 21 (quoting Gov't Post-Tr. Sur-Reply Br. at 28). Moreover, "Mr. Harvey's reliance on the [2004] NFRD was entirely appropriate and well-founded[.]" Pl. Post-Tr. Sur-Reply Br. at 22. And, "[a]s of the date of his 'before' valuation, only the Army's 'suspicion' weighed against the [2004] NFRD." Pl. Post-Tr. Sur-Reply Br. at 22.

In addition, "Mr. McPherson's testimony is consistent with Mr. Harvey's analysis, given that Mr. McPherson could not identify even a single property anywhere that had proceeded with development during the remedial investigation stage of a CERCLA investigation at an NPL site." Pl. Post-Tr. Sur-Reply Br. at 23 (citing TR 1270–71 (McPherson)). And, "Mr. Harvey's appraisal conclusion that [a] diminution in value of $9.2 million [was] caused by the [Army's] permanent taking . . . is strongly supported by the practical reality that no other purchasers have come forth to purchase any part of the [p]roperty, except [a] minor portion of . . . [Phase I.]" Pl. Post-Tr. Sur-Reply Br. at 23.

In sum, the parties can "debate forever whether WVI should have offered, or the Government should have asked for, more detailed development plans[,]" however, "[t]his case has never been merely about whether any particular well locations interfere, in the short run, with WVI's current development plan." Pl. Post-Tr. Sur-Reply Br. at 24–25. Instead, "[i]t is — and always has been — about the paralyzing uncertainty created by the [Army's] ongoing, evolving, and indefinite occupation of the [Waverley View] Property." Pl. Post-Tr. Sur-Reply Br. at 25. And, "[t]here is no evidence that a slight repositioning of the [Army's monitoring] wells . . . spells the difference between a taking and a feasible new real estate development plan." Pl. Post-Tr. Sur-Reply Br. at 25.

Moreover, the Government's contention that "WVI did not object to the proposed well locations[,] because WVI 'simply took [Phase] II off the market[,]' . . . is simply false." Pl. Post-Tr. Sur-Reply Br. at 25 (quoting Gov't Post-Tr. Sur-Reply Br. at 19, 21). Instead, "the record shows that all but one prospective purchaser of the [Waverley View] Property disappeared upon the [Army's] entry onto the [p]roperty." Pl. Post-Tr. Sur-Reply Br. at 27. And, "[a]lthough WVI

continued to market the [p]roperty, no other purchasers materialized." Pl. Post-Tr. Sur-Reply Br. at 27.

WVI insists that Mr. Soter "is unquestionably qualified to testify" about: "(1) the import of obtaining [p]reliminary [p]lan approval in the City of Frederick; (2) the impact of wells and remedial activities on site development plans; and (3) the time, cost, and uncertainty associated with obtaining re-approval for new or altered site development plans." Pl. Post-Tr. Sur-Reply Br. at 27. As "[t]he Government's appraisal expert, Mr. McPherson, testified . . . [p]reliminary [p]lan approval by the City of Frederick is a valuable entitlement." Pl. Post-Tr. Sur-Reply Br. at 28. Mr. Soter and Mr. McPherson "also agreed that the Government's current well network on the [p]roperty interferes with [WVI's] Preliminary Plan." Pl. Post-Tr. Sur-Reply Br. at 28. And, as Mr. McPherson "conceded[,] . . . applying a buffer of 50 feet around each well, to allow for testing and maintenance, will '*result in the loss of four units* [of 293 planned units] and possibl[y] redesigning the remaining ten units resulting in additional design costs.'" DX 142 at 92 (emphasis added). Moreover, "[n]o reasonable developer would spend millions of dollars redesigning and seeking approval for a new [p]reliminary [p]lan . . . while the Army and [the] EPA are considering installation of additional wells for the [R]emedial [I]nvestigation[.]" Pl. Post-Tr. Sur-Reply Br. at 28.

> ### f.        The Court's Resolution.

> ### i.        Governing Precedent.

The hallmark of a physical taking is government occupation of real property. *See, e.g.*, *Loretto*, 458 U.S. at 427 ("[W]here real estate is actually invaded . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution.") (internal quotations omitted). And, it is well established that "a physical taking is defined by the government's corporeal violation of private property." *Bassett, New Mexico LLC v. United States*, 55 Fed. Cl. 63, 74 (Fed. Cl. 2002). "In cases of a partial physical taking as that here, [however,] just compensation under the [T]akings [C]lause of the Constitution includes 'not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking[.]'" *Hendler VI*, 175 F.3d at 1383 (quoting *Grizzard*, 219 U.S. at 183); *see also Bassett, New Mexico LLC*, 55 Fed. Cl. at 74 (noting that the United States Court of Federal Claims has "recognized the possibility of compensable stigmatic injuries that extend beyond the tangible aspects of a physical taking"). Plaintiffs, however, "bear the burden of proving [such] severance damages." *Hendler VI*, 175 F.3d at 1383. And, "[t]he guiding principle of just compensation, [remains] . . . that the owner of the . . . property 'must be made whole but is not entitled to more.'" *United States v. 564.54 Acres of Land*, 441 U.S. 506, 516 (1979) (emphasis omitted) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934) ("[A property owner] is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and Federal Constitutions.").

WVI contends that the Army's permanent physical taking had an adverse economic impact on the entire Waverley View Property. WVI claims that the Army's investigative activities produced two linked effects flowing from the Army's physical occupation. The first effect was preventing WVI from developing Phase II of the Waverley View Property. The second effect was

the diminution of the Waverley View Property's overall market value due to the stigma associated with the Army's ongoing physical presence, uncertainty of future investigative or remedial action, and the threat of CERCLA liability.

ii.     **Plaintiff Failed To Establish That The Taking Of Certain Portions Of The Waverley View Property Prohibited The Development Or Sale Thereof.**

WVI maintains that the presence of the Army-installed monitoring wells on the Waverley View Property and the ongoing "uncertainty" surrounding the potential for future investigative or remedial action by the Army or the EPA effectively prohibits the development and sale of the entire property. The Government counters that the presence of the Army-installed monitoring wells does not inhibit development of the property and that any future investigative or remedial action is "speculative" as neither the EPA nor the Army have reentered the property since expiration of the WVI ROE, and have no immediate or certain plans to do so.

The Government is correct about the speculative nature of WVI's contention that the EPA or the Army would restrict or oppose development of the Waverley View Property. Instead, the decision not to pursue further development of Phase II of the Waverley View Property represents an informed and calculated business decision (TR 454–55 (Dorment); TR 579 (Soter)), or in Mr. Dorment's own words, "opportunity in crisis" (JX 22 at WVI00008413).

At trial, Mr. Dorment testified that, despite his "impression" to the contrary (TR 729 (Dorment)), neither the Army nor the EPA "told [WVI] that it was prohibited from developing [the] property because of groundwater monitoring" (TR 728–29 (Dorment); *see also* TR 477 (Anderson) (agreeing that "no one from the Government has told [WVI], in words or substance, '[WVI] cannot go forward with development or getting approvals to develop Phase [II] until the groundwater monitoring has been completed'"); TR 576 (Soter)). In fact, WVI did not ask the Army or the EPA if it could proceed with development of Phase II or even "express[] concern that installation of [monitoring] wells on [Phase II] would prevent [it] from developing [the property]." TR 940, 947–48 (Gortva); *see also* DX 126; TR 445 (Anderson). Nor did WVI "investigate to determine whether other developers had been allowed to complete developments while remedial investigations were occurring." TR 472 (Anderson). In addition, the City of Frederick did not inform WVI that it "was prohibited from developing its property because of groundwater monitoring." TR 728 (Dorment). And, WVI did not ask the City of Frederick what "the effect of groundwater monitoring wells might be on approvals for Phase [II]." TR 471 (Anderson). If WVI had made such an inquiry, however, it would have learned that the presence of groundwater monitoring wells on the property would not have precluded approval of the Final Site Plan for Phase II. JX 30 at 19–20.[54]

In any event, WVI took none of the steps necessary to begin developing Phase II. For example, in late 2008, WVI's predecessor-in-interest, RGHGAB, withdrew its Final Site Plan for

---

[54] The court's review of CERCLA and the Maryland Code, did not reveal any legal duty on the part of the Army, the EPA, or the MDE to inform or advise WVI of the effects of investigation or remedial activities on developing the Waverley View Property.

Phase II. JX 20; PX 120; PX 156 at 6. Although the Planning Commission provided "review comments" to RGHGAB, WVI never addressed these comments or resubmitted the plan for approval (JX 20; PX 120; PX 156 at 6; TR 470 (Anderson)), despite approval being a necessary step toward development (JX 30 at 12–13; PX 156 at 3). Instead, subsequent promotional materials concerning the Waverley View Property, provided that "[f]inal plan approval [of Phase II] will be necessary and will need to be completed by the purchaser[.]" PX 29 at WVI00007847. Nor did WVI complete each of the "required" improvements upon which approval of RGHGAB's PND Master Plan was conditioned. *See* SVTR 36–37. In fact, other than executing the January 2013 Deferral Agreement, that "reduc[ed WVI's] up-front financial outlay" requirement by "$2 million" (TR 175–76, 471 (Anderson)), the record does not evidence any other material efforts taken by WVI to develop Phase II.

Moreover, WVI did not present the Army or the EPA with a copy of its plans to develop Phase II before signing the WVI ROE (TR 1040 (Gortva)),[55] nor did WVI inform either agency of any plans to develop Phase II in the "near term" (TR 956–57 (Gortva)). WVI also did not object to the proposed location of "drilling areas," as shown in the map included with the WVI ROE (TR 956 (Gortva); TR 1310 (Tesner); *see also* JX 5 at US000006), no did it indicate that any "well locations conflicted with [its] plans for [Phase II]" (TR 956 (Gortva); *see also* TR 948 (Gortva)). In addition, "[WVI] never asked the [Army or the EPA] about where it would locate [the monitoring] wells[,]" and "never asked the [Army or the EPA] to move a [monitoring] well location" to accommodate development plans for Phase II. TR 727–28 (Dorment). And, despite the Army's attempt to obtain feedback from WVI about the proposed offset locations of monitoring wells (TR 950–51, 1142–44 (Gortva); *see also* DX 127), the Army never received a response. (TR 951 (Gortva)).[56]

_____

[55] WVI's argument that it provided the Army with detailed development plans for Phase II in the 2010 CGS Site Investigation Report included with Mr. Anderson's May 9, 2011 letter, is not evidenced in the trial record. Pl. Post-Tr. Reply Br. at 20–26. Prior to "filing this lawsuit," WVI did not inform the Army that any plans existed regarding WVI's development of Phase II. TR 727 (Dorment); *see also* TR 962–63, 1040 (Gortva). Instead, WVI contends that the Army should have presumed the significance of the plans included in the 2010 CGS Site Investigation Report, although they predated WVI's ownership of the Waverley View Property by more than two years, and were included in a report prepared for RGHGAB, not WVI. PX 150 at PL002157–58 (Figures 1 and 2 are dated "10/27/10" and "10/24/10," respectively). Moreover, even assuming that the Army was aware of these plans, as Mr. Gortva testified,

> there [are] no GPS coordinates. There is no way to fix [the plans relative to] . . . the ground. There [are] no utilities on [the plans]. There is nothing to indicate [these are] exact plan[s], [or] more than . . . conceptual drawings of the proposed locations of the homes. Nothing on [the plans] would indicate . . . that this is a true engineering design plan of where exactly the houses will be built."

TR 993 (Gortva); *see also* TR 147 (Anderson) (testifying that the plans were "small scale").

[56] WVI argues that the presence of the Army-installed monitoring wells prohibited development of Phase II (Pl. Post-Tr. Sur-Reply Br. at 27–29), despite the continuing presence of

For these reasons, WVI's contention that either the EPA or the Army would restrict or oppose development of the Waverley View Property is not supported in the record.  Instead, the trial record reflects examples of several projects in which the Army located and/or relocated monitoring wells to accommodate development (TR 1320–1334 (Tesner); DX 119 (describing the Army's interactions with a developer in Ramsey County, Minnesota); DX 120 (showing monitoring wells installed at Cameron Station in Alexandria, Virginia)).  The court does not view that testimony, however, as evidencing a policy mandating the Army or the EPA to accommodate development.  In any event, the extent to which any of the Army's or the EPA's activities have, or will, interfere with development of the Waverley View Property is unknown at this time, as WVI has yet to take the steps necessary to do so.  Although WVI may view this "uncertainty" as prohibitive, it is a risk WVI accepted when it purchased the Waverley View Property.

For these reasons, the court has determined that Plaintiff failed to establish at trial that the Army's taking of certain portions of the Waverley View Property prohibited or interfered with development of the Waverley View Property.

### iii.    Plaintiff Failed To Establish That Any Stigma Attached To The Waverley View Property Was Caused By The Government's Activities Thereon.

The court has "recognized the possibility of compensable stigmatic injuries that extend beyond the tangible aspects of a physical taking." *Bassett, New Mexico LLC*, 55 Fed. Cl. at 74; *see also Hendler v. U.S.*, 38 Fed. Cl. 611, 625 (Fed. Cl. 1997) ("Moreover, if fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation." (internal citations and quotation marks omitted)).  And, "'stigma' amounts to considerably more than a mental attitude on the part of buyers.  It is based upon a very real possibility that any commercial activity on the property might lead to regulatory prohibition or real physical danger." *Bassett, New Mexico LLC*, 55 Fed. Cl. at 74.

As a threshold matter, the court does not consider the aforementioned non-precedential cases, recognizing stigma as a cognizable basis for a Takings Clause claim, persuasive, because such a theoretical basis for recovery is speculative and implicates Due Process concerns.  In any

---

its own CGS-installed monitoring wells on the property (*see* SVTR 22; *see also* PX 76).  CGS-installed monitoring wells GW-1 and GW-3, however, are located within the planned development of Phase II, and appear to interfere with the planned residential development of the property. *Compare* PX 76, *with* DX 142 at 91.  In light of the Army's history of locating and/or relocating monitoring wells to accommodate development (TR 1320–1334 (Tesner); DX 119 (describing the Army's interactions with a developer in Ramsey County, Minnesota); DX 120 (showing monitoring wells installed at Cameron Station in Alexandria, Virginia)), WVI fails to explain why the Army-installed monitoring wells present a significant challenge to development, but the CGS-installed monitoring wells do not.  Moreover, WVI also fails to explain why the presence of the Army-installed monitoring wells present a barrier to planning approval by the City of Frederick, but the CGS-installed monitoring wells do not.  In fact, in 2004 and 2006, despite the presence of numerous CGS-installed monitoring wells, the Planning Commission approved both the PND Master Plan and the Final Site Plan for Phase I.  JX 20; PX 120; PX 156 at 5; TR 112 (Anderson).

event, whatever stigma may be attached to the Waverley View Property, predated WVI's ownership of the property and the Government's taking of certain portions of the Waverley View Property.

On November 15, 2012, when WVI purchased the Waverley View Property, the following information was publicly known: (1) Phase II of the Waverley View Property lies directly adjacent to the Fort Detrick Area B-11 disposal pits (PX 70); (2) in October 1992, the MDE discovered contamination in "residential wells in the vicinity of Fort Detrick Area B" (PX 24 at PL004078); (3) on November 13, 1997, the Army publicly reported that contamination likely migrated from Area B-11 onto the Waverley View Property (DX 128 at 19–20; TR 920 (Gortva)); (4) on April 8, 2009, Fort Detrick Area B Groundwater was listed on the NPL as a CERCLA Superfund site, and the Area B-11 Chemical Waste Disposal Pits were identified as a "source area" (PX 65 at 2); (5) in early 2010, the Kristen Renee Foundation launched a public campaign "to research and investigate the findings associated with Fort Detrick 'Area B' groundwater" (DX 142 at 14); (6) on October 8, 2011, *The Baltimore Sun* published an article about contamination at Fort Detrick and concerns for the surrounding community (DX 41 at WVI00006709–12); (7) Mr. White and "more than 100 fellow plaintiffs" filed a "mass tort lawsuit" against the Army (DX 41 at WVI00006709); (8) beginning in 2011, the Army publicly distributed a "Project Overview" reaffirming its suspicion that contamination had migrated onto the Waverley View Property (TR 930–31 (Gortva); *see also* JX 15 at US002781; TR 762–63 (Harvey)); and (9) in 2011 and 2012, the Army began requesting permission to investigate properties around Fort Detrick (TR 924 (Gortva)).

Moreover, WVI had the following additional information when it purchased the Waverley View Property in 2012: (1) on October 4, 2001, WLGA reported that "1,1,1 [t]richloroethane, tetrachloroethene, and trichloroethene were detected [on the Waverley View Property] in September/October 2001" (PX 151 at 1); (2) on March 10, 2011, and continuing until WVI purchased the property, the Army sought access to the Waverley View Property as a "critical" component of its "site investigation activities for the Fort Detrick Area B Groundwater Remedial Investigation" (JX 3 at WVI00009453; *see also, e.g.*, PX 7; DX 16; DX 17; DX 22; TR 150–51 (Anderson)); (3) on November 16, 2011, the Army Corps informed Messrs. Dorment and Anderson of "significantly elevated" levels of contaminants found less than 20 feet from the Waverley View Property (TR 926–27 (Gortva)); (4) on February 7, 2012, the Army Corps informed WVI's predecessor-in-interest, RGHGAB, that the Waverley View Property was "critical to achieving [its] project goals and *no viable alternative locations exist*" (JX 3 at WVI00009453 (emphasis added)); (5) on September 6, 2012, the MDE informed RGHGAB that it was not willing to issue a "'comfort letter' . . . stat[ing] that there would be no known health risk if the property were to be developed under the constraints of the [2004] NFRD (essentially no groundwater use)" because of the "unknown . . . extent of groundwater contamination associated with Area B" (DX 33 at US000157); and (6) on November 8, 2012, the Army Corps again informed Mr. Anderson that the Waverley View Property was "critical for the completion of [the Army's] efforts" (PX 7 at WVI0008362).

Therefore, WVI's reliance upon the 2004 NFRD was misplaced. Pl. Post-Tr. Br. at 5 (explaining that WVI "understood the [2004] NFRD to be the 'gold standard' of assurances that environmental constraints would not impede development of the [Waverley View P]roperty" (quoting TR 143 (Anderson))). The 2004 NFRD was not a guarantee that the Waverley View

Property was free of contaminants, and RGHGAB was well aware of this when the MDE refused to issue a "comfort letter" because of the "unknown . . . extent of groundwater contamination associated with Area B." DX 33 at US000157. And, to the extent the 2004 NFRD provided any assurances, it was only as reliable as the information submitted by RGHGAB in the 2004 Site Characterization Report. But, as WVI's expert, Dr. Matthew Tonkin,[57] testified, despite CGS's conclusion that "[n]o contaminants of potential concern . . . were identified" (PX 151 at 15), "it [was] possible that there were contaminants [on the Waverley View Property] that just hadn't been located" (TR 505 (Tonkin)). Therefore, WVI's reliance on the 2004 NFRD when it purchased the property, was unreasonable, particularly in light of the Army's well-known suspicion that contamination had migrated onto the Waverley View Property. JX 15 at US002781; DX 128 at 19–20; TR 920, 930–31 (Gortva).

Likewise, the threat of future investigative or remedial action was known to the public when WVI purchased the property, and so was the threat of CERCLA liability. The EPA's CERCLA authority predated WVI's ownership of the Waverley View Property by more than three and a half years. And, at that time, it was a matter of public knowledge that the Army intended to investigate properties around Fort Detrick (TR 924 (Gortva)), especially the Waverley View Property  (JX 15 at US002781; DX 128 at 19–20; TR 920, 930–31 (Gortva)). In addition, Mr. Dorment was aware of the Army's interest in gaining access to the Waverley View Property, because it was a "critical" component of the Army's Remedial Investigation.   JX 3 at WVI00009453.

As a practical matter, the only material difference between the Waverley View Property on November 15, 2012 and today, is the physical presence of the Army-installed monitoring wells on Phase II of the property.  Although, WVI voluntarily consented to the installation of these monitoring wells, WVI insists that they stigmatize the entire property and "represent a problem . . . in the competitive marketplace." TR 708 (Dorment). In 2004, however, RGHGAB engaged CGS to "determine the on-site extent . . . of contamination as a direct result of potential off-site migration from the adjacent Fort Detrick Military Reservation[.]" PX 151 at 1. Thereafter, CGS installed seven groundwater monitoring wells on the property. PX 151 at 1. These groundwater monitoring wells were installed "to depths of about 115 feet below ground surface" (PX 155 at 5), and "were constructed of 6-inch diameter steel casing," except for GW-7 which "was constructed of 4-inch diameter . . . PVC [pipe]" (PX 151 at 2–3; see also PX 88 at A-14 (Image 7). And, as of the court's December 1, 2017 site visit to the Waverley View Property, at least some of the CGS-

---

[57] At trial, WVI proffered Mr. Tonkin as an expert "hydrogeologist with expertise in the area of CERCLA investigation, remedial investigations, feasibility studies, and remedial actions." TR 501. The Government did not object. TR 501. Mr. Tonkin has been the President of SSPA for the past four years and a Principal Hydrogeologist with SSPA for the past 20. TR 498. His education includes a Doctor of Philosophy in Civil Engineering from the University of Queensland, Australia, a Master of Science in Hydrogeology and a BS in Applied Geology from Birmingham University. PX 66. Mr. Tonkin has worked on "about 25 or 26" projects with the EPA, and the "majority of those were . . . CERCLA sites . . . involving remedial investigations and feasibility studies[.]"  TR 499.  Therefore, the court considers Mr. Tonkin an expert "hydrogeologist with expertise in the area of CERCLA investigation, remedial investigations, feasibility studies, and remedial actions." TR 1065–66; see also FRE 702.

installed monitoring wells remain on Phase II, nearly fourteen years after CGS completed its investigation. SVTR 22; *see also* PX 76. The CGS-installed monitoring wells are clearly visible, and project several feet above ground. PX 88 at A-14 (Image 7). Therefore, whatever stigma may be attached to the Waverley View Property because of the presence of monitoring wells was well established by the presence of the CGS-installed monitoring wells and predated the presence of the Army-installed monitoring wells by nearly a decade.

For these reasons, the court has determined that any stigma attached to the Waverley View Property predated WVI's ownership and was not caused by the Army's or the EPA's activities on the property.

**iv.      Plaintiff Is Entitled To $1.06 Per Square Foot Of The Waverley View Property Physically Occupied By The Army-Installed Monitoring Wells And Gravel Access Road.**

"The guiding principle of just compensation, . . . is that the owner of the . . . property 'must be made whole but is not entitled to more.'" *564.54 Acres of Land*, 441 U.S. at 516 (quoting *Olson*, 292 U.S. at 255 ("[A property owner] is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and Federal Constitutions.")). Because of "serious practical difficulties in assessing the worth an individual places on particular property at a given time," however, the United States Supreme Court has recognized the need to determine "just compensation" through "a relatively objective working rule." *Id.* at 511. Thus, just compensation for a permanent taking is "generally" determined by the fair market value of the property taken. *See Bass Enters. Prod. Co.*, 133 F.3d at 895; *see also Bauman v. Ross*, 167 U.S. 548, 574 (1897) (defining "just compensation" as "the value of [property that the owner] has been deprived of, and no more"). "Under this standard, the owner is entitled to receive what a willing buyer would pay in cash to a willing seller at the time of the taking." *564.54 Acres of Land*, 441 U.S. at 511. But, "the quantum of damages" must "be shown to a reasonable approximation," *i.e.*, "estimated with a fair degree of accuracy." *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1379 (Fed. Cir. 2013) (on remand) (internal quotations and citations omitted).

Although the parties argue at length about the appropriate amount of just compensation, they are based on the fair market value of the Waverley View Property before and after installation of the Army's monitoring wells. Just compensation, however, is measured as of the "time of the taking." *564.54 Acres of Land*, 441 U.S. at 511. And, the taking in this case, did not occur until expiration of the WVI ROE, *i.e.*, November 13, 2014. But, WVI's expert, Mr. Harvey, determined "the fair market value of the Waverley View Property before and after November 21, 2013" (PX 157 at 10); the Government's expert, Mr. McPherson, determined the same as of May 10, 2013 (DX 142 at 2). As such, each parties' valuation was based on the incorrect period of time.

In addition, Mr. Harvey, testified that the fair market value of the Waverley View Property before and after installation of the Army's monitoring wells was $13,040,000 and $3,840,000, respectively. PX 157 at 17. These valuations, however, are not supported by the record. For example, Mr. Harvey based his "before" valuation on numerous incorrect assumptions, including: (1) that the Waverley View Property was not contaminated by TCE or PCE (PX 88 at 12; *see also*

PX 76 (Figures 11A and 11B); TR 355–56 (Thomson); TR 765 (Harvey); TR 954–55 (Gortva)); and (2) that the value of the Waverley View Property was not affected by the well-known history of contamination of Area B (PX 157 at 13–16). These assumptions are inconsistent with the record, particularly with the Army's discovery of TCE and PCE on Phase II of the Waverley View Property before expiration of the WVI ROE. PX 76 (Figures 11A and 11B); TR 355–56 (Thomson); TR 954–55 (Gortva)). Mr. Harvey also mistakenly assumed that WVI "entered into the [WVI] ROE under coercion due to the Army's and [the] EPA's threat of CERCLA liability[.]" PX 88 at 29. To the contrary, as determined by the court, WVI voluntarily consented to the terms of that agreement. As to Mr. Harvey's "after" valuation, he incorrectly assumed that development of Phase II was "not legally permissible [or] physically possible for the foreseeable future[.]" PX 88 at 11; *see also* TR 774 (Harvey). This is inconsistent with the court's determination that neither the Army nor the EPA prohibited or interfered with development of the Waverley View Property.

Mr. McPherson, on the other hand, testified that the fair market value of the Waverley View Property before and after installation of the Army's monitoring wells was $11,000,000 and $10,750,000, respectively. PX 157 at 17. Mr. McPherson's "after" valuation, however, was based on the presence of "hypothetical perpetual easements [that] would enable the [Army] to access and sample [the Army-installed] monitoring wells[.]" DX 142 at 90; *see also* DX 142 at 90–94. But, the presence of such easements is inconsistent with the fact that neither the Army nor the EPA has any immediate need or plans to enter the Waverley View Property again. DX 111 at 3–5; TR 1080–83, 1085 (White); TR 1385–99 (Tesner); ECF No. 70, 95. As to Mr. McPherson's "before" valuation, although he considered preexisting stigma (DX 142 at 12–150), his valuation nevertheless represents the "unimpaired value"[58] of the Waverley View Property (DX 142 at 7 ("The values estimated in my report are based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions. The appraiser[] is not an expert in the identification of hazardous substances or detrimental environmental conditions. The property has had significant environment assessments and reports. The unimpaired value is being estimated.")). Again, however, this is inconsistent with the Army's discovery of TCE and PCE on Phase II of the Waverley View Property before expiration of the WVI ROE. PX 76 (Figures 11A and 11B); TR 355–56 (Thomson); TR 954–55 (Gortva)).

Despite the errors in each parties' valuation, the court has determined that Mr. McPherson's "before" valuation of $11,000,000 provides the best basis from which the court can extrapolate a proper valuation of the property as of November 13, 2014.[59] *See Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1324, 1326 (Fed. Cir. 2015) (holding that "nothing [is] inappropriate with . . . looking at the evidence as a whole and using [the court's] own methodology to calculate a damages award[,]" because the "court is not *necessarily* stuck with the 'stark choice' of accepting or rejecting a party's valuation . . . [as it] 'is responsible for deciding what evidence to credit or reject and what result to reach'") (quoting *Precision Pine & Timber, Inc. v. United States*, 596

---

[58] Mr. McPherson defines "unimpaired value" as "[t]he market value of a contaminated property developed under the hypothetical condition that the property is not contaminated." DX 142 at 18.

[59] Unlike Mr. Harvey's "before" valuation, Mr. McPherson's "before" valuation accounts for preexisting stigma attached to the Waverley View Property.

F.3d 817, 832 (Fed. Cir. 2010)); *see also Kimball Laundry Co. v. United States*, 338 U.S. 1, 20 (1949) (holding that, in determining compensation due, a court exercises its reasonable judgment, "with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken"); *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("We are unwilling to restrict the trial courts to any single basis for determining fair market value. Those courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular case. It may be a single method or some combination of different methods.").

In this case, the court must first account for the fact that Mr. McPherson's valuation was determined as of May 10, 2013, approximately a year and a half before the taking occurred on November 13, 2014. DX 142 at 2. As Mr. McPherson testified, properties in Frederick, Maryland appreciated in value by 3 percent between May 10, 2013 and November 13, 2014. TR 1209–10 (McPherson); *see also* DX 142 at 20, 88. Appreciating Mr. McPherson's "before" valuation by 3 percent during this period, yields an unimpaired value of approximately $11,500,000 for the Waverley View Property as of November 13, 2014.

Next, the court must account for the presence of TCE and PCE on the Waverley View Property. Mr. Harvey testified that the presence of TCE and PCE negatively impacts a property's fair market value by an average of 72%. PX 88 at 75. Applying this reduction to the court's valuation would yield a value of $3,220,000 as an estimate of the Waverley View Property's impaired value as of November 13, 2014.

The court must next apportion value between Phase I and Phase II of the property. Based on Mr. McPherson's "before" valuation of $11,000,000, he determined that the "contributory values" of Phase I and Phase II were $7,400,000 and $3,600,000, respectively. DX 142 at 87–89. Apportioning the court's valuation of $3,220,000 using this same ratio, yields an impaired value of approximately $1,050,000 for Phase II of the Waverley View Property, as of November 13, 2014.

Phase II consists of approximately 23 acres (DX 142 at 40, 42, 92 (describing "Expansion Parcel A (Phase II)" as 22.81639 acres, or 993,882 square feet, in size); *see also* PX 88 at 25). Therefore, the court has determined that Phase II of the Waverley View Property was worth $1.06 per square foot on November 13, 2014 ($1,050,000/993,882 square feet, yields $1.0564 per square foot). Accordingly, WVI is entitled to $1.06 per square foot for the property physically occupied by the Army-installed monitoring wells and gravel access road, including a reasonable square footage to accommodate development around the monitoring wells. Neither party, however, provided the court with an estimate of the square footage of property physically occupied by the Army-installed monitoring wells and gravel access road. Therefore, the court is unable to determine damages at this time.

## IV.      CONCLUSION.

For these reasons, the court has determined that the Army's activities after expiration of the WVI ROE effected a permanent physical taking of those portions of the Waverley View Property occupied by the Army-installed monitoring wells and gravel access road. Accordingly, WVI is entitled to $1.06 per square foot of property physically occupied by the Army-installed

monitoring wells and gravel access road.  Neither party, however, has provided the court with an estimate of the square footage of property physically occupied by the Army-installed monitoring wells and gravel access road, including a reasonable square footage to accommodate development around the monitoring wells.  Accordingly, the parties are directed to provide the court with this information on or before February 23, 2018.

All other pending motions are denied as moot.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**

# Court Exhibit A

## TABLE OF ABBREVIATIONS

### WAVERLEY VIEW INVESTORS, LLC v. UNITED STATES, No. 15-371 L

| | |
|---|---|
| Army | United States Army |
| Army Corps | United States Army Corps of Engineers, Baltimore District |
| BB&T | BB&T Bank |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 |
| CGS | Chesapeake GeoSciences, Inc. |
| CL Group | CL Group LLC |
| Detrick Overlook | Detrick Overlook, LLC |
| DOJ | United States Department of Justice |
| DTA | Declaration of Takings Act |
| ENSAT | Environmental Service & Technology Corporation |
| EPA | United States Environmental Protection Agency |
| ESA | Environmental Site Assessment |
| FFA | Federal Facilities Agreement |
| Fort Detrick | United States Army Garrison, Fort Detrick, Maryland |
| Fort Detrick RAB | Fort Detrick Restoration Advisory Board |
| GAB | GAB Enterprises, Inc. |
| GTA | Geo-Technology Associates, Inc. |
| MCL | Maximum Contamination Level |
| MDE | Maryland Department of the Environment |
| NFRD | No Further Requirements Determination |
| NPL | National Priorities List |
| Nusbaum | Nusbaum Realty Co. |
| PCE | Perchloroethylene |

| | |
|---|---|
| Planning Commission | City of Frederick Planning Commission |
| PND | Planned Neighborhood Development |
| RGH | Rocky Gorge Homes, LLC |
| RGHGAB | RGHGAB at Frederick, LLC |
| ROE | Right of Entry |
| SSPA | S.S. Papadopulos & Associates, Inc. |
| TCE | Trichloroethylene |
| TCFM | Trichlorofluoromethane |
| UASFLA | Uniform Appraisal Standards for Federal Land Acquisitions |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VCP | Voluntary Cleanup Program |
| VOC | Volatile Organic Compound |
| WLGA | W. L. Gore & Associates, Inc. |
| WVI | Waverley View Investors, LLC |

# In the United States Court of Federal Claims

No. 15-371 L

Filed:  January 5, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | |
| WAVERLEY VIEW INVESTORS, LLC, | * | |
| | * | |
| Plaintiff, | * | Federal Rules of Evidence; |
| | * | Rule 26 of the Rules of the United States |
| v. | * | Court of Federal Claims (General |
| | * | provisions regarding discovery). |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION AND ORDER ON EVIDENTIARY ISSUES

From January 17–18 and 24–26, 2017, the court convened a trial in the above-captioned case.  The exhibits identified herein, together with ECF and the testimony adduced at the trial (TR 1–1469), comprise the record regarding the court's Post-Trial Memorandum Opinion and Order Regarding A Partial Physical Takings Clause Claim.

## I.  DOCUMENTS PROFFERED BY PLAINTIFFS THAT THE COURT RULES ARE ADMITTED INTO EVIDENCE.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PX 2 | PX 6 | PX 10 | PX 13 | PX 14 | PX 18 | PX 23 | PX 24 |
| PX 25 | PX 26 | PX 29 | PX 30 | PX 33 | PX 34 | PX 35 | PX 36 |
| PX 38 | PX 39 | PX 40 | PX 41 | PX 42 | PX 43 | PX 44 | PX 51 |
| PX 52 | PX 53 | PX 54 | PX 55 | PX 56 | PX 57 | PX 58 | PX 59 |
| PX 62 | PX 63 | PX 65 | PX 66 | PX 68 | PX 69 | PX 70 | PX 71 |
| PX 72 | PX 73 | PX 74 | PX 75 | PX 76 | PX 77 | PX 78 | PX 79 |
| PX 80 | PX 81 | PX 82 | PX 83 | PX 84 | PX 85 | PX 86 | PX 87 |
| PX 88 | PX 89 | PX 90 | PX 91 | PX 92 | PX 93 | PX 94 | PX 95 |
| PX 96 | PX 97 | PX 98 | PX 99 | PX 100 | PX 101 | PX 102 | PX 103 |
| PX 104 | PX 105 | PX 106 | PX 107 | PX 108 | PX 109 | PX 110 | PX 111 |
| PX 112 | PX 113 | PX 114 | PX 115 | PX 116 | PX 117 | PX 118 | PX 119 |
| PX 120 | PX 121 | PX 122 | PX 123 | PX 126 | PX 127 | PX 128 | PX 129 |
| PX 131 | PX 132 | PX 133 | PX 134 | PX 135 | PX 136 | PX 139 | PX 140 |
| PX 141 | PX 142 | PX 143 | PX 144 | PX 145 | PX 146 | PX 147 | PX 148 |
| PX 149 | PX 150 | PX 151 | PX 152 | PX 153 | PX 154 | PX 155 | PX 156 |
| PX 157 | PX 158 | PX 159 | PX 160 | PX 161 | PX 162 | PX 163 | |

## II. DOCUMENTS PROFFERED BY THE GOVERNMENT THAT THE COURT RULES ARE ADMITTED INTO EVIDENCE.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DX 1 | DX 3 | DX 5 | DX 6 | DX 7 | DX 8 | DX 9 | DX 10 |
| DX 11 | DX 12 | DX 13 | DX 14 | DX 15 | DX 16 | DX 17 | DX 18 |
| DX 19 | DX 20 | DX 21 | DX 22 | DX 23 | DX 25 | DX 26 | DX 27 |
| DX 28 | DX 29 | DX 30 | DX 31 | DX 32 | DX 33 | DX 34 | DX 35 |
| DX 36 | DX 37 | DX 38 | DX 39 | DX 41 | DX 43 | DX 44 | DX 45 |
| DX 46 | DX 47 | DX 48 | DX 49 | DX 50 | DX 51 | DX 52 | DX 53 |
| DX 54 | DX 55 | DX 56 | DX 58 | DX 59 | DX 60 | DX 62 | DX 64 |
| DX 65 | DX 66 | DX 68 | DX 69 | DX 70 | DX 71 | DX 72 | DX 73 |
| DX 74 | DX 75 | DX 76 | DX 77 | DX 78 | DX 79 | DX 80 | DX 81 |
| DX 82 | DX 85 | DX 86 | DX 87 | DX 89 | DX 91 | DX 93 | DX 94 |
| DX 95 | DX 96 | DX 97 | DX 98 | DX 102 | DX 103 | DX 104 | DX 105 |
| DX 106 | DX 107 | DX 109 | DX 111 | DX 112 | DX 113 | DX 114 | DX 115 |
| DX 116 | DX 119 | DX 120 | DX 121 | DX 122 | DX 123 | DX 124 | DX 125 |
| DX 126 | DX 127 | DX 128 | DX 129 | DX 130 | DX 131 | DX 132 | DX 133 |
| DX 134 | DX 135 | DX 136 | DX 137 | DX 137a | DX 138 | DX 139 | DX 140 |
| DX 141 | DX 142 | | | | | | |

## III. DOCUMENTS PROFFERED JOINTLY BY THE PARTIES THAT THE COURT RULES ARE ADMITTED INTO EVIDENCE.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JX 1 | JX 2 | JX 3 | JX 4 | JX 5 | JX 6 | JX 7 | JX 8 |
| JX 9 | JX 10 | JX 11 | JX 12 | JX 13 | JX 14 | JX 15 | JX 16 |
| JX 17 | JX 18 | JX 19 | JX 20 | JX 21 | JX 22 | JX 23 | JX 24 |
| JX 25 | JX 26 | JX 27 | JX 28 | JX 29 | JX 30 | JX 31 | |

## IV. COURT EXIHIBITS.

CX 100    CX-A

## V. CONCLUSION.

To the extent the court cited exhibits to which the parties objected, those objections are overruled. To the extent the court has not cited documents to which the parties object, those objections are moot.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**

2